UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**SUZANNE SULLIVAN, Regional Director of Region 22 of the National Labor Relations Board For and on behalf of the National Labor Relations Board**

    Petitioner,

v.

**IBN CONSTRUCTION INC.,**

    Respondent.

Civ. No. 22-5668 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

    Presently before the Court is the petition of Suzanne Sullivan, the Regional Director of Region 22 of the National Labor Relations Board ("Petitioner" or "Board"), brought pursuant to Section 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) (the "Act"), for injunctive relief pending the final disposition of the matters pending before the Board on charges against IBN Construction Inc. ("Respondent" or "IBN"). The Board contends that IBN has engaged in, and is currently engaging in, conduct in violation of Section 8(a)(1) and (3) of the Act regarding interference with union activities.

    For the reasons expressed below, the Board's petition for injunctive relief is **GRANTED**.[1]

---

[1] Also pending are (a) the Board's motion to try the petition for temporary injunction on the basis of the partial record developed before the Board's administrative law judge and affidavits completed as part of the Board's administrative investigation (DE 3); and (b) the Board's motion for a protective order requiring the parties to redact identifying information from affidavits and documentary evidence submitted to the Court (DE 4). Both are granted.

I.  **FACTUAL BACKGROUND**[2]

Respondent IBN is a New Jersey-based construction company specializing in demolition. The unfair labor practice proceeding underlying this petition is related to a representation election that was scheduled to take place in June 2021 but was cancelled after the New Jersey Building Laborers District Council (the "Union") withdrew its representation petition. (Pet. Br. Ex. 9.) The Board contends that the Union sought to cancel the election because it became

---

With respect to the first motion, I find that trying the petition on the basis of the administrative and investigative record is appropriate here given the Court's limited fact-finding function on a Section 10(j) petition: to determine whether there is reasonable cause to believe the Respondent violated the National Labor Relations Act, not to resolve contested factual issues or the credibility of witnesses. *Balicer v. I.L.A.*, 364 F. Supp. 205, 225-226 (D.N.J. 1973), *affd. per curiam* 491 F.2d 748 (3d Cir. 1973). Indeed, District Courts considering a Section 10(j) petition commonly base their reasonable cause determinations on evidence presented in the form of affidavits or administrative hearing transcripts. *See, e.g., Eisenberg v. Honeycomb Plastics Corp.*, 1987 WL 10908, at *1 (D.N.J. 1987); *Eisenberg v. Tubari, Ltd., Inc.*, 1985 WL 32832, at *1, 3 (D.N.J. July 8, 1985). I also note that IBN has not opposed this motion and it has itself relied on the administrative and investigative record to make its case in response to the Board's petition. The Board's motion to try the petition on the basis of sworn affidavits and the partial administrative record (DE 3) is therefore GRANTED.

As to the second motion, I find that a protective order requiring the parties to redact names and identifying information of current IBN employees from all affidavits and documentary evidence submitted to the Court is appropriate and necessary to protect the employees' confidential cooperation with the Board's investigation and administrative process, as well as to protect the witnesses from possible retaliation by their employer. Moreover, such identifying information will be of no particular value to the Court in deciding the petition, and IBN has not opposed the motion in any event. The Board's motion for a protective order requiring the parties to redact identifying information in affidavits and documentary evidence (DE 4) is therefore GRANTED.

[2] Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Pet. Br" = Petitioner's Memorandum of Points and Authorities in Support of Petition for Temporary Injunctive Relief under Section 10(j) of the National Labor Relations Act, as Amended (DE 1-2)

"Resp. Br." = Respondent's Memorandum of Law in Opposition to Petition for Protective Restraining Order under Section 10(j) of the National Labor Relations Act

evident that the Union had lost majority support after IBN "engaged in a relentless campaign of fear and intimidation intended to stifle the voice of any employee who wanted the Union to represent their workplace interests." (Pet. Br. at 8.)

I summarize the pertinent facts, not as ultimate factual findings, but rather as components of the Board's showing of reasonable cause.

The Union began an organizing campaign to represent IBN laborers around November 2020. During its campaign, the Union received signed authorization cards from IBN employees, primarily from IBN's Newark jobsite. The record suggests that by the end of March 2021, the Union had collected approximately 33 cards; at any rate there appears to be no significant dispute that at some relevant point it obtained cards from a majority of the 49 covered workers. (Pet. Br. Ex. 5(a) 58-59; 67-105; Ex. 5(b) 117-146). On March 29, 2021, the Union filed a petition for representation with the Board's Region 22 office, supported by the 33 signed authorization cards. By its petition, the Union sought to represent the following bargaining unit:

> All full-time and regular part-time laborers employed by the Employer from its 49 Herman Street, Newark, New Jersey facility, excluding all office clerical employees, managers, guards, and supervisors as defined in the Act and all other employees.

(Pet. Br. Ex. 1.)

On April 19, 2021, Region 22 of the Board approved a stipulated election agreement signed by IBN and the Union, which called for a mail ballot election, in which ballots would be mailed to employees on May 3, 2021, with a return date of May 24, 2021. The agreement scheduled the count of the mail ballots to take place between June 1 and June 8, 2021. (*Id.* at 7.)

On April 21, 2021, IBN submitted a voter eligibility list to Region 22 that identified 49 individuals who IBN asserted were bargaining unit employees eligible to vote. (Pet. Br. Ex. 8.) The record suggests that by May 1, 2021, the Union had obtained 27 authorization cards from the 49 eligible individuals,

3

signaling that the Union had obtained the support of a majority of IBN's bargaining unit employees. (Pet. Br. Ex. 5(a) 45-50; Ex. 6(a) 81-107.)

Relying on more than a dozen confidential witness statements, the Board alleges that IBN undermined the Union's organizing efforts and sabotaged its would-be representative election through a series of unfair and illegal labor practices:[3]

*First*, several IBN employees reported IBN management surveilling their interaction with the Union. For example, one employee stated that in February, Martin Espinoza, IBN's owner, informed him that he had been watching the employee talk to a Union representative and told him not to do so. (Witness F Aff. ¶ 3.) Another recalled that in March, Jorge Rodriguez, supervisor of IBN's Newark jobsite, told a group of more than 10 employees that he was aware of who signed authorization cards with the Union and who did not. (Witness J Aff. ¶ 2.)

*Second*, multiple employees attested that Rodriguez told employees on various occasions that IBN would reduce their hours if the employees supported the Union. (Witness D Supp. Aff. ¶ 2; Witness J Aff. ¶ 2.)

*Third*, four employees recalled Rodriguez telling a group of employees that they could not be part of the Union if they are undocumented. (Witness A Aff. ¶ 4; Witness B Aff. ¶ 5; Witness C Aff. ¶ 5; Witness J Aff. ¶¶ 2, 7.)

*Fourth*, employees claim that in April, Espinoza threatened to take legal action against the employee who initiated the Union drive and, on numerous occasions, questioned employees about their Union support. (Witness A Aff. ¶ 6; Witness D Supp. Aff. ¶ 3; Witness H Aff. ¶¶ 3, 5; Witness I Aff. ¶ 4; Witness J Aff. ¶¶ 2, 6.)

---

[3] I present here a non-exhaustive, representative sample of the unfair labor practices the Board alleges in its brief. (*See* Pet. Br. 9-12.) The affidavits I refer to are appended to the Board's petition and listed on the rider sheet at DE 1-4.

*Fifth*, Espinoza allegedly labeled a longtime employee a "traitor" in the presence of other employees, because that longtime employee supported the Union. The employee was terminated shortly thereafter. (Witness J Aff. ¶ 10.)

*Sixth*, employee accounts suggest that soon after mailing ballots to employees on May 3, 2021, IBN directly interfered with the Board's mail-ballot voting procedures. In particular, employees claim that 1) Espinoza instructed an employee to enter Espinoza's car, vote in his presence, and give Espinoza the completed ballot to return to Region 22 (Witness E Aff. ¶¶ 4-6); and 2) Espinoza and another IBN manager instructed employees to text them photographs of the employees' mail ballots marked with their votes (Witness D Aff. ¶ 9; Witness I Aff. ¶ 6).

*Seventh,* and finally, employees state that IBN ultimately acted on its threats to reduce pay and discharge employees for supporting the Union when, in late April and early May, IBN 1) reduced the hours of employees who regularly worked six days a week to eliminate overtime (Witness B Aff. ¶ 4; Witness F Aff. ¶ 5; Witness H Aff. ¶ 7; Witness J Aff. ¶ 6); 2) reassigned Union supporters from operating machinery to more burdensome labor-intensive jobs (Witness F Aff. ¶ 4; Witness H Aff. ¶ 6); and 3) terminated two employees who IBN managers knew or believed supported the Union (Witness J Aff. ¶¶ 1-2, 9-10; Witness K Aff. ¶ 2).

The Union determined that in light of these alleged actions by IBN, it could not hold a free and fair election, and on May 20, 2021, the Union requested to withdraw its petition for a representative election.[4] (Pet. Br. at 8,

---

[4] The Board asserts that support for the Union continued to diminish thereafter, referring to witness accounts of events as late as October 2021 that suggest employees who had supported the Union stopped communicating with Union representatives, stopped attending Union meetings, and stopped attending Union social events. One witness claims to have been told by an employee that he was afraid that if his employer saw him at a Union event, he would lose his job. (Pet. Br. 13-14; Ex. 5(b) 174-182.)

Ex. 9.) On the same day that it withdrew its petition, the Union filed an unfair labor practice charge with Region 22 of the Board.[5] (Pet Br. Ex. 2(a).)

On June 16, 2022, the Board issued a complaint against IBN in Case 22-CA-27745, alleging that IBN has been "interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act." (Pet. Br. Ex. 3.) An administrative hearing commenced before Administrative Law Judge Kenneth W. Chu on August 1, 2022, and the case remains in progress. (Pet. Br. at 1; Resp. Br. at 1.)

On September 22, 2022, the Board petitioned this Court, pursuant to Section 10(j) of the Act, for temporary injunctive relief, including 1) an order requiring IBN to cease and desist from engaging in unfair labor practices, and 2) an interim bargaining order requiring IBN to recognize and bargain with the Union. (DE 1; Pet. Br. at 5.) On October 12, 2022, IBN filed a brief in opposition to the Board's petition for temporary injunctive relief. (DE 20.) On October 18, 2022, the Court held a show-cause hearing on the Board's petition. (DE 24.) Neither side proffered testimony, but instead relied on the written record.

## II.    LEGAL STANDARD

Section 10(j) of the Act empowers the National Labor Relations Board or its designated agent to seek interim injunctive relief from a federal district court pending the Board's own administrative adjudication of unfair labor practice proceedings. *See* 29 U.S.C. § 160(j). A district court's determination whether to issue temporary injunctive relief under § 10(j) involves a two-step inquiry. First, the district court must decide whether there is reasonable cause to believe that an unfair labor practice has occurred. *See Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir.1998); *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 877 (3d Cir.1990). This prong of the test is satisfied when,

---

[5] The Union filed amended charge forms on January 6, 2022 and March 3, 2022. (Pet. Br. Exs. 2(b), 2(c).)

viewing the facts most favorably to the Board, there is sufficient evidence to support the legal theory of violation presented by the Regional Director, and when that theory is substantial and not frivolous. *See Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986). Second, having found "reasonable cause," the district court must find that the issuance of an injunction is "just and proper," i.e., that it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board. *See id.*; *Dorsey Trailers*, 147 F.3d at 247; *Vibra Screw*, 904 F.2d at 877. "Under this inquiry, the court determines whether an injunction is necessary to preserve the Board's remedial powers, which incorporates a weighing of relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief, along with the public interests implicated by the labor disputes." *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 98–99 (3d Cir. 2011).

### III.  DISCUSSION

#### A. The Board Has Established Reasonable Cause to Believe IBN Has Violated the Act.

The Board has satisfied its burden of establishing that there is reasonable cause to believe that IBN engaged in unfair labor practices, specifically that 1) IBN violated Section 8(a)(1) of the Act by discouraging employees from supporting the Union through threats and intimidation, as well as by directly interfering with employees' voting in the representative election; and 2) IBN violated Section 8(a)(1) and (3) by reducing employee work hours, adversely altering job assignments, and terminating two known Union supporters.

The reasonable cause standard requires the district court to examine whether "(1) the Regional Director's case depends on a substantial, non-frivolous legal theory"; and (2) whether "there is sufficient evidence, taking the facts favorably to the board, to support that theory." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076 (3d Cir. 1984). This is a "low threshold of proof" and the

7

amount of evidence required by the reasonable cause determination "is less than that required to prove a violation." *Id.* (citing *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 905–06 (3d Cir.1981)).

The Board has surmounted that low threshold of proof with ease. The Board has submitted numerous witness statements, along with sworn testimony from the underlying administrative proceeding, containing descriptions of IBN's actions that provide reasonable cause to believe that IBN violated the Act. As discussed *supra,* these witness statements include accounts of, among other things, IBN creating an impression of surveillance of employees communicating with Union, threatening job loss and reductions in pay in connection with employees' support of the Union, threatening to file lawsuits against Union supporters, promising raises if the Union lost the representative election, directly interfering with employees' voting, and reducing work hours and terminating Union supporters. The Board has also put forward evidence of the chilling effect these alleged actions appear to have had on the Union's ability to build support and to hold a free and fair election, crystallizing a "substantial, non-frivolous legal theory." Therefore, given the low standard of proof, the Board has established reasonable cause to believe that Respondent's actions constituted an unfair labor practice.

IBN presents three arguments that the Board cannot establish reasonable cause to believe IBN committed any violation of the Act. None of them succeed.

*First,* IBN asserts that certain of the Board's allegations have been contradicted by the evidence in the underlying administrative proceeding. (Resp. Br. at 8-9.) For instance, while the Board alleges Espinoza "promised an employee a wage increase if the Union lost the election," the employee added during his hearing testimony that he was the one who approached Mr. Espinoza and asked for a raise. (Resp. Br. at 8.) IBN also notes that witness testimony in the administrative proceeding revealed that the allegedly adverse work assignments, involving "smashing concrete by hand" were, in reality, comparable tasks for which employees used familiar tools. (Resp. Br. at 8.)

8

That certain of the Board's allegations may have been contradicted—I take no position as to whether they have—does not detract from the weight of the remaining evidence. Concede *arguendo* that IBN is correct in stating that certain witness statements have been weakened or refuted by later testimony. I would still have before me a significant amount of testimony that IBN engaged in a number of unfair labor practices. That remaining evidence is still more than sufficient to meet the low threshold of proof under the governing Section 19(j) standard.

*Second*, IBN argues that it did no more than undertake an informational campaign in an effort to convince employees that they would be better off without the Union. Such an informational campaign, it argues, was permissible under the Act because the statements by management did not include any threats or promises of benefit. (Resp. Br. at 9.) It is true that such campaigns are permissible if they are strictly informational and if management refrains from making any threats or promises. However, as discussed *supra*, most of the IBN employees who submitted confidential affidavits recalled actions taken by IBN that were threatening or intimidating in nature, even if they stopped short of explicit threats. While IBN portrays its campaign as innocuous, the employees' accounts of conversations regarding pay reduction, possible legal action, and certain employees' immigration status, combined with IBN's alleged interference with ballot submission, provide at least a reasonable-cause basis for the Board's contrary interpretation.

*Third*, IBN argues that it did not *improperly* reduce hours, alter job assignments, or terminate employees, because support for the Union was not the motivation for any of these routine employment actions. (Resp. Br. at 13-16.) IBN points, for example, to the terminations of the two employees the Board alleges were Union supporters. These employees, says IBN, were terminated because they failed to report to work for five consecutive workdays. (Resp. Br. at 15.) Such a factual dispute, while it may be pursued in the administrative proceeding, is not one that this Court may resolve under the reasonable-cause standard governing a 10(j) petition. The evidence, whether or

not it is irrefutable, does set forth at least a reasonable-cause basis for these adverse employment actions being connected to the employees' support of the Union.

IBN's arguments are not insubstantial. This Court's task, however, is not to try the administrative case, but only to determine whether the Board has met its relatively low burden of proof. I find that it has. Weighing all of the evidence together, I find reasonable cause to believe that IBN has violated the Act.

### B. The Board Has Established that the Injunction Sought is Just and Proper.

The Board has also met its burden of demonstrating that injunctive relief is "just and proper." Injunctive relief is just and proper under Section 10(j) when "the alleged unfair labor practices," by their nature, "are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo." *Vibra Screw*, 904 F.2d at 878. To put it another way, the Board must demonstrate that, assuming it prevails on the merits, remedial efforts by the Board would by then be impaired or ineffective. *See id.* at 878–79 (10(j) injunctive relief is appropriate where "the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take"). In *Vibra Screw*, the Court stated that "[b]ecause the 'just and proper' inquiry must recognize the public interest implicit in protecting the collective bargaining process, the critical determination is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired." 904 F.2d at 879. In granting injunctive relief, however, the Court must maintain a sense of proportion, remaining mindful that "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Suburban Lines*, 731 F.2d at 1091.

IBN argues with some force that the Board's delay in filing this petition weighs against any finding that emergent, injunctive relief is necessary.[6] (Resp. Br. at 18-21.) IBN also argues that injunctive relief is not needed to protect the efficacy of any final order entered in the underlying administrative proceeding, primarily because the Board has not alleged that IBN is currently committing any ongoing violation. (Resp. Br. at 21.)

It is true that delay can, under certain circumstances, indicate that emergent relief is unnecessary, but the time factor does not outweigh the need for relief here. "When reviewing the amount of time the Board takes to file a section 10(j) 'there is a certain amount of leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme.'" *Hirsch v. Konig*, 895 F. Supp. 688, 697 (D.N.J. 1995) (quoting *Vibra Screw*, 904 F.2d at 881). As the Court explained in *Hirsch*, the Board must engage in careful investigation and deliberation before it petitions the court for 10(j) relief." *Id.* But even setting aside deference to the Board's investigative processes, I would find injunctive relief to be just and proper here. Based on the record already compiled, the Board is on solid ground in arguing that the Union's ability to represent its employees will likely continue to diminish while the Board is in the process of making its determination. An interim bargaining order is necessary to protect and restore the *status quo ante,* and to guard the collective bargaining process. *See Vibra Screw*, 904 F.2d at 879. An injunction would be an important step toward restoration of the parties to their respective positions prior to IBN's allegedly unlawful behavior. Moreover, an interim bargaining order will not impose undue burdens on IBN. IBN will be required only to bargain in good faith to reach a contract. The parties agreed at oral argument that any contract can be made nonfinal, *i.e.,* subject to rescission should the Board ultimately determine that IBN acted

---

[6] IBN notes that based on the timing of the Board's investigation into conduct that allegedly occurred between March and June of 2021, the Board knew nearly all the pertinent facts in the case as of September 2021, an entire year before it filed its petition with this Court. (Resp. Br. at 18-19.)

11

lawfully.[7] On balance, the burden to IBN in having to bargain in good faith with the Union does not exceed the potential harm to the remedial powers of the Board pending an ultimate decision that IBN violated the Act, should that occur.

Having weighed the "relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief" (*Chester*, 666 F.3d 87, 98-99), I find that the Board has satisfied its burden of establishing that injunctive relief is just and proper.

## IV. CONCLUSION

For the reasons set forth above, the Board's petition for injunctive relief is **GRANTED**. An appropriate order follows.

Dated: October 26, 2022

/s/ Kevin McNulty

**Hon. Kevin McNulty**
**United States District Judge**

---

[7] The proposed interim bargaining order "would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Rather, it would only require bargaining with the Union in good faith to an agreement or a bona-fide impasse." (Pet. Br. at 37.) Moreover, "[a]ny agreement reached between the parties under a Section 10(j) decree can contain a condition subsequent to take into account the possibility that the Board may ultimately refuse to grant a final bargaining order remedy." (*Id.*)