Joanna Pagones Ross
Counsel for the Petitioner
National Labor Relations Board, Region 22
20 Washington Place, 5th Floor
Newark, New Jersey  07102
Telephone:  (862) 229-7037

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUZANNE SULLIVAN, | : |
| Regional Director of Region 22 | : |
| of the National Labor Relations Board | : |
| For and on behalf of the | : |
| National Labor Relations Board, | : |
| | : |
| Petitioner, | : |
| | : |
| v. | :    Civil No. 2:22-cv-05668 |
| | : |
| IBN CONSTRUCTION CORP., | : |
| | : |
| | : |
| | : |
| Respondent | : |
| | : |

**PETITIONER'S MOTION TO EXTEND ORDER**
**GRANTING TEMPORARY INJUNCTION AFTER ISSUANCE**
**OF THE ADMINISRATIVE LAW JUDGE'S DECISION**

To the Honorable Kevin McNulty, United States District Judge:

Counsel for Petitioner, Suzanne Sullivan, the Regional Director of Region 22 of the National Labor Relations Board ("Board"), hereby respectfully moves this honorable Court for and on behalf of the Board and submits as follows:

1. On October 26, 2022, this Court issued an Order Granting Temporary Injunction ("Order") pending the final disposition of the proceeding before the Board in Case 22-CA-277455. ("Exhibit A").

2. On April 3, 2023, this Court extended the Order to May 26, 2023, pending Administrative Law Judge Kenneth W. Chu ("ALJ Chu")'s decision. ("Exhibit B").

3. On April 3, 2023, ALJ Chu issued his decision in the NLRB case, sustaining all complaint allegations litigated, with the exception of one allegation pertaining to the retaliatory reassignment of employee work. ("Exhibit C").

4. The Order provides that an additional extension may be granted for an additional six months after the issuance of the decision of the ALJ in the NLRB case.

5. Despite ALJ Chu's favorable decision, the injunction Your Honor ordered needs to remain in place; an ALJ's decision has no final force or effect until acted on by the Board. See, e.g., *Schaub v. West Michigan Plumbing & Heating, Inc*., 250 F.3d 962, 968 (6th Cir. 2001); *Sharp v. Webco Industries, Inc*., 225 F.3d 1130, 1136 (10th Cir. 2000). In accordance with the Board's

Rules and Regulations, Respondent has until May 1, 2023 to appeal ALJ Chu's decision to the Board, in which case Petitioner has the right to file an answering brief and Respondent could then file a reply brief. Thus, ALJ Chu's decision does not place Respondent under any judicial restraint, nor does it compel, on its own, Respondent to provide immediate relief to the discharged employees. Absent the injunctive relief Your Honor has ordered, a final Board order in due course could be rendered meaningless, and the harm done to employees' statutory rights irreparable. This is precisely the result Section 10(j) was enacted to prevent.

6. It is therefore respectfully requested that consistent with *Eisenberg v. Hartz Mountain Corporation*, 519 F.2d 138, 144 (3d Cir. 1975), *reaffirmed in Eisenberg v. Holland Rantos Co., Inc.,* 583 F.2d 100, 103-04 (3d Cir. 1978), the Order be extended for a period of an additional six (6) months, to November 26, 2023, pending the NLRB's final decision.

Respectfully submitted on April 18, 2023.

/s/ Joanna Pagones Ross
Joanna Pagones Ross
Counsel for Petitioner

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

SUZANNE SULLIVAN,                                :
Regional Director of Region 22                    :
of the National Labor Relations Board             :
For and on behalf of the                          :
National Labor Relations Board,                   :
                                                  :
            Petitioner,                           :
                                                  :
            v.                                    :        Civil No. 22-05668
                                                  :
IBN CONSTRUCTION CORP.,                           :
                                                  :
                                                  :
                                                  :
            Respondent                            :
_____          :

## <u>**ORDER GRANTING TEMPORARY INJUNCTION**</u>

This case was heard by the District Court Judge on the verified Petition of

Suzanne Sullivan, Regional Director of Region 22 of the National Labor Relations

Board (the Board), for and on behalf of the Board, for a temporary injunction

pursuant to Section 10(j) of the National Labor Relations Act (the Act), as amended,

29 U.S.C. §160(j), pending final disposition of the matters now before the Board in

Case 22-CA-277455, and upon the issuance of an order to show cause why

injunctive relief should not be granted as prayed in said Petition.

The Court, upon consideration of the pleadings, evidence, memoranda,

argument of counsel and the entire record in the case, has found and concluded that

there is reasonable cause to believe that Respondent IBN Construction Corp., has engaged in and is engaging in acts and conduct in violation of Sections 8(a)(1) and (3) of the Act, and that the requested temporary injunctive relief pursuant to Section 10(j) of the Act is just and proper in this case.

Now, therefore, upon the entire record, the petition (DE 1) is GRANTED and the motion for consideration of the administrative record (DE 3) is GRANTED, and it is ORDERED that pending the final disposition of the proceeding before the National Labor Relations Board, Respondent, its officers, agents, servants, employees and attorneys and all persons acting in concert or participation with it shall be and are hereby:

1. ENJOINED AND RESTRAINED, in any manner or by any means from:

a. Threatening employees with discharge, decreased pay, unspecified reprisals because of their assumed immigration status and with lawsuits, to discourage employees from supporting the Union;

b. Creating the impression of surveillance to discourage employees from supporting the Union;

c. Engaging in surveillance of its employees' protected union activities by interfering with the National Labor Relations Board's representation election;

d. Informing employees of the futility of selecting the Union as their bargaining

representative;

e.     Interrogating its employees about their Union sympathies;

f.     Implicitly promising raises to discourage employees from supporting the Union;

g.     Decreasing work hours because of employee support for the Union;

h.     Altering job assignments because of employee support for the Union;

i.     Discharging or otherwise discriminating against employees because they engage in union activity; and

j.     In any other manner, unlawfully interfering with, restraining, or coercing its employees asserting their rights under Section 7 of the Act.

2.     Take the following affirmative action necessary to effectuate the policies of the Act and to restore the *status quo ante*:

a.     Within five (5) days of the date of issuance of this Order, recognize the Union as the exclusive collective bargaining agent of its bargaining unit employees;

b.     Upon request by the Union, engage in good faith bargaining with the Union over the terms and conditions of employment of its bargaining unit employees;

c.     Should the parties reach agreement on the terms of a collective bargaining agreement for the bargaining unit employees, reduce that agreement to writing and execute the agreement;

d.     Within five (5) days of the issuance of this Order, restore all terms and

conditions of employment of its employees which existed prior to April 1, 2021.

e.  Within fourteen (14) days of the Court's issuance of the Injunction Order, hold one or more mandatory bargaining unit employee meetings, on working time and at times when the Respondent customarily holds bargaining unit employee meetings, and scheduled to ensure the widest possible employee attendance, albeit with proper social distancing measures due to the COVID-19 pandemic, at which the Injunction Order will be read to the bargaining unit employees by a responsible Respondent official in the presence of a Board agent or, at the Respondent's option, by a Board agent in the presence of a responsible Respondent official; (ii) announce the meeting(s) for the order reading in the same manner it would customarily announce a meeting of employees; and (iii) require that all employees of the unit attend the meeting(s).

f.  Provide the Union with notice of, and equal time and access to Respondent's worksites in New Jersey, to respond to any Respondent meetings with employees about union representation;

g.  Within five (5) days of issuance of this Order, post copies of this Injunction Order at the Respondent's worksites in New Jersey, as well as translations of such an Order in other languages as necessary to ensure effective communication to the Respondent's employees as determined by the Board's Regional Director for Region 22, said translations to be provided by the Respondent at the Respondent's expense

and approved by the Regional Director, in all places where notices to its employees are normally posted; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements, and mail copies of the same to all unit employees; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its worksites to monitor compliance with this posting requirement;

h.    Within twenty (20) days of the issuance of this Court's decision and Injunction Order, file with the Court, with a copy to the Regional Director of Region 22 of the Board, a sworn affidavit from a responsible Respondent official setting forth with specificity the manner in which the Respondent has complied with the terms of the Court's decree, including how, where and when the Court's documents have been posted, and the date(s), time(s) and location(s) of when and where, the Order was read to employees and by whom, as required by the Court's Order.

This Order shall expire six months from the date of its issuance; provided however, that the Petitioner may, upon motion, request a thirty day extension of this Order if it appears that the decision of the National Labor Relations Board's Administrative Law Judge in the underlying unfair labor practice complaint in Case 22-CA-277455 is imminent; provided further, that after the issuance of said decision of the Administrative Law Judge, upon motion of the Petitioner, this Order may be extended, pending the National Labor Relations Board's final decision, for an

additional period not to exceed six months from the date of the Administrative Law Judge's decision; provided further, that the Petitioner may, upon motion, request an additional thirty day extension of this Order, if it appears that the final decision of the National Labor Relations Board on the underlying unfair labor practice complaint is imminent.

IT IS FURTHER ORDERED that service of a copy of this order, shall be forthwith made upon Respondent by an agent of the Board in any manner provided in the Federal Rules of Civil Procedure for the United States District Courts or by certified mail and that proof of such service be filed herein.

Done at Newark, New Jersey this 26th day of October 2022.


<u>    /s/ Kevin McNulty    </u>
United States District Judge
District of New Jersey

EXHIBIT B

Joanna Pagones Ross
Counsel for the Petitioner
National Labor Relations Board, Region 22
20 Washington Place, 5th Floor
Newark, New Jersey  07102
Telephone:  (862) 229-7037

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUZANNE SULLIVAN, <br> Regional Director of Region 22 <br> of the National Labor Relations Board <br> For and on behalf of the <br> National Labor Relations Board, <br><br> Petitioner, <br><br> v. <br><br> IBN CONSTRUCTION CORP., <br><br><br><br> Respondent | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : Civil No. 2:22-cv-05668 |

## PETITIONER'S MOTION TO EXTEND
## ORDER GRANTING TEMPORARY INJUNCTION

To the Honorable Kevin McNulty, United States District Judge:

Counsel for Petitioner, Suzanne Sullivan, the Regional Director of Region 22

of the National Labor Relations Board ("Board"), hereby respectfully moves this

honorable Court for and on behalf of the Board and submits as follows:

1. On October 26, 2022, this Court issued an Order Granting Temporary Injunction ("Order") pending the final disposition of the proceeding before the Board in Case 22-CA-277455. ("Exhibit A").

2. This Order is due to expire six (6) months from the date of its issuance and provides that an extension may be granted for an additional thirty (30) days if it appears that the decision of the Board's Administrative Law Judge is imminent.

3. The administrative hearing in Board Case 22-CA-277455 was held before Administrative Law Judge Kenneth W. Chu ("ALJ Chu") on August 1-3, September 26-28, October 19-21, and November 16-17, 2022.

4. In accordance with the Board's Rules and Regulations, matters that have procured temporary relief pursuant to Section 10(j) of the National Labor Relations Act are afforded expedited treatment and given priority by the Board over all other cases.

5. During the administrative hearing on November 16, 2022, Counsel for the Petitioner informed ALJ Chu of this Court's Order.

6. At the close of the administrative hearing on November 17, 2022, ALJ Chu set January 3, 2023 as the deadline for the filing of post-hearing briefs.

7. Due to the length of the administrative hearing record, on December 5, 2022, Counsel for the Petitioner filed a request for an extension of time.

8.  On December 6, 2022, ALJ Chu issued an order granting the extension and setting January 17, 2023, as the deadline for the filing of post-hearing briefs. ("Exhibit B").

9.  On January 10, 2023, upon discovering that approximately eighty (80) pages of its witness' testimony had not been transcribed, Respondent IBN Construction Inc. ("Respondent") requested an extension of time until January 27, 2023 to file its post-hearing brief. ("Exhibit C").

10. On January 11, 2023, ALJ Chu issued an order granting Respondent's requested extension and setting January 27, 2023 as the deadline for the filing of post-hearing briefs. ("Exhibit D").

11. On January 26, 2023, Respondent requested an extension of time to file post-hearing briefs to January 31, 2023. ("Exhibit E").

12. On January 27, 2023, ALJ Chu issued an order granting Respondent's extension of time request and setting January 31, 2023 as the deadline for the filing of post-hearing briefs. ("Exhibit F").

13. Post-hearing briefs were filed by the parties on January 31, 2023.

14. On February 22, 2023, Counsel for the Petitioner reminded ALJ Chu of this Court's Order and of the necessity for expedited treatment of Board Case 22-CA-277455. ("Exhibit G").

15. Counsel for Petitioner notes that the complexity of issues addressed during the eleven (11) day Board litigation necessitates the ALJ's careful consideration of the administrative hearing transcript and the parties' post-hearing briefs.

16. Absent a limited thirty (30) day extension of the Order, the expiration of the injunctive relief your Honor has ordered will cause a final Board order in due course to be meaningless and the resultant harm done to employees' statutory rights will be irreparable. This is precisely the result Section 10(j) was enacted to prevent.

17. It is, therefore, respectfully requested that consistent with *Eisenberg v. Hartz Mountain Corporation*, 519 F.2d 138, 144 (3d Cir. 1975), *reaffirmed in Eisenberg v. Holland Rantos Co., Inc.,* 583 F.2d 100, 103-04 (3d Cir. 1978), the Order be extended to May 26, 2023, an additional thirty (30) days from the date of its expiration, pending ALJ Chu's decision.

Respectfully submitted on March 31, 2023.

**IT IS SO ORDERED.**

**s/ Kevin McNulty**
**Hon. Kevin McNulty**
**U.S. District Judge**
**Date: 4/3/2023**

/s/ Joanna Pagones Ross
Joanna Pagones Ross
Counsel for Petitioner

4

EXHIBIT C

JD(NY)–05-23
Newark, NJ

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

IBN CONSTRUCTION CORP.

Case 22–CA–277455

    **and**

NEW JERSEY BUILDING LABORERS
DISTRICT COUNCIL

*Joanna Pagones Ross, Esq.,*
*Robert Mulligan, Esq.,*
    for the General Counsel.
*Raymond G. Heineman, Esq.,* of New Jersey,
    for the Charging Party.
*John R. Vreeland, Esq.,*
*David I. Solomon., Esq.,* of New Jersey,
    for the Respondent.

DECISION

STATEMENT OF THE CASE

KENNETH W. CHU, Administrative Law Judge. This case was tried in a hearing by videoconference on August 1, 2, 3, September 26, 27, 28, October 18, 19, 20, 21, and November 16, 17, 18, 2022.[1] The New Jersey Building Laborers District Council (Union) filed unfair labor practice charge with the National Labor Relations Board (NLRB) on May 20, 2021, with amendments to the charge made on January 22 and March 3, 2022. Region 22 issued a complaint and notice of hearing on June 16, 2022.[2] An answer was timely filed by IBN Construction Corp. (Respondent or IBN) on June 30, 2022, generally denying the allegations in the complaint (GC Exh.1 (b) (d) (f) (h) and (k)).[3]

On the entire record, including my assessment of the witnesses' credibility[4] and my observations of their demeanor at the hearing and corroborating the same with the adduced evidence of record, and after considering the posthearing briefs, I make the following

---

[1] There were no objections to having the hearing conducted by videoconference.

[2] All dates are 2021 unless otherwise indicated.

[3] The General Counsel exhibits are identified as "GC Exh." and the Respondent's exhibits are identified as "R. Exh." Joint Exhibits are identified at "Jt. Exh." The posthearing brief for the General Counsel is identified as "GC Br. The posthearing brief for the Charging Party is identified as "CP Br." The Respondent's brief is identified as "R. Br." The hearing transcript is referenced as "Tr."

[4] Witnesses testifying at the hearing included Vincente Simbana, Luis Gomez, Nelson Molina, Jose Pereira, Melvin Garcia, Francisco Martinez, Ulises Fuentes, Bolivar Rivera, Luis Jimenez, Nelson Benitez, Harrison Lopes, Juan Alvares, Nelson Martin Espinoza, Dayana Coello, Angel Macas, and Jorge Rodriguez.

FINDINGS OF FACT

I. JURISDICTION AND UNION STATUS

5

The Respondent IBN Construction Corp., a New Jersey domestic corporation, with an operating facility at 49 Herman Street, Newark, New Jersey, has been engaged in the business of building demolition and construction where it derives gross annual revenue in excess of $1 million.  The Respondent has purchased and received at its Newark facility products, goods, and
10   materials valued in excess of $5000 directly from suppliers located outside the State of New Jersey.

The Respondent admits in its answer, and I find, that the Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.  The New
15   Jersey Building Laborers District Council is a labor organization within the meaning of Section 2(5) of the Act.

II. THE UNION ORGANIZING CAMPAIGN

20   Respondent IBN specializes in demolition, removal of debris and rubbish, and cleaning the jobsites after completion of the demolition.  Most if not all of the demolition work involves buildings, such as offices, townhomes, and schools.  The Respondent is also engaged in some renovation and construction work.  The following employees of the Respondent, as set forth in paragraph 5(a) of the complaint, constitute a unit appropriate for the purposes of collective
25   bargaining within the meaning of Section 9(a) of the Act:

> All full-time and regular part-time laborers employed by
> Respondent from its 49 Herman Street, Newark, New Jersey
> facility, excluding all office clerical employees, managers, guards,
30   and supervisors as defined in the Act and all other employees.[5]

1.  The Testimony of Vicente Simbana

Vincente Simbana (Simbana) has been an organizer with the Union since 2012.  He
35   started as a volunteer and became a full-time paid employee with the Union in October 2020.  As an organizer for the Union, his primary duty is to  visit construction jobsites for potential unionization of the workers (Tr. 20–22).  Simbana testified that IBN Construction was one of the worksites that he had visited soon after October 2020.  He visited several IBN jobsites, including Newark, Nutley, West Orange, Patterson, Rutherford, and Trenton, New Jersey.  He believed
40   there were at least 10 different IBN jobsites.  Routinely, upon arriving at a jobsite, Simbana would introduce himself to the workers and would talk to them about safety issues, workers' rights, wages, and other benefits as a member of the Union.  Simbana would usually visit the jobsites on his own.  On occasions, the union coordinator, Anna Tavares and/or another

---

[5]  The Respondent denies in its answer that a response is required to the allegations set forth in Par. 5. To the extent a response is required, Respondent denies the allegations set forth in Par. 5(a), (b), and (c) of the complaint (GC Exh. 1(k)).

organizer named Luis Gomez, would accompany him.  Simbana recalled his first visit was the IBN Newark jobsite, located at 155 Washington Street, Newark, New Jersey (Tr. 22–26).

5

The purpose of the visits was for Simbana to discuss with the workers the benefits of being a member of a union and to obtain union authorization cards if they were interested in joining a union.  Simbana testified that he explained to the workers that the union authorization card was to give the Union permission to represent them with the employer.  Simbana recalled collecting all the union cards from the workers except one card that was obtained by Luis Gomez (GC Exh. 2: Blank union authorization card captioned, "Laborers' Eastern Region").  Upon

10    receiving the signed union cards from the workers, Simbana would place them in his briefcase and turn them over to his director, David Johnson (Tr. 26–29).  Simbana described his routine to obtain the worker's consent and signature on the union authorization card:

15

So it was to speak with workers, to visit them topside or go to their houses to talk to them about  the benefits and tell the way belonging to the Union, to talk about safety, to talk about the differences between public and private jobs and other subjects, to talk to them about the authorization card. To always follow all the protocol of the authorization cards.

20

 Q. And when you received signed authorization cards with 20 employees what did you do with these cards?
A. I can tell you that I continued collecting them.
Q. And after you collected the cards what happened next, what did you do with the cards?
A. I would give them to my supervisor (Tr. 239, 240).

25

Simbana did not recall if he spoke to the workers about strikes; the amount of union dues to be paid; or that after collective bargaining was completed, that the benefits might be the same as before the unionization (Tr. 233–236).  Simbana proceeded to testify how he went about having the union authorization cards signed by the worker, referring to the names of the workers on the voter (Excelsior) list that was provided by the Respondent (Jt. Exh. 3).  Simbana

30    described obtaining 27 signed union cards (Tr. 117),

Jesus Aguilar signed in front of his house after receiving a call from Simbana.  Aguilar signed on December 24.  Simbana denied making any marks on the card (Tr. 58, 59, 67; GC Exh. 3 at p. 1).

35

Juan Alvares signed his card at the Newark jobsite.  Simbana said that no one else was present.  Alvares signed on January 12. He wrote down the address, phone number and name of the "supporter" on the card.  Simbana said Alvares gave him permission to note the name "IBN" as the employer because Alvares had a cup of coffee in his hand (Tr. 68,

40    69; GC Exh. 3 at p. 2 ).[6]

Amando Anaya signed his union authorization card at the Passaic jobsite.  Simbana said that co-worker Luis Jimenez was with him.  Anaya signed on March 18.  Simbana made no marks on the card (Tr. 69, 70; GC Exh. 3 at p. 3).

_____

[6]  Juan Alvares' proper spelling of his surname is "Alvares" as reflected in his handwritten spelling on his union card and not "Alvarez" as reflected in the transcript and posthearing briefs.

3

JD(NY)-05-23

Arthur Anamarca signed his card at the Parsippany jobsite on October 20.  Simbana made no marks on the card (Tr. 71, 72; GC Exh. 3 at 4).

5      Antolin Benites signed his union card on April 22 at his apartment after Simbana received a call from him.  Simbana marked the card "IBN" as the employer after Benites signed the card (Tr. 72–74; GC Exh. 3 at p. 5).

Francisco Benitez signed on January 20 at the Newark jobsite.  He called Simbana.
10     Benitez signed his card inside Simbana's car on May 20, 2021.  Simbana testified that he marked the location of the jobsite as a reminder to himself where Benitez had signed his card (Tr. 74–76; GC Exh. 3 at p. 6).

Nelson Benitez signed his card on December 29, 2020.  Simbana was not sure where his
15     card was signed.  Simbana made no marks on Benitez' card (Tr. 75–77; GC Exh. 3 at p. 7).

Ulises Javier Fuentes signed the card, either at his house or at the Newark jobsite on February 25.  Simbana made no marks on the card  (Tr. 77, 78; GC Exh. 3 at p. 8).[7]
20
Melvin Garcia  signed his card on April 1 at his residence, located on 30 Parker Street, Newark, New Jersey. Simbana said he made no marks on the card (Tr. 78; GC Exh. 3 at p. 9).

25     Edgar Heras Perez signed his card in front of Francisco Martinez' house  at 377 Morris Avenue on April 23.  Simbana said that Martinez was not present but Harrison Nicholas Lopes (another worker) was present.  Lopes told Simbana that another worker wanted to talk with him and they waited for his arrival at Martinez' residence.  When Perez arrived, he signed the card on April 23 on the sidewalk of Martinez' residence (Tr. 79–81; GC
30     Exh. 3 at p. 10).

Luis Jimenez signed his union card at his home on February 23.  Simbana did not recall who called.  Simbana made no marks on the card (Tr. 81, 82; GC Exh. 3 at p. 11).

35     Victor Uoclla signed at his residence located on 30 Parker Street on April 1.  Simbana testified explaining the purpose of the card and that it gave permission for the Union to represent him.  Simbana said he made no marks on the card (Tr. 82, 83; GC Exh. 3 at p. 12).

40     Harrison Nicholas Lopes signed in a coffee shop in Newark on April 21.  Simbana said he made no marks on Lopes' card (Tr. 83, 84; GC Exh. 3 at p. 13).[8]

---

[7] Fuentes wrote his first name on the union card as Ulises and not as "Ulysses."
[8] The proper spelling of his surname is "Lopes" and not Lopez.

4

Boris Martinez signed at the front of his residence in Simbana's car on January 1. Simbana did not recall who had called for the meeting. Simbana made no marks on the card (Tr. 84 86; GC Exh. 3 at p. 14).

5

David Medina signed on April 1, at the 30 Parker Street address after a Union meeting. Simbana made no marks on his card (Tr. 86, 87; GC Exh. 3 at p. 15).

Nelson Molina signed his union card at a restaurant in Elizabeth on January 6. Simbana said that he had initiated the call to Molina (Tr. 87; GC Exh. 3 at p. 16).

10

Emmanuel Noyola signed his card at his home in Simbana's car on March 3. Simbana called him and made no marks on his card (Tr. 88, 89; GC Exh. 3 at p. 17).

15

Javier Perrira signed at the Newark jobsite in a co-worker's car on January 20. Simbana was with Nelson Molina and believed there were four workers in the car. He did not recall the name of the fourth worker. Simbana wrote the worksite location on the right-hand corner of Perrira's card for him to remember where the card was signed (Tr. 89-91, 108; GC Exh. 3 at p. 18).

20

Jose Patricio Pereira signed outside of the Newark jobsite in a co-worker's car. Simbana recalled that Nelson Molina, Pereira and maybe, Javier Perrira, were present. Simbana said Pereira and Perrira signed in the car on January 20 (Tr. 91–93; GC Exh. 3 at p. 19).

25

Luis Ramos signed his union card at the Trenton jobsite on March 8. Simbana testified that Franklin Saula, Jose Santande and Segundo Santande were present. Simbana said that he wrote "IBN" on the card after Ramos gave him permission to fill in the card with the employer's name (Tr. 93–95; GC Exh. 3 at p. 20).

30

Moises Bolivar Rivera signed his card on February 22. Simbana did not recall who initiated the call to sign or the location where the card was signed. He said that no one was present (Tr. 95–97; GC Exh. 3 at p. 21).

Byron Santos signed his card on May 1. Simbana testified that union representative Luis Gomez obtained the signed card. Simbana was informed by Gomez that the card was

35

signed in a park in Newark (Tr. 97–99; GC Exh. 3 at p. 22).

Segundo Sarango signed in front of his home after Simbana called him. Simbana said that Christian Sarango was also present. Both signed on February 25. Simbana testified that he marked the letters "IBN" on the card after he informed Sarango that he forgot to

40

fill in the name of the employer. Simbana said Sarango then gave him permission to fill in the employer's name on his card (Tr. 99–101; GC Exh. 3 at 23).

Franklin Siguencia signed his card at the Trenton jobsite on March 8. Simbana said that Segundo Santander, Jose Santander and Luis Ramos were present. Simbana testified he

45

made no marks on Siguencia's card (Tr. 101, 102; GC Exh. 3 at p. 24).

Oscar Torres signed his union card at his home on March 17 after Simbana called him. Simbana made no marks on his card (Tr. 102, 103; GC Exh. 3 at p. 25).

5     Dialta Juan Viilalta signed the union card at his residence on February 23. Simbana did not remember who had called to initiate the signing of the card (Tr. 103, 104; GC Exh. 3 at p. 26).

Diego Villavigencio signed the card at his residence on February 23. Simbana did not remember who had called to have the card signed (Tr. 104, 105; GC Exh. 3 at p. 27).

10     The counsel for the General Counsel asserted that 15 more signed union authorization cards were from workers not named on the voter list. In addition to the 27 signed cards testified above by Simbana, 15 cards were obtained by Simbana of workers not on the voter list. The counsel for the General Counsel noted that General Counsel Exhibit 3 contains the 27 union cards corresponding to Joint Exhibit 3 and that General Counsel Exhibit 4 contains the remaining

15     15 signed cards by workers not on the voter list (Tr. 146, 147). As such, Simbana testified that he ensured the 15 workers signing the union authorization cards did in fact work for IBN even though their names were not on the voter list. He explained how he obtained the additional 15 signed union authorization cards, to wit:

20     Andreas Diaz signed outside of his home; Diaz was introduced to Simbana by Nelson Benitez, who had called Simbana to stop by the house. Diaz lives in Benitez' residence and he signed the union card on January 3. Diaz said he worked for IBN. Simbana said he went through the same procedure in explaining the purpose of the card to Diaz.

25     Simbana made no markings on Diaz' card (Tr. 118–120; GC Exh. 4 at p. 1).

Fausto Fajardo's authorization card was signed on March 24. Simbana obtained his phone number from a member family. Simbana understood that Fajardo works at IBN. Fajardo spoke Simbana in Simbana's car. Simbana made a mark on the card, noting the

30     name of the employer as "IBN." Simbana said that Fajardo gave him permission to sign the card (Tr. 120–123; GC 4 at 2).

Juan Mauricio Fajardo signed his union card at 78 Walnut Steet, outside of his home in Simbana's car. Simbana was referred to Fajardo from a co-worker. Simbana said that

35     Fajardo works for IBN. His card was signed on March 24. Simbana testified he made no marks on the card (Tr. 123–125; GC Exh. 4 at p. 3).

Carlos Yuka's card was signed outside of his residence. Simbana obtained his name from a co-worker. Simbana called him. Yuka told Simbana that he works for IBN.

40     Yuka signed the union card on March 11 after Simbana explained the purpose of signing the card. Simbana made no marks on the card (Tr. 125, 126; GC Exh. 4 at 4).

Guido Lemo signed his union card outside the Newark jobsite. Jose Santander and Angel Vega were present. Simbana testified that he knew Santander as the worker who had

45     signed the card at the Trenton jobsite. He also knows Vegas as an IBN worker because he was working at the Newark site. Simbana testified that Lemo said he works for IBN.

Simbana again explained the purpose of the union card to Lemo.  Simbana made a marked a word "work" on the upper right hand corner of the card to remind himself where the card was signed.  Lemo signed the card on March 23 (Tr. 126–128; GC 4 at 5).

5      Francisco Martinez signed the union card at his jobsite.  According to Simbana, supervisor Angel Macas was present, as well as co-worker Segundo Sarango.  Macas asked Simbana why he was on the jobsite.  He told Macas that he wanted to talk with the workers during their lunch period and started to talk with Martinez.  Simbana explained the purpose of the card to Martinez.  Simbana believed that Macas and Sarango were 10      present when Martinez signed the card.  Simbana believed Macas became very angry and started to make phone calls.  Simbana believed the card was signed at the IBN Nutley jobsite.  Simbana did not recall when he first met with Martinez.  Simbana stated that three workers were present, including Sarango and supervisor Macas.  Simbana testified that Macas identified himself as the foreman and recalled that Macas started to make 15      phone calls and moved away from the group but does not remember how far away (Tr. 193, 194).  Martinez signed the card on March 18.  Simbana made no marks on the card. (Tr. 128–130; GC Exh. 4 at 6).

Dario Maquilon signed his union card outside of his home.  Simbana was informed by 20      Maquilon that he works at IBN.  Simbana stated that his name was referred by a co-worker.  Maquilon signed on January 3.  Simbana explained the purpose of the card to give the Union the right to represent him with his employer.  Simbana made a notation on the card with word "at home" to remind himself where the card was signed (Tr. 130, 131; GC Exh. 4 at 7).
25

Ernesto Masaquiza signed near the West Orange jobsite at coffee shop on March 9.  Simbana was told that Masaquiza worked for IBN.  Simbana explained to the worker the purpose of signing the union card.  Simbana marked on card "West Orange jobsite" as a reminder as to where the card was signed.  He also penned in the letters "IBN" on the 30      card.  He was asked by Masaquiza to do so because Masaquiza was busy buying coffee and needed to get back to work (Tr. 131–133; GC Exh. 4 at p. 8).

Marco Sanchez signed in front of his house in Simbana's car on March 9.  Simbana said he was referred by a co-worker at IBN.  Simbana explained to Sanchez that the union 35      card was to authorize the Union to represent him with IBN.  Simbana made no marks on his Sanchez' card (Tr. 133, 134; GC Exh. 4 at p. 9).

Cristhian Sarango signed in the front of his house.  Simbana said that Cristhian was referred to him from his father, Segundo Sarango.  Cristhian came with his father and 40      another individual.  Both Sarangos worked for IBN and signed union cards on February 25 (Tr. 134–137; GC Exh. 4 at 10 (for Cristhian); also, see GC Exh. 3 at p. 23 (for Segundo).

Jonathan Fernando Sarango signed his card on the sidewalk outside of his residence. It is 45      believed that Jonathan Sarango was the third Sarango that was mentioned meeting Simbana at their residence.  According to Simbana, he was informed by Sarango that he

7

JD(NY)-05-23

works for IBN.  Simbana explained the purpose of the union card to the workers. Sarango signed his union card on February 25 (Tr. 137, 138; GC Exh. 4 at p. 11).

5       Jose Santander signed at the Trenton jobsite.  Simbana testified that Segundo Santander, Franklin Siguencia, and another individual were present.  Franklin signed on the same day (GC Exh. 3 at 24).  Simbana was informed by Santander that he works for IBN. Santander signed on March 8.  Simbana testified he marked the letters "IBN" because Santander was having coffee and was told by him to put down the name of the company on the card (Tr. 138–141; GC Exh. 4 at 12).

10

Segundo Santander signed his card at the Trenton jobsite on  March 8.  Simbana testified that he informed Santander the purpose of the card was to give his consent for the Union to represent him with his employer (Tr. 141, 142; GC Exh. 4 at p. 13).

15      Luis Ramos signed his card at the Trenton jobsite.  He was identified as the fourth worker that was present with Jose Santander, Segundo Santander and Siguencia when all four signed union cards on March 8 (see above) (Tr. 143; GC Exh. 3 at p. 20).

Edwin Vasquez signed his card near the Newark jobsite on March 1.  According to
20      Simbana, Vasquez informed him that he works at IBN (Tr. 143, 144; GC Exh. 4 at p. 14).

Angel Vega signed his union card outside of the Newark jobsite. Simbana said that co-worker Lemo was present.  Simbana said that Vega informed him that he worked for IBN.  Simbana again explained the purpose of signing the card.  Vegas signed on March
25      23.  Simbana made a notation "job" on the card to remind himself where the card as signed (Tr. 144–146; GC Exh. 4 at p. 15).

### 2.   The Testimony of Luis Gomez

30      Luis Gomez (Gomez) is an organizer for the Union and started working there in 2019. He had obtained union authorization cards from workers as part of his organizing responsibilities.  He described the protocol in obtaining signed union cards.  He said the purpose of the card is to give the Union permission to represent the worker who had signed the card.  He said that it was proper protocol to complete the card on behalf of the worker if permission is
35      given by the worker (Tr. 663–665).

He is familiar with the organizing campaign with the IBN workers.  He was aware of the campaign at the end of 2020 through his director, David Johnson.  Gomez was assigned to the organizing campaign with his coworker, Vicente Simbana.  Gomez testified that Simbana was
40      the lead organizer and he assisted Simbana in talking with the workers (Tr. 665, 666).

Gomez testified that he knows an IBN worker named Brian Santos.  He testified to meeting Santos with Simbana on April 30.  He said there was a meeting at a park in Newark and he spoke to Santos about the union authorization card.  Gomez explained to Santos the purpose
45      of the card.  Gomez specifically recall telling Santos that the card would authorize the Union to represent him with IBN.  Gomez believed that Santos was concerned that he was under

surveillance.  According to Gomez, Santos arranged the meeting in the park because Santos lives on the property of the IBN owner (Tr. 666–668).

5     The meeting lasted approximately 35 minutes.  Following their meeting in the park, Gomez received a phone call that night from Santos wanting to meet again the next day because he had more questions about the Union.  Gomez met Santos the next day at a different location and he was asked by Santos about wages and the Union.  Gomez again explained the purpose of the signed authorization card.  Santos signed the union card on May 1.  Gomez stated that Santos completed all the information on the card.  Gomez said that he retained the card and later gave

10     the card to Simbana (Tr. 668, 669; GC Exh. 3 at p. 22).

### 3. The Union's representative petition is withdrawn

15     After collecting a number of authorization cards, the Union believed towards the end of March that it had enough support from the IBN workers to file a certification petition to unionize the workers.  The Union and the Respondent entered into a stipulated election agreement on April 16 (Jt. Exh. 2).  As such, the agreement stated that the election will be conducted by ballots to be mailed out to the employees on the voter (Excelsior) list on May 3 and must be received by Region 22 by May 24.  Upon the signed election agreement, the Respondent provided a voter list

20     of all workers eligible to vote in the election.  The voter list named 49 workers (Jt. Exh. 3).

    There was a total of 42 signed union authorization cards collected.[9]  Simbana collected 41 union authorization cards and Gomez collected one (GC Exhs. 3 and 4).  Based upon the number of signed authorization cards (33) by the end of March, the Union filed a representation petition

25     on March 29 (Jt. Exh. 1).  By motion filed by the General Counsel on February 16, 2023, and after the hearing record closed, the counsel for the General Counsel moved to correct an error in her posthearing brief.  It is maintained that while the Union obtained a majority support by May 1, but the General Counsel mistakenly indicated that there were 27 signed authorization cards by May 1, when the Union actually obtained majority support with 25 signed authorization cards.[10]

30     The General Counsel's motion also corrected a mistake in her posthearing brief.  The motion stated that after the removal of two supervisors from the Excelsior list, it gave the Union a 53 percent majority on May 1 and not a 57 percent majority.[11]

35     Upon my review as to the number of signed authorization cards as of May 1(GC Exh. 3), the number of signed authorization cards is correctly reflected as 25 giving the Union a 53 percent majority of the bargaining unit employees as of May 1 without the inclusion of the supervisors and the additional 15 names collected by Simbana that were not on the Excelsior list.

40     On May 20, the Union requested the withdrawal of the petition and contended it did not want to proceed with the election.  Afterwards, the Union filed the above charges against the Respondent alleging, in part, interference by IBN in the election.  On June 1, Region 22

---

[9] See, Appendix A of the GC Br.

[10] Two authorization cards were signed after May 1 (workers Aguilar and Anamarca) reducing the number of signed cards from 27 to 25. See GC Br. at p. 6.

[11] I have marked the General Counsel's motion of February 16, 2023, as GC Exh. 1(q).  The Respondent and Union did not oppose the motion.

JD(NY)-05-23

approved the withdrawal of the petition and cancelled the mail-in ballot election that had commenced on May 3 (Jt. Exh. 4).

5

Simbana testified extensively as to the reasons the Union eventually decided to withdraw the representative petition.  He indicated that there was a meeting with the Union and the workers on April 1 at the home of a worker.  Simbana said four to six workers attended.  He discussed with the workers about the union campaign, work safety, union cards, salaries, and the election.  According to Simbana, workers complained of long hours, not getting paid enough or receiving checks from another employer.  Simbana said that Union organizer, Jose Castillo, was

10

with him.  According to Simbana, workers expressed fear of surveillance during the meeting because the building had camera (Tr. 30–41).

Simbana also recalled a second meeting with the workers held on April 20, in Newark at the home of Nelson Benitez.  Simbana said ten employees were present and they discussed the

15

same topics regarding overtime, private jobs, election, and workers' rights.  Simbana noted that the representative petition was withdrawn after the April 20 meeting because he was receiving calls from the workers that the owner was interfering with the election process.  Simbana heard from the workers that ballots were mailed but were not counted and names of supervisors were on the voter list (Tr. 41–44).  Upon review the voter list, Simbana testified that Guido Espinoza;

20

Angel Macas; Juan Diego Naranjo; Segundo Saula; Marco Henen; and Oscar Rodriguez were all supervisors (Tr. 45–53, 56, 57).

Simbana testified to other reasons that the petition was withdrawn.  He said that worker Luis Jimenez called him and said he already voted but owner Nelson Martin Espinoza told

25

Jimenez to call the NLRB for a new ballot and when he gets it, to meet him at the company yard. According to Simbana, Jimenez went to the company backyard after receiving a second ballot and Jimenez completed the new card in front of Espinoza in favor of the company.  Simbana did not recall the date this occurred, but his conversation with Jimenez occurred prior to the petition being withdrawn.  Simbana said he informed his director, David Johnson.  According to

30

Simbana, he was told by Jimenez that he completed two ballots, one in support of the Union, which he mailed, and a second ballot, which he showed to Espinoza that supported the employer. Simbana said Jimenez was afraid of losing work hours and being retaliated against him. Simbana does not know if Jimenez had mailed the second ballot that supported the employer (Tr. 150–157; 198–200).

35

Simbana testified that worker Ivan Bolívar Rivera signed an authorization card and was informed by Nelson Espinoza's brother, Freddy Espinoza, also known as "Roman" or "Romano" was a supervisor at another company named FR.  Freddy Espinoza (Freddy) was in charge of demolition, but Rivera complained to Simbana that he was supervised by Freddy but had never

40

worked at the FR company.  According to Simbana, Rivera told him that Freddy (or Roman) that Bolivar was to send him a picture of his ballot by phone text when he completed his ballot. Simbana said he informed the director, Johnson.  Again Simbana did not recall when this conversation occurred with Rivera, but believed it was before the petition was withdrawn (Tr. 157–159).  Simbana is not aware of any witnesses to this conversation between Rivera and

45

Freddy (Tr. 213).

Simbana recalled several complaints from workers Dario Maquilon, Francisco Benitez, and Nelson Benitez not receiving their ballots.  According to Simbana, Francisco Benitez called three times for his ballot and did not get a ballot.  He was also informed by Benitez that supervisors Macas and Rodriguez received ballots and voted (Tr. 157–167).  Simbana said that Nelson Benitez complained he did not receive a ballot.  Benitez allegedly told Simbana that he overheard Espinoza asking the workers who had favored the company to be sure to update addresses.  According to Simbana, Benitez did not hear Espinoza making this request to update their addresses to the workers who supported the Union (Tr.167–169).  Simbana said that he was not informed by Benitez of any recordings or witnesses to these conversations.  He did not remember if he had one or two phone conversations with Benitez about Espinoza asking workers who had supported the company to update their addresses (Tr.  224, 225, 228).

Simbana testified that worker Guido Lemo told Espinoza that he had already voted and Espinoza replied that that the Union was not in his best interest and that the Union lies (Tr. 169, 170).  Simbana was not told by Lemo if there were any witnesses to this conversation between him and Espinoza (Tr. 228, 229).  Simbana stated that Armando Anaya told him that supervisor Emmanuel Noyola asked if he had already voted and wanted to stop by his house (Tr. 170, 171).  According to Simbana, worker Victor Lloccla told Simbana that he was reassigned to Newark and that after "all this is over," he would be discharged (Tr. 171, 172, 229, 230).  Simbana said that Lloccla did not mention if there were any witnesses (Tr. 242, 243).

Simbana testified that after the Union withdrew its representative petition, the workers started to ignore him.  He said there was a Union sponsored BBQ on June 20 and only five or six workers attended the event, although he had invited over 15 workers.  He was allegedly informed by Luis Jimenez that the workers did not come because they were scared and had their work hours reduced (Tr. 174–180).

Simbana also testified that there was a union meeting in October and only 5 or 6 attended, although he invited 10 workers.  Simbana stated that Jimenez told him that the workers were afraid of losing their jobs and that several workers would be fired after the Newark jobsite work was completed.  Simbana also testified that workers were not returning his call.  Luis Jimenez allegedly told Simbana that he didn't want to come because he was afraid of losing his job.  He was also told that the workers were not getting work, hours were being reduced by the Respondent, and the workers will lose their jobs after the Newark jobsite work was completed (Tr. 181, 182).

### III. THE UNFAIR LABOR PRACTICES

The General Counsel alleges a litany of 8(a)(3) and (1) violations of the Act culminating with the Union's withdrawal of its representation petition.  The following 8(a)(1) violations are alleged in paragraph 8 of the amended complaint when the Respondent, by Nelson Martin Espinoza,

- (a) on about February, at the West Orange, New Jersey jobsite, informed employees that he was watching them talk to the Union and thereby created an impression among its employees that their union activities were under surveillance by the Respondent;

-   (b) on about April 9, at the Newark jobsite, informed employees that there is no future with the Union as their bargaining representative;

5     -   (c) on about April 29, at the Newark jobsite, threatened to discharge employees because of their support for the Union;

-   (d) on about April 29, at the Newark jobsite, threatened to file a lawsuit against employees engaged in Union activities;

10

-   (e) on about April 29, at the Newark jobsite, threatened the immigration status of employees because of their support of the Union;

-   (f) on about April, at the Newark jobsite, interrogated employees about their Union sympathies, membership and activities;

15

-   (g) on about April, at the Newark jobsite, accused an employee of starting the Union organizing campaign and thereby created an impression among its employees that their union activities were under surveillance by the Respondent;

20

-   (h) on about April or May, at the Newark jobsite, accused an employee of being a Union supporter and thereby created an impression among its employees that their union activities were under surveillance by the Respondent;

25    -   (i) on about May 18, at the Newark jobsite, instructed an employee to cast his official NLRB mail ballot in his presence and thereby engaged in surveillance of the employee's protected, concerted activities; and,

-   (j) on about May, at the Newark jobsite, implicitly promised an employee a wage increase if the Union lost the election.

30

The complaint further alleges in paragraph 9 that the Respondent violated Section 8(a)(3) and (1) of the Act when the Respondent, by Jorge Rodriguez,

35    -   (a) on about March, at the Newark jobsite, threatened employees with a reduction in pay because of their Union activities;

-   (b) on about March, at the Newark jobsite, informed employees that he knew who signed Union authorization cards and thereby created an impression among its employees that their union activities were under surveillance by the Respondent;

40

-   (c) on about March, at the Newark jobsite, by informing employees that he saw them talk to the Union, created an impression among its employees that their union activities were under surveillance by the Respondent;

45

- (d) on about March, at the Newark jobsite, threatened the immigration status of employees because of their support for the Union;

5

- (e) on about March or April, at the Newark jobsite, threatened employees with termination because of their Union activities; and,

- (f) on about May, went to its employees' homes and interrogated employees about their Union sympathies.[12]

10       Paragraph 10 of the complaint alleges that the Respondent violated Section 8(a)(1) of the Act when the Respondent, by Angel Macas on about May, at the Nutley, New Jersey jobsite, instructed an employee to photograph his official NLRB mail ballot and thereby engaged in surveillance of employees' protected concerted union activities.

15       Paragraph 11 of the complaint alleges that the Respondent violated Section 8(a)(1) of the Act when the Respondent, by Freddy Espinoza on about May 2021, at the Newark jobsite, coercively interfered with the official NLRB mail ballot election conducted in case 22–RC–274819, and engaged in surveillance of employees' protected, concerted union activities.[13]

20       Paragraph 12 of the complaint alleges that the Respondent violated Section 8(a)(3) and (1) of the Act when the Respondent,

- (a) on about April, reduced employees' work hours;

25  - (b) on about April, altered employee job assignments; and,

- (c) on about May 2021, discharged the employees named below:

                          i. Jose Patricio Pereira
30                        ii. Francisco Martinez

        Paragraph 13 of the complaint alleges that Respondent engaged in the conduct described above in paragraph 12, because the named employees joined and assisted the Union and engaged in protected, concerted activities, and to discourage employees from engaging in these activities
35  in violation of Section 8(a)(3) and (1) of the Act.[14]

---

[12] Par. 9 was amended by the General Counsel (Tr. 853, 854:GC Exh. 1(t)).

[13] Par.11 was amended by the General Counsel (Tr. 854; GC Exh. 1(t)). The counsel for the Respondent did not reply with an amended answer and stood by his initial answer to the complaint (Tr. 953).

[14] On September 22, 2022, the Regional Director of NLRB Region 22 petitioned the District Court of New Jersey, pursuant to Sec. 10(j) of the Act, for injunctive relief pending final disposition of this complaint before the Board.  On October 18, 2022, the Court held a show-cause hearing on the Board's petition.  The Board's petition for injunctive relief was granted on October 26.  The Order enjoined and restrained IBN from a) threatening employees with discharge, decreased pay, unspecified reprisal because of their assumed immigration status and with lawsuits to discourage employees from supporting the Union; b) creating an impression of surveillance to discourage employees from supporting the Union; c) engaging in surveillance of its employees' protected union activities by interfering with the NLRB's representation election; d) informing employees of the futility of selecting the Union as their bargaining

A number of the allegations intersect in that an alleged interrogation of an employee regarding his union activities and support could also be considered as an alleged interference with the union mail ballot election.  Similarly, allegations regarding reduced job and work assignments could be considered part of the Respondent's antiunion campaign as well as reprisal conduct taken against employees for their union support and sympathy.  As such, the allegations below do not neatly fit into any single violation, but rather, a totality of all the allegations are reviewed as to whether there were violations of the Act.   The counsel for the General Counsel examined several IBN bargaining unit employees relating to the allegations in the complaint.

5

---

representative; e) Interrogating its employees about their Union sympathies; f)  Implicitly promising raises to discourage employees from supporting the Union; g) Decreasing work hours because of employee support for the Union; h) Altering job assignments because of employee support for the Union; i) Discharging or otherwise discriminating against employees because they engage in union activity; and j) In any other manner, unlawfully interfering with, restraining, or coercing its employees asserting their rights under Section 7 of the Act.  Further, IBN was ordered to take the following affirmative action necessary to effectuate the policies of the Act and to restore the status quo ante: a) Within five (5) days of the date of issuance of this Order, recognize the Union as the exclusive collective-bargaining agent of its bargaining unit employees; b) Upon request by the Union, engage in good faith bargaining with the Union over the terms and conditions of employment of its bargaining unit employees; c) Should the parties reach agreement on the terms of a collective-bargaining agreement for the bargaining unit employees, reduce that agreement to writing and execute the agreement; d) Within five (5) days of the issuance of this Order, restore all terms and conditions of employment of its employees which existed prior to April 1, 2021; e) Within fourteen (14) days of the Court's issuance of the Injunction Order, hold one or more mandatory bargaining unit employee meetings, on working time and at times when the Respondent customarily holds bargaining unit employee meetings, and scheduled to ensure the widest possible employee attendance, albeit with proper social distancing measures due to the COVID-19 pandemic, at which the Injunction Order will be read to the bargaining unit employees by a responsible Respondent official in the presence of a Board agent or, at the Respondent's option, by a Board agent in the presence of a responsible Respondent official; (ii) announce the meeting(s) for the order reading in the same manner it would customarily announce a meeting of employees; and (iii) require that all employees of the unit attend the meeting(s); f) Provide the Union with notice of, and equal time and access to Respondent's worksites in New Jersey, to respond to any Respondent meetings with employees about union representation; g) Within five (5) days of issuance of this Order, post copies of this Injunction Order at the Respondent's worksites in New Jersey, as well as translations of such an Order in other languages as necessary to ensure effective communication to the Respondent's employees as determined by the Board's Regional Director for Region 22, said translations to be provided by the Respondent at the Respondent's expense and approved by the Regional Director, in all places where notices to its employees are normally posted; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements, and mail copies of the same to all unit employees; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its worksites to monitor compliance with this posting requirement; h) Within twenty (20) days of the issuance of this Court's decision and Injunction Order, file with the Court, with a copy to the Regional Director of Region 22 of the Board, a sworn affidavit from a responsible Respondent official setting forth with specificity the manner in which the Respondent has complied with the terms of the Court's decree, including how, where and when the Court's documents have been posted, and the date(s), time(s) and location(s) of when and where, the Order was read to employees and by whom, as required by the Court's Order.  The Board's petition for injunctive relief was subsequently appealed by the Respondent on November 7.  As of the date of this decision, the United Circuit Court of Appeals for the Third Circuit had not rendered a ruling on the appeal (Tr. 956, 957; GC Exh. 1(q), (r), and (s)).

Their testimony are summarized below.

### 1.  The testimony of Nelson Danilo Molina

5      Nelson Molina (Molina) has been working for IBN for over 2 years since February 2020.
He stopped working at IBN in October 2021.  Molina worked at the 155 Washington Street
(Newark) jobsite.  He began working at the Newark jobsite in late November/December 2020.
He said that there were about 14–16 workers during the time he was there.  At the Newark
jobsite, Molina worked as a laborer and was responsible for carrying materials, cleaning up
10   rubbish and demolishing of concrete.  He testified that his supervisor was Jorge Rodriguez
(Rodriguez).  Molina testified that Rodriguez gave him his daily work assignments, such as,
which floor to work on and what type of work to perform.  He asserted that the owner of IBN,
Nelson Martin Espinoza, instructed him to follow the orders of Rodriguez.  Molina said that
Rodriguez had a desk in the building that was being demolished at the Newark jobsite.  Molina
15   also said that Rodriguez had granted him about 8 days of sick leave while at the Newark jobsite
while he was working at the Newark jobsite (Tr. 314–317).  Molina testified that he would
inform Rodriguez if he was taking more than 3 days off for sick leave.  Molina recalled one
occasion when Rodriguez took him to the hospital after suffering an injury on the job (Tr. 345,
346, 353, 354).
20
       Simbana testified that he met Molina in a coffee shop in Elizabeth, New Jersey.  Simbana
said he called Molina after receiving his phone number from other workers (Tr. 87).  Molina
testified that he knows Simbana as someone from the Union.  He confirmed meeting Simbana at
the coffee shop in Elizabeth in December 2020.  He testified to receiving several calls from him
25   to meet.  Eventually, they met at the coffee shop.  Molina confirmed that Simbana initiated the
calls to meet and that he got his number from a coworker.   Molina testified that no one else was
at the meeting. Molina testified that Simbana explained to him the purpose of the Union and
benefits of belonging to the Union.  Simbana explained that the card was to give the union
authorization to represent him with the employer.   Molina signed the authorization card and
30   asserted that the card had his signature (GC Exh. 3 at 16).  He testified to completing all the
information on the card.  He signed because Simbana informed him of more benefits, insurance,
and higher salaries.  He signed the authorization card on January 6, after several exchanges of
texts and phone calls with Simbana.  Molina stated that he did not retain the texts he had
exchanged with Simbana (Tr. 317–321).
35
       Molina testified that his address on the authorization card was correct and that it was the
same address on his voters list.  He testified that the owner's son, Brian Espinoza, told him to
update his address for the election (Tr. 321, 322; Jt. Exh. 3).  Molina testified that neither
Espinoza or any supervisor dictated or told him how to vote in the election (Tr. 351, 352).
40
       In regard to joining the Union, Molina testified that supervisor Rodriguez, in a group
conversation in March, told him and 14 to 16 workers that they did not have the paper to join the
union.  He believed Rodriguez was referring to immigration residency (green) cards and/or social
security cards (Tr. 322, 323).  Molina testified that Rodriguez told the group that day that,
45

one of you guys, I don't know who, but one of you guys are talking to a union personnel and you guys are not able to apply for -- under a union representation because you don't have the papers. If you want is to work under a union regiment, then go ask that other person that you're talking to (Tr. 346).

5

Molina conceded that no one threatened him about reporting the status of the workers to immigration. He also never heard any other worker being threatened about their immigration status (Tr. 346, 347).

10      Molina further testified to two conversations in April.  Molina did not recall if the conversations occurred on the same day or on different days.  In one conversation, Molina testified that Espinoza was handing out flyers at the Newark jobsite with Rodriguez.  Another worker named Ivan Bolivar was nearby.  Molina recalled the flyer stated that that IBN was 100 percent more functional working without a Union.  Molina testified that Espinoza asked if he
15  was part of the people was being represented by the Union. Molina responded, "yes" to Espinoza.  He told Espinoza that he supported the Union.  He believed Bolivar also stated that he supported the Union (Tr. 323–325).  Molina admitted that Espinoza was giving his opinion when he stated that IBN would be 100 percent more functional without the union. Molina stated that Espinoza's comment was consistent with what was stated in the flyer (Tr. 347, 348).

20

In a second conversation in April and also at the Newark jobsite, Molina overheard Espinoza accused worker Nelson Benitez that he was the instigator, who visited and talked with the workers to support of the Union.  Molina recalled Benitez asking Espinoza how he knew, and Espinoza responded that he has people to inform him.  Molina believed six or seven other
25  workers overheard this conversation (Tr. 325, 326).

Molina also complained that his work hours were reduced after informing Espinoza that he supported the Union.  He testified working a ten hour shift from Monday to Friday and eight hours on Saturday.  He testified his work hours were cut to 40 hours per week in about March,
30  April or May.  Molina testified that 14 to 16 workers supported the union based upon his conversations and exchanges with them.  He asserted that all the workers that supported the Union were transferred to the Newark jobsite.  He mentioned a worker named Juan Gabriel Villalta and another worker, Victor Uoclla, were transferred from the Orange jobsite to Newark (Tr. 327, 328, 346).  Molina also believed that the 14 to 16 workers who supported the Union
35  were transferred to the Newark jobsite so that their work hours could be reduced and be sent home when there was no work available (Tr. 331).

Molina stated that the hours he had worked would be reported to the supervisor at the jobsite on a daily basis for his paycheck (Tr. 341).  Molina testified that he would pick up his
40  paycheck at Espinoza's house and either he or a family member would hand out the checks to the workers.  He recalled receiving checks from companies named Walls Systems and Jalisco Concrete. Molina insisted that he had always worked at IBN even though his checks came from different companies.  He said that Espinoza would come around the Woodridge jobsite when Molina was there in March and April 2020 and Espinoza would give the work orders even
45  though his checks were from Walls Systems.  Molina said that was the same arrangement at the Newark jobsite, when he was working for Espinoza and Rodriguez, but his payroll checks were

16

from Jalisco Concrete.  Molina stated he never worked for Jalisco (Tr. 332–336; GC Exh. 5 at 1 and 2, referencing Jalisco payroll checks dated January 15, 2020, January 8, 2021, and February 9, 2021).

5        Molina stated that he did not start to get payroll checks issued by IBN until April. Molina admitted that he received overtime work during the same period that he said his hours were reduced (Tr. 348).  He also stated that his rate of pay was increased from $17 to $19 after the union withdrew the petition (Tr. 338–340).

10                        2. The testimony of Jose Patricio Pereira

         Jose Patricio Pereira (Pereira) was a laborer with IBN for 11 years.  He demolished concrete, cleaned and removed rubbish from the worksite.  He was terminated in May while working at the Newark jobsite (Tr. 360, 361). Pereira testified that Rodriguez was his supervisor.
15  He said Rodriguez would give out the assignments, what needs to be done, and send him to different locations to do the work.  Pereira said there were 12 to14 workers at the Newark site. He said that Rodriguez did not have an office, just a table on the jobsite on the 1st floor.  He said that workers would sign in and out on a sheet placed on the table (Tr. 361, 362).  He did not recall when he started working at the Newark jobsite, but testified he started working on the 1st
20  floor in the demolishment of the building (Tr. 404).

         Simbana testified that he met Pereira outside the Newark jobsite in a worker's car.  He believed that Molina, Pereira, and Javier Perrira were in the car with him.  He testified that Pereira and Perrira signed their union authorization cards in the car on January 20 (Tr. 91–93).
25  Pereira testified that he met Simbana  at the Newark jobsite.  He did not recall when.  He recalled that Simbana talked to him and two or three other workers about workers' rights and benefits in joining the Union (Tr. 363, 364).

         Although Pereira did not recall when he first met Simbana, he did recall signing a union
30  authorization card on January 20 inside the car in front of the Newark jobsite.  He insisted that he completed all the information requested on the card but had Simbana filled in the employer's name "IBN" because he was busy signing something in Simbana's notepad and he gave Simbana permission to pencil in "IBN" (Tr. 365, 366).

35       Pereira testified that he was not informed by IBN to update his address for the ballot voting.  He did not recall the time period he was living in his previous address before he moved to his new address (Tr. 400).  He testified that he did not want the Respondent to know of his new address (at the Walnut street address) and did not request a change of address with his employer.  When quired as how he was going to receive the ballot to vote, he responded that he
40  would go back to his old address and check the mailbox to get the ballot (Tr. 367, 401–403). Pereira accused IBN of taking the ballots out of the mailboxes and filling them to support the employer.  He testified,

         A. They themselves, they themselves were changing the elections, they themselves were
45       taking them out of the addresses.
         Q. Out of the mailboxes?

A. Yes.  (Tr. 405).

Pereira testified that Simbana gave him a ballot to fill out when he did not receive a ballot at his old address (Tr. 406).

5

Pereira testified that he was with a group of workers at the Newark jobsite discussing about the Union when Rodriguez told them that they were crazy (to join the Union) and that the workers needed their paper. Pereira said this comment occurred in March, but that Rodriguez would always make that comment, usually with one or at most, two workers (Tr. 367–369).

10   Pereira recalled another occasion in a meeting with Espinoza on April 29 in a group at the Newark jobsite.  Pereira said that Espinoza repeated that the workers needed papers to join the Union and that they were crazy to support the Union.  Pereira did not recall anything else was said by Espinoza.  Pereira believed that 12 to 14 workers heard the remarks (Tr. 369, 370, 386).

15   In another meeting called by Espinoza in May, Espinoza commented that he knew the workers at the Newark jobsite were in support of the union.  Pereira recalled that Espinoza was handing out flyers and that 12 to 14 workers were present for his comments. Pereira testified that he did not tell his supervisors that he supported the Union before this meeting (Tr. 374–378).  He also recalled Espinoza threatening to file a lawsuit against the workers. He recalled this was said

20   once by Espinoza.  He did not recall when this comment was made but specifically testified Espinoza said "…because of the union, he would do a lawsuit on the person that was organizing the union" (Tr. 390, 391).

Pereira complained that soon afterwards, his work hours at the Newark jobsite were

25   reduced by IBN.  He testified working nine or ten hours per day when the Union was organizing but after the meetings with Espinoza, his hours were reduced to eight hours per day from Monday to Friday and no work on Saturday.  Pereira recalled generally talking about the reduced hours with his coworkers and Rodriguez overheard the remarks.  Pereira said that Rodriguez told the group that "…you guys asked for it, you guys were asking for it, that's why the hours were

30   cut."  Pereira did not recall when this comment was made by Rodriguez but did recall that it was in 2021 and that workers Melvin Garcia, Juan Alvares, and Javier Perrira were in this group discussion (Tr. 370–374, 385).

Pereira was discharged by IBN in May.  Pereira was told by Espinoza by phone text that

35   there was no work for him.  Pereira denied that he disrespected Espinoza.  Pereira no longer has access to the text messages from Espinoza.  Pereira's last work day was on a Saturday, May 1. Pereira testified that he only missed 2 or 3 days of work.  However, Pereira admitted that he did not work from Monday through Friday of the following week due to an illness.  Pereira also admitted that he never called his supervisors or Espinoza that he was not coming to work.  He

40   admitted not getting permission to miss work and did not inform IBN of his absence until May 9. Pereira believed he was terminated due to his support for the Union (Tr. 378–382; 398).

3. The testimony of Melvin Garcia

45   Melvin Garcia (Garcia) has worked as a laborer with IBN from 2013 to 2021.  Like Pereira, he was discharged in 2021 (Tr. 518, 519).  During his employment, Garcia was

supervised by Rodriguez and Macas.  Garcia testified that Rodriguez would give instructions and work assignments to him and the other workers.  Garcia also knows Macas as his supervisor when he was assigned to the Nutley jobsite.  Garcia stated that Macas would give the work orders for demolition at Nutley.  In addition, Garcia would ask Macas for permission if he needed a day off from work (Tr. 520, 521).  Garcia was assigned to the Newark jobsite after the demolition in Nutley was completed about March (Tr. 531, 532).  Garcia testified that he was terminated in 2021, but he did not recall when (Tr. 518).  His discharge was not alleged as a violation of the Act in the amended complaint.

Garcia knows Simbana as someone from the Union.  He recalled meeting Simbana at the Nutley jobsite along with other workers, but does not remember when.  At this initial encounter, Garcia stated that Simbana gave out his business cards and asked the workers to call him.  There were no other discussions. Garcia subsequently called Simbana and they discussed the benefits of belonging to the Union over the phone.  Garcia signed his union authorization card on April 1 (Tr. 521, 522; GC Exh. 3 at 9).

Simbana testified that he met Garcia in front of Garcia's residence on April 1.  Simbana testified that Garcia completed his union card on that date and he made no markings on his card (Tr. 78).  Garcia testified that he completed the union card and he work "IBN" as his current employer on the card.  Garcia stated that Simbana explained the purpose of the card before he signed it.  Garcia believed that signing the card would make his employment better at IBN (Tr. 522, 523).

Garcia testified that his work hours were reduced, but he did not recall if his hours were reduced before or after he signed the union card.  Garcia stated that his work hours were from 7 a.m. to 4:30 p.m. Monday through Friday.  He said the hours were reduced to 7 a.m. to 3:30 p.m., but he continued to work on Saturday until 12 noon.  Garcia testified that he was working at the Newark jobsite when his hours were reduced.  He was told by foreman Rodriguez that his hours were reduced because he supported the Union.  Garcia believed three workers were present when the comment was made (Tr.  523, 524).

Garcia also knows Espinoza as the owner of IBN.  He testified to a discussion about the Union in April 29 with Espinoza and the workers at the Newark jobsite.  Garcia recalled Espinoza stating that he will sue the employees supporting the Union.  Garcia testified that he took the remark as Espinoza's attempt to intimidate the workers for joining the Union.  Garcia believed there were several workers present when the remark was made by Espinoza (Tr. 525, 526, 540).  Garcia testified that Espinoza's threat to sue the workers also included suing the Union (Tr. 534).

While working at the Nutley jobsite, Garcia testified that foreman Macas in about May, instructed him to complete the mail ballot and to take a snapshot of his ballot and send it to Espinoza.  Garcia was not instructed by Macas as to how he should vote.  Garcia refused to do so (Tr. 526, 527, 536).  Garcia never sent or show his ballot to Macas or Rodriguez (Tr. 540, 541).  Although Garcia had been assigned to the Newark jobsite since March, he also testified that he would be reassigned to Nutley on occasions.  He said he was working in Nutley when Macas instructed him about the ballot (Tr. 533).

Garcia testified that he was terminated from his IBN job when he failed to show up for work for a week and did not have permission for his absence.  He is aware that permission was required to take off from work (Tr. 541).  After his termination in 2021, Garcia  testified that on March 20, 2022, he received a call from foreman Macas to return to work.  Garcia insisted that Macas called him back to work because he was a good worker.  However, Macas told Garcia that his re-employment must be kept quiet and said he did not want the Union to find out that he was returning to work, otherwise the Union would come to the worksite.  Garcia told Macas that he will return to work on March 24, 2022 (Thursday), but he did not because he was scared of the employer's retaliation since he continued to support the Union (Tr. 529, 530, 534, 539).

### 4. The testimony of Francisco Adlid Martinez Garcia

Francisco Adlid Martinez Garcia (Martinez) was a laborer with IBN since July 2019.  He performed demolition work at the Newark jobsite.  Martinez testified that Angel Macas hired him to work at the Newark jobsite under a supervisor named "Frank."  Martinez was subsequently reassigned to the Nutley jobsite and worked under the direction of foreman Macas.  He did not recall when he was reassigned to Nutley but indicated that he met Simbana at the Nutley jobsite in March.  Martinez recalled that the workers and Macas were having lunch when Simbana came to visit (Tr. 646–649).

Martinez testified that Simbana said he was a representative of the Union and discussed with the workers the benefits of having a Union.  He specifically recall that the workers would get better wages and a better life.  He also recalled that the workers would receive health benefits and vacation pay.  Martinez said that Simbana distributed union authorization cards that day to the workers.  Martinez said that he signed the card during his lunch hour.  Martinez believed that Macas observed him signing the card because Macas was also having lunch.  The record shows that Martinez signed the union authorization card on March 18.  Martinez testified that Simbana explained to him that signing the card was to support the Union.  Martinez said that he completed all the information on the card on that date (Tr. 649–651, 656, 658, 659; GC Exh. 4 at p. 6).  Martinez believed that other workers had also signed the cards on that date, but did not recall the names of the workers.  He also testified that he discussed the Union with other workers after signing his card, but never in front of Macas (Tr. 657).

Simbana testified that Martinez signed the card at the Nutley jobsite.  Simbana observed that supervisor Macas was present, as well as worker Segundo Sarango.  Macas asked Simbana why he was on the jobsite.  Simbana testified that he told Macas that he wanted to talk with the workers during their lunch period.  Simbana started to talk with Martinez and told him the purpose of the card.  Simbana believed that Macas and Sarango were present when Martinez signed the card.  Simbana said he made no marks on Martinez' card.  Simbana believed Macas became very angry and started to make phone calls (Tr. 128–130).

Simbana testified that Macas had identified himself as the supervisor.  Simbana confirmed that there were only three workers at the jobsite. He recalled that Macas moved away from them during his discussion with the workers about the Union.  He did not recall how far Macas moved away (Tr. 193, 194).

JD(NY)-05-23

Martinez was discharged from his job approximately 2 months after signing his union card. Martinez testified that after completing the day's work at the Nutley jobsite, he was told to go home (Tr. 652). Martinez said that the work was completed at the Nutley jobsite. He did not
5   recall if the other workers were also told to go home (Tr. 656, 657). Martinez said that Macas told him that owner Espinoza will call him (Martinez). Martinez testified that he waited for Martinez to call him. He said he waited a week but never received a call from Espinoza. He then decided to visit the IBN yard (in Irvington, New Jersey) (Tr. 653, 654). When he spoke to Espinoza when he arrived at the yard. He said that Espinoza started the conversation by telling
10   him there was no work for him. Martinez did not say anything in response, and apparently, left the area (Tr. 654, 655).

### 5. The testimony of Ulises Javier Fuentes

15   Ulises Javier Fuentes (Fuentes) was and is employed by IBN since 2014.[15] He is a laborer in the demolition of concrete and other building materials at the Newark jobsite. He would place the rubbish on a forklift. He has occasionally worked as a forklift operator. He knows Rodriguez as his supervisor because he goes to him for work assignments. When he needs to take a day off from work, he would make the request to Rodriguez. He has worked at
20   the Newark jobsite for approximately a year (from the time of this proceeding) (Tr. 492, 493). Prior to that time, Fuentes had worked at the Patterson jobsite, and briefly, in Virginia with IBN (Tr. 501).

Fuentes started to hear talks about a union from other workers in February. He did not
25   recall what was said about the Union in his conversations with others. He mentioned that he gave his phone number to worker Juan Alvares, who in turn, gave his number of Simbana. Fuentes testified that he knows Simbana was from the Union (Tr. 493, 494). Fuentes testified that he spoke with Simbana over the phone and they discussed the benefits of having a union and specifically, about working conditions and his wages at IBN. Fuentes asked Simbana to meet
30   him at his home to speak further about the Union (Tr. 494).

Simbana did not recall where Fuentes signed the card, either at his house or at the Newark worksite. Simbana testified that Fuentes' union authorization card was signed on February 25. Simbana denied making any marks on his card (Tr. 77, 78). Fuentes testified that
35   he met Simbana in front of his home and that he signed the card after their meeting (Tr. 494, 495). Fuentes recalled that supervisor Rodriguez was a friend of his. Fuentes testified that Rodriguez asked him if Fuentes had signed the union card. Fuentes lied that he had signed the card because of their friendship. Fuentes said that Rodriguez asked him in front of his house but there were no one else around. Fuentes believed Rodriquez asked him about 15 days after he had
40   signed the union card. (Tr. 496, 496, 497, 500, 505).

Fuentes also recalled the comment made by Rodriguez at the Newark jobsite about May. He stated that there were eight to ten workers starting work on the 1st floor of the building. Fuentes testified that Rodriguez stated to the group that "…we can't be part of the Union because

---

[15] I note for the record that Fuentes spelled his first name as "Ulises" on his union authorization card (GC Exh. 3 at p. 8).

of that thing, you know, that thing of not being legal because we were illegals" (Tr. 495, 502, 503).  Fuentes admitted that none of the supervisors or Espinoza threatened to report their immigration status to the government (Tr. 505).

5        Fuentes testified that he knows Melvin Garcia and that he was discharged by IBN. Fuentes recalled that he was having lunch with Supervisor Rodriguez (because of their friendship) at a restaurant one day during the summer (of 2021) when Espinoza and his brother entered the restaurant.  Fuentes testified that it was just a coincidence that the Espinoza brothers were having lunch at the same time.  Fuentes knows Nelson Espinoza as the owner of IBN and his

10       brother as "Romano." Fuentes raised with Nelson Espinoza about returning Garcia back to work.  According to Fuentes, Espinoza replied that if he takes Garcia back, then Jose Pereira would also want his job back.  Fuentes stated that Garcia and Pereira both missed a week of work and was then discharged.  Fuentes is not aware of any other workers who were similarly discharged for missing a week's work (Tr. 497–500, 501, 502).

15

                        6. The testimony of Bolivar Ivan Rivera

         Bolivar Ivan Rivera (Rivera) has been working as a laborer with IBN since February or March 2020.  As a laborer, he was engaged in demolition work.  He has exclusively worked at

20       the Newark jobsite since his employment with IBN, except when he was reassigned to a Nutley jobsite in November 2020.  Rivera testified that his supervisor at the Nutley site was Angel Macas.  He knows him as the supervisor because he gave work orders and assignments.  He was reassigned to the Newark jobsite in April (Tr. 461–463).  Rivera testified he had received payroll checks from Jalisco Concrete but insisted that he has always worked for IBN since February or

25       March (Tr. 479).

         Simbana testified that he knows Rivera as Moises Bolivar Rivera.  He recalled that Rivera signed the union authorization card on February 22 (GC Exh. 3 at 21).  Simbana did not recall where the card was signed but recalled that there were no other persons present at the time

30       (Tr. 97–99).  Rivera knows Simbana from Nelson Molina during the time the Union began organizing the workers.  Rivera testified that he was working at the Newark jobsite and the time. He was given Simbana's phone number and they discussed the benefits of belonging to the Union.  A meeting with Simbana was arranged at Rivera's residence, where the union card was signed by Rivera (Tr. 463, 464).

35

         Rivera testified that after he returned from his assignment in Nutley, he spoke to other workers about supporting the Union at the Newark jobsite.  He recalled discussing the Union with Diego Avia Vincenzo, Luis Jimenez, Melvin Garcia, and Segundo Sarango.  Rivera recalled specifically telling them that he supported the Union.  Rivera believed that Sarango is the cousin

40       to foreman Macas (Tr. 464, 465).  As noted above, Rivera was returned to Newark in April.  He testified that four other workers were transferred to the Newark jobsite about that time.  Rivera recalled that Melvin Garcia, Luis Jimenez, Segundo Sarango, and Diego Avia Vincenzo were transferred with him and that they supported the Union (Tr. 465, 466, 483, 484).

45       Rivera maintained that Diego Avia Vincenzo and Segundo Sarango knew that this group of workers transferred to Newark supported the Union.  Rivera speculated that they reported this

JD(NY)-05-23

to foreman Macas (who is allegedly the cousin of Sarango).  Rivera testified that the group of workers supporting the Union no longer talked about the Union because they knew Sarango and Vincenzo would inform Supervisors Macas in Nutley or Rodriguez in Newark of their support for the Union.  Rivera also testified that Vincenzo and Sarango received higher wages and
5     overtime work when they were assigned to a different jobsite while his work hours were reduced when he worked in Newark (Tr. 466–469).

While at the Newark jobsite, Rivera recalled that Rodriguez was his supervisor.  He knows him to be the supervisor because Rodriguez would give direction for work assignments.  Rivera
10     recalled one occasion when he was getting his tools to start the day's work when Rodriguez commented to him and other workers that he knew they were in favor of the Union and that they should all go work for the Union.  Rivera believed that Armando Anaya, Nelson Benitez, Juan Alvares, and  Ulises Javier Fuentes were present when the comment was made by Rodriguez.  Rivera testified that none of the workers wanted to discuss their support for the
15     Union after Rodriguez made this comment (Tr. 469–472).

Rivera also recalled an incident with Espinoza at the April 29 meeting at the Newark jobsite.  Rivera testified that Espinoza was handing out flyers in disfavor of the Union.  Rivera
20     was allegedly asked by Espinoza if he had signed the union card and Rivera lied when he replied, "no."  Rivera stated that Espinoza then commented that "…all the Salvadorians had betrayed him."  Rivera stated that Molina was present.  Rivera also recalled another occasion when he was going to work with Nelson Benitez and Espinoza directly accused Benitez that he was the lead worker in supporting the Union.  Rivera believed Armando Anaya was standing nearby and overheard this accusation made by Espinoza  (Tr. 472, 473).[16]
25

Rivera testified to another incident involving the brother of Espinoza.  He stated that Freddy Espinoza (Freddy) has acted as an IBN supervisor.  He testified that Freddy has given him instructions and work assignments in the past.  In April or May, Rivera testified that Freddy
30     started making phone calls to Rivera and asked whether Rivera has received his ballot to vote.  Rivera responded "no" in the initial call from Freddy.  Rivera stated that Freddy would call him four or five consecutive days if he had received the ballot.  Finally, Freddy gave Rivera the NLRB phone number to get a ballot.  When Rivera received his ballot, he did not want to inform Freddy because he was afraid that Freddy would tell him how to vote.  Rivera stated that Freddy wanted to see his completed ballot.  Rivera testified that he made a copy of the blank ballot and
35     indicated on the ballot that he did not vote for the Union.  He said that the copied ballot was texted to Freddy.[17]  Rivera stated that he completed the original ballot in support of the Union and mailed that ballot to the NLRB (Tr. 474–477).

Rivera explained he was scared that Freddy would take his ballot and sign the ballot in
40     favor of IBN so he did not want Freddy to take the ballot from him (Tr. 477).  Rivera stated that he was informed by the brother (or brother-in-law) of Freddy's wife that ballots were taken away from the workers and completed by someone on behalf of IBN.  He stated that he is a close

---

[16] Molina previously had testified that he was present with Rivera when Espinoza insinuated that Benitez was the lead supporter for the Union.

[17] This incident with Freddy was similar in the earlier testimony of Garcia with respect to foreman Macas instructing Garcia to show him the ballot (Tr. 526).

friend of Freddy Espinoza's family.  He was told of two workers who had their ballots taken by Freddy.  He only recalled the name of Guillermo Anamarca, who had his ballot taken (Tr. 480, 481, 484, 485, 486).[18]

5      Simbana testified that he was told by Rivera that a supervisor named "Roman" from another company, called "FR" was in charge of demolition at the Newark jobsite.[19]  According to Simbana, Rivera told him that Roman instructed Rivera to send a picture of his completed ballot to him via text message (by phone).  Simbana did not remember when this conversation occurred, but it was in 2021 and prior to the Union's withdrawn of its representation petition (Tr.
10    157–159).

       Rivera also testified to a workers' meeting in about April at the home of Nelson Benitez. He said there were 10 workers and two representatives from the Union at the meeting.  He recalled that Simbana was at the meeting.  Rivera denied that there was a recording of that
15    meeting (Tr. 477, 478).  Simbana testified that the workers discussed overtime, private jobs, election, and workers' rights at the meeting.  Simbana stated that one of the reason for the meeting was that he had received calls from the workers that the owner was interfering with the election process (Tr. 41–44).

20     Rivera was subsequently recalled as a witness for the Union.  Rivera testified that he knows Freddy Ramon Espinoza (Freddy) as the brother of Nelson Martin Espinoza, the owner of IBN (Tr. 752).  Rivera recollected that Freddy telephoned him about his ballot.  As Rivera previously testified, above, Freddy asked if the ballot had arrived and Rivera responded in the negative.  Rivera said he was instructed by Freddy to do nothing with the ballot until he (Freddy)
25    has seen it (Tr. 752, 753).  Rivera testified that he sent Freddy a picture of a copied ballot showing that he supported IBN.  He completed his original ballot showing his support for the Union (Tr. 753).  Rivera testified that he sent the picture of the ballot by video to Freddy.  Rivera included a message in his video that stated, "Look roman, I am in support of you." He said it was sent a couple of days after he mailed in his original ballot in support of the Union (Tr. 754, 755).
30    Rivera indicated that he did not speak to Freddy before the video text was sent to him and never received a response from Freddy after the video was sent (Tr. 759).[20]

       Rivera gave testimony of an incident on September 17, 2022.  Rivera testified that he was playing cards and watching a volleyball game in a Newark park in the evening when Freddy
35    Espinoza arrived at the park.  Freddy went up to Rivera and pointed his finger at him and called

---

[18] There is no worker by the name of Guillermo Anamarca on the list of IBN workers (see, GC Exh. 7). There is a worker named Edgardo Anamarca, who signed a union authorization card on October 20, 2021 (GC Exh. 3 at 4).

[19] Fuentes testified that Freddy Espinoza is also known as "Romano," which might also be his nickname as "Roman" (Tr.  501). Also, see testimony of Rivera, who stated that "Roman" is Roman Espinoza and the brother of Nelson Martin Espinoza (Tr. 755).

[20] The Union sought to introduce the video and text of the transmission to Freddy as part of the record.  Union counsel represented that the video and text was sent by Rivera to a person named "Roman" (Tr. 755). The Respondent's counsel objected, asserting that the video and text sent to someone named "Roman" was not necessarily Freddy Espinoza.  I held the exhibit in reserve pending the testimony of Freddy Espinoza (Tr. 760, 761; U. Exh. 1 (a) and (b)).  The counsel for the Respondent subsequently conceded that the phone number used by Rivera in his video text was in fact the cell phone number of Freddy Ramon Espinoza and the exhibit was entered into the record (Tr. 776).

him the "Judas of the company" and wished bad things on the Respondent company.   Rivera testified that Freddy called him "Judas" three times and admittedly believed that Freddy was drunk.  Rivera testified he left the park because he was fearful as to what Freddy was capable of because he was drunk (Tr. 761–763).  Rivera said he reported this incident to Simbana about a
5    week later (Tr. 767).

The record shows that Rivera received a letter of apology from Nelson Espinoza personally handed to him at the West Orange jobsite.  He also received a verbal apology from Espinoza when Rivera was handed the letter.  Espinoza told Rivera that Freddy did not have the
10    right to say what he said. Rivera said that the letter of apology was also sent to a coworker who was present during the Freddy incident, but did not know if the letter went out to all employees (Tr. 768–770).

### 7. The testimony of Luis Eduardo Jimenez

15

Luis Eduardo Jimenez (Jimenez) is a laborer and driver with IBN for approximately here years.  He worked in the IBN yard in Irvington, New Jersey.   He knows Simbana and had exchanged several phone conversations with him about the Union.  He believed a coworker provided his telephone number to Simbana.  Simbana met with Jimenez in 2021 outside of his
20    residence.  Jimenez completed the union authorization card on February 23.  He testified to completing all the information on the card.  He was informed by Simbana that in signing the card, he would be supporting the Union and for greater benefits on his job (Tr. 416–420; GC Exh. 3 at 11).  Simbana testified he went to Jimenez' home to further discuss about the Union. He recalled that Jimenez signed the authorization card on February 23.  Simbana denied making
25    any marks on Jimenez' card (Tr. 81, 82).

Jimenez knows Espinoza as the owner of IBN.  He recalled a conversation with Espinoza over the phone in May regarding the upcoming election.  According to Jimenez, Espinoza inquired whether Jimenez had received his ballot to vote.  Jimenez responded that he had
30    completed the ballot, but had not sign the back of the envelope.  Espinoza told Jimenez that he completed the ballot incorrectly and provided him with the NLRB phone number to obtain another ballot.  Jimenez called and received a second ballot.  Jimenez then received a second phone call from Espinoza asking if he had received the second ballot.  Jimenez replied in the affirmative and was instructed to bring the ballot to the IBN yard in Irvington so that Espinoza
35    could help him complete the ballot (Tr. 421, 422, 443).

On the date after their conversation, Jimenez arrived at the yard and Espinoza asked if Jimenez had his ballot.  Jimenez replied he did and the two proceeded to Espinoza's car.  Inside the car and in the presence of Espinoza, Jimenez completed the ballot in support of the employer.
40    Jimenez testified that Espinoza was sitting next to him in the car, so he pretended not to support the Union.  Jimenez admitted that Espinoza did not tell him how to vote while they were in his car.  Jimenez also admitted that he does not know if Espinoza knows how he voted.  He said that Espinoza then took his ballot and informed Jimenez that he will mail the ballot on his behalf.[21] Jimenez then left the car and started his work day (Tr. 422–425, 452, 453).

---

[21] Jimenez testified that he mailed the first ballot supporting the Union to the NLRB (Tr. 433).

Jimenez testified that there was an audio recording of his second phone conversation with Espinoza.  He did not recall when this phone conversation actually occurred but he happened to be in Simbana's car when he received the call from Espinoza.  Jimenez testified that he gave Simbana permission to record his conversation with Espinoza.  In the audio recording, Jimenez was asked by Espinoza if he had received the ballot.  Jimenez replied "yes."  He was asked by Espinoza to bring the ballot (to the yard) (Tr. 425–427, 434, 435; GC Exh. 9(b)).

Simbana testified that he heard the audio exchange between Jimenez and Espinoza when Jimenez sent the audio to him (Tr. 205, 206).  Simbana testified that Jimenez informed him that Espinoza had called him and asked if he had already voted.  Simbana said Jimenez responded "yes" to Espinoza.  According to Simbana, Espinoza then told Jimenez to call the NLRB for a new voting ballot and when he gets it, to meet him at the company yard.  According to Simbana, Jimenez went to the yard and Jimenez completed the new ballot in front of Martin in favor of the company.  It was in 2021, but Simbana did not recall the date.  Simbana stated that his conversation with Jimenez occurred prior to the petition being withdrawn.  Simbana believed that Jimenez completed two ballots.  Simbana said that Jimenez was afraid of losing work hours and being retaliated against (for his support of the Union) (Tr. 150–157).

Jimenez testified that he is paid by a company name Jalisco even though he worked for IBN.  Jimenez denied that he had ever worked for Jalisco.  He said that he started to receive payroll checks from IBN about the time the ballots were being mailed.  He testified to doing the exact same work.  Jimenez said he would pick up his check at Espinoza's house or sometimes at the Irvington office (Tr. 427–430).  Jimenez also testified that he asked Espinoza for a raise in May at the Irvington yard.  At the time, Jimenez was receiving $18 dollars per hour and requested $1 dollar raise.  According to Jimenez, Espinoza responded, "let's wait till the next pay period."  Jimenez opined that Espinoza was referring to the results of the elections.  Jimenez testified that he received a $1 dollar raise in early 2022 after he had asked a second time for a raise (Tr. 430, 431).

Jimenez also testified to a conversation with Espinoza about September 23, 2022.  At the time, Jimenez worked Monday through Saturday.  On that date, he received a text from Espinoza that there was not work for him on the following Saturday.  He was told there was not much work to do on this Saturday.  Jimenez believed that there was work being done on Saturday and complained to Simbana.  Jimenez insisted that there was always work for him to perform on Saturdays.  However, on cross-examination, he admitted to several Saturdays in July and August 2022 when he did not work (Tr. 431–433, 438, 449–451).  Jimenez simply thought it was strange that Espinoza would send him a text for the first time that there were no work for him on that Saturday.  He said that he never before (or since) received a text from Espinoza not to come to work on a Saturday (Tr. 454).

### 8. The testimony of Nelson Benitez

Nelson Benitez (Benitez) is a machine operator and has been employed with IBN at the Newark jobsite since 2016.  On occasions, he would also perform demolition work.  His supervisor is Rodriguez and he knows Espinoza as the owner of IBN.  Benitez resigned from

IBN in November.  He testified leaving the company because he was being intimidated and retaliated against by Rodriguez and Espinoza because he supported the Union.  He also complained about his work assignment was altered and his hours were reduced (Tr. 544, 545).

5       Benitez knows Simbana as a representative of the Union.  He first met Simbana at the Newark jobsite, but did not recall when.  Benitez said Simbana gave him his phone number and they met again outside of his home.  Benitez said that he called Simbana.  Benitez testified that he met Simbana the very next day after their initial meeting at the Newark site.  He said that Simbana explained the purpose of the union authorization card and that by signing the card, he 10 authorized the Union to represent him with IBN.  Benitez signed the card when he met Simbana again on December 29, 2021  (Tr. 545–548, 599; GC Exh. 3 at 7).

      Simbana testified that he met with Benitez over 10 times.  He did not recall when Benitez signed his card but did recall he made no marks on Benitez' union card (Tr. 75–77).

15

      Benitez recalled a group meeting on about April 9 with Espinoza at the Newark jobsite.  Benitez said that his brother, Francisco  was with him and that supervisor Rodriguez was with Espinoza.   Espinoza asked if Benitez signed the authorization card.  Benitez replied, "yes."  Espinoza told them there was no future with the Union (Tr. 548, 549).

20

      Benitez testified that there was a second meeting called by supervisor Rodriguez on April 29.  Benitez said that Espinoza was at this meeting.  He did not recall if there were other workers around.  Benitez did not testify as to what was said at this meeting because he was sent home by Espinoza.  Benitez stated that earlier on the same day, he was putting his tools away with his 25 brother, Francisco Benitez, when Espinoza appeared.  According to Benitez, Espinoza approached Benitez and stated to him that "I know you are the head of all this shit.  That you need to stop ruining the heads of the rest of the workers."  Benitez asked how he knew and Espinoza responded that the Union has its people and he has his people to report back to him.

30       Espinoza also allegedly stated that the Union promises nice things but never delivered and that the Union will take half of his salary.  Benitez also asserted that Espinoza told him that everyone will be sent home during the election process and the company will hire new worker.  It is alleged that Espinoza also stated to him that the workers that had signed authorization cards will not be coming back to work.  Benitez was told by Espinoza to go home and that is the 35 reason Benitez did not attend the meeting that was called by supervisor Rodriguez on that day (Tr. 549–554, 562, 563, 565, 566).  Benitez believed that Espinoza knew at the time that he had signed the union card.  Benitez said his brother was also sent home by Espinoza (Tr. 560)

      Benitez complained that shortly thereafter, his work duties and hours were changed.  40 Benitez performed mostly machinery work but was now instructed to do demolition work.  He insisted that he rarely performed demolition work prior to April.  His work hours were reduced in late April when he used to work nine to 11 hours, he was only working eight hours from Monday to Friday.  He stopped working on Saturdays and was also sent home during inclement weather (Tr. 554–556, 567).

45

Upon my examination, Benitez testified that supervisor Rodriguez told the workers that they will be receiving their ballots to vote in the union election. Benitez mentioned this to Simbana, but did not recall what else was discussed with him (Tr. 573–575). According to Simbana, Benitez called him about not receiving his ballot (Tr. 224, 225, 228). Simbana was

5      also informed by Benitez that Espinoza asked the workers who were in favor of the company to be sure to update their addresses. Simbana recalled that Benitez told him that Espinoza did not ask the workers who supported the Union to update their addresses (Tr. 167–169). However, Benitez subsequently testified that when he moved his residence and changed his address after signing his union card (in December 2020), IBN did ask Benitez to update his address and he

10     sent a picture of his new address to Foreman Macas (Tr. 575, 576).

Benitez was aware that Francisco Martinez and Jose Pereira were terminated. He knew them from working at the Newark jobsite. He was not certain as to the reason for their termination. Benitez said that they both informed him that they were been "dumped" by IBN.

15     Benitez recalled that both were replaced by two different workers. He believed they were new workers and had not previously been employed by IBN (Tr. 556–559, 569).

### 9. The testimony of Harrison Nicholas Lopes

20     Harrison Nicholas Lopes (Lopes) is a laborer with IBN since September 2019.[22] He performed mostly demolition work at the Newark jobsite. His supervisor at the jobsite was Rodriguez. He stopped working at IBN in June 2021(Tr. 588 –590). Lopes testified that when he first started working at the Newark jobsite, he started from the first floor of the building and worked his way to the upper consecutive floors. He stated that the workers would demolish the

25     inner walls (sheet rock) of each floor, working to the top floor. Lopes said that once that was completed, he and the other workers would start demolishing the heavier concrete materials of the outer walls and work down from the top floor (Tr. 607, 608). Lopes worked back and forth between the Newark and West Orange (New Jersey) jobsites (Tr. 608).

30     Lopes testified that he knows Simbana as a representative from the Union. He recalled meeting Simbana in January near his West Orange jobsite (Tr. 590). He met Simbana only once at the West Orange jobsite. Lopes said that he had seen Simbana also at the Newark jobsite but had not spoken to him at that jobsite (Tr. 599, 611). Lopes said that Simbana spoke to him about workers' rights and that the Union was there to help him to improve his working conditions and

35     get better wages, in addition to getting health benefits. Lopes asked Simbana to meet him again near his residence in Newark. Lopes gave Simbana his phone number to call. Lopes testified that he signed the union card on April 21 and that he completed all the information on the card (Tr. 590–593, 609, 610).

40     Simbana testified that he met Lopes near his home in Newark at a restaurant. He testified that Lopes signed the union authorization card on April 21. Simbana said he made no marks on Lopes' union card (Tr. 83, 84; GC Exh. 3 at p. 13). Lopes testified that his address on the union card was correct. He insisted that the address reflected on the voter list of 80 Walnut Street is

---

[22] I note that the correct spelling of his surname is "Lopes" as reflected in his union authorization card and not as "Lopez" (GC Exh. 3 at p. 13).

incorrect and that he never lived at that address.  He asserted that the Respondent never told him to update his address or provide him with a change of address form (Tr. 593, 594, Jt. Exh. 3).

Lopes testified that he knows Espinoza as the owner of IBN.  He recalled Espinoza
5      discussing the Union in February with a group of workers at the West Orange jobsite.  According to Lopes, Espinoza was discussing the upcoming election and that they should not vote for the Union.  Lopes testified that Espinoza said that "…he just said that we shouldn't vote for the union, that the people who work for the union were liars, and they always tell lies and stuff like that." (Tr.  594, 595, 600).  Lopez testified that Espinoza did not tell him how to vote (Tr. 596).
10

Lopes testified that Espinoza has observed him with Simbana at the West Orange jobsite 1 or 2 days after the February meeting.[23]  Lopes testified that he was eating lunch in his car outside the West Orange jobsite and that Simbana was outside the car with the car door open. He spoke with Simbana for 15 minutes.  Lopes testified that  Espinoza told him (on a subsequent
15      day according to Lopes) to stop by and see him.  Lopes testified that he had a second conversation with Espinoza a "few days later."  Lopes was told by Espinoza that he observed him talking with Simbana outside the jobsite for 15 minutes and that Espinoza told Lopes that, "He said that we should not speak to him because what he was saying was not the truth and -- and we should not listen to him. Basically that."  Lopes said no one else was present when the
20      remarks were made by Espinoza. (Tr. 596–598, 600, 601).

Lopes asserted that he believed Espinoza was watching him talk with Simbana.  He testified not seeing him during this time but maintained that it is Espinoza's routine to walk around the jobsite, so Lopes assumed that he was being watched while talking to Simbana (Tr.
25      612, 613).  Lopes believed that he was being watched closely by Espinoza because allegedly Espinoza had started to file a lawsuit against the Union (Tr. 598, 615).  Lopes did not know if the lawsuit was also filed against the IBN workers who supported the Union (Tr. 616).

Lopes also complained about his reduced work hours after signing the union card and
30      speaking with Simbana.  Lopes testified that he worked 8 hours Monday through Friday at the Newark jobsite.  He also complained of having only seven or eight hours of work on Saturdays. He testified that he formerly worked 10 to 12 hours Monday through Friday at Newark and other jobsites (Tr. 602, 603).

35      Lopes was injured at work on June 21.  He did not return to work after his work-related injury.  Lopes testified that he fully recovered from his injury and sent a text message to Espinoza about 4 months after his injury that he could work.  He was informed by Espinoza that there was no work for him at IBN (Tr. 617, 618).  Admittedly, Lopes initially believed he did not expect to return to work due to his injury and that the demolition work was hard and difficult on

---

[23] Lopes subsequently testified on cross-examination that he only met Simbana once at the West Orange jobsite and that was in February when Espinoza allegedly observed him talking with Simbana during a morning break around 9 a.m. (Tr. 611).  This is contrary to his earlier testimony that he met Simbana at the West Orange jobsite in January (Tr. 590).  However, the lack of recollection as to the month of their meeting does not distract from what had occurred.  Lopes' credible testimony is based upon the specificity and details of his testimony in regards to Espinoza's observation and telling Lopes of his 15-minute observation of him with Simbana.

his medical condition.  He testified that he did not know the progress of his recovery at that time when he did not expect to return to work (Tr. 620, 621).[24]

### 10. The testimony of Juan Alvares Camacho

5

Juan Alvares Camacho (Alvares) is a laborer with IBN since 2015.  He mostly work in cleaning rubbish and the demolition of concrete and other materials.  He has worked at the Newark jobsite but at the time of this proceeding, but he was reassigned to the West Orange worksite.  At the time of his reassignment, there were four other workers with him at the Newark

10    jobsite.  Alvares noted that there were ten workers when the demolition work was being done at Newark.  He was told by Espinoza that Rodriguez was his supervisor.  He has taken work assignments and orders from Rodriguez.  He believed that Rodriguez has a little office on the first floor at the Newark jobsite (Tr. 626–630).

15    Alvares stated that he knows Simbana as a representative from the Union and recalled meeting him on the morning of January 12 in front of the Newark jobsite.  Alvares stated that Simbana called out and asked if he was a worker (Tr. 638).  Alvares testified that he signed the union card in Simbana's car on that date before going to work (Tr. 630, 631; GC Exh.3 at p. 2). Simbana informed Alvares that signing the card was to give the Union authorization to represent

20    him with IBN (Tr. 631, 632).  Alvares said that he was told by Simbana that he would receive better wages.  Alvares said that Simbana did not mention  health benefits or retirement benefits if he decided to join the Union (Tr. 640, 641).

25    Simbana testified that he met Alvares at the jobsite in Newark on January 12 and he signed the union card.  Simbana said no one else was present.  Simbana testified that he penned in the address, phone number and noted the location where the card was signed on the upper right hand corner of the card.  Simbana said that Alvares had a cup of coffee in his hand and gave him permission to complete part of the union card (Tr. 68, 69).

30    Alvares testified that his work hours were reduced in April.  He stated that he had always worked nine hours Monday through Friday and eight hours on Saturday at the Newark jobsite. He said his work was reduced to 8 hours per day Monday through Friday and received only four hours of work on Saturday (Tr. 632, 633).  After his hours were reduced, Alvares recalled discussing the change in his hours with coworkers in either March or April at the Newark jobsite. He believed there were eight workers in this group discussion.  He recalled that supervisor

35    Rodriguez was present and commented, "This is what you guys wanted.  This is what you guys were looking for.  The owner is furious."[25]  Alvares believed that Rodriguez was referring to the Union and that Espinoza was furious (Tr. 633–636).

Alvares also recalled a second discussion with the workers about the Union around the same time frame.  He said that foreman Rodriguez was also present at this second group

40    discussion.  Alvares testified that Rodriguez said, "What are you guys doing being part of the

---

[24] The amended complaint did not allege, and I do not find, that the Respondent refused to rehire Lopes due to his protected union activity.
[25] There was a typographic error in the transcript.  The testimony was incorrectly transcribed as "The owner is *not* furious," which is clearly a mistake (Tr. 636).

union?…you guys don't have documents."  Alvares believed that Rodriguez was referring to those workers that are lacking immigration status documents.  Alvares recalled that Francisco Benitez and Oliver Fleinez were present when the remark was made by Rodriguez (Tr. 636, 637).  Admittedly, Alvares said that Rodriguez did not threaten to report the workers to the immigration officials and never threatened any of the workers (Tr. 642, 643).

#### IV.   THE TESTIMONY OF NELSON ESPINOZA AND DAYANA COELLO AS CUSTODIANS OF THE RECORDS

#### 1.  Nelson Martin Espinoza

Nelson Martin Espinoza (Espinoza) was called by the General Counsel as the custodian of the records on a subpoena served on the Respondent.  He testified that he is the owner of IBN and has a host of responsibilities, from getting jobs, getting workers for the jobs, negotiating contracts, preparing documents and forms, and other duties (Tr. 681).

The General Counsel issued a nine-page subpoena served on IBN (GC Exh. 6).  Espinoza testified that he doled out locating the documents to his payroll clerk, Dayana Coello (Coello), to find payroll records and a list of employees.  Espinoza said he was responsible to search for the rest of the subpoenaed documents, such as communications between employer and employees (Tr. 682, 683).  The responded documents were introduced in the record as the list of IBN employees and the payroll records (GC Exhs. 7, 8).  Espinoza testified that there were over 40 folders of payroll records.  He said it is not familiar with each payroll sheet (Tr. 682–684).

With regard to the specific items requested by the General Counsel, IBN was subpoenaed for a list of all employees working at the jobsites, including but not limited to daily sign-in/out logs.  Espinoza testified that there are sign-in/out sheets at the back warehouse of the yard, but he does not know if the signing is done on a daily basis.  He also stated that some sign-in sheets are located at the jobsites as with a sign-in/out at the West Orange jobsite.  Espinoza said that some sign-in/out sheets are prepared by the foremen at the different jobsites.  He said he has not seen this particular sheet from West Orange, but does not deny it is an IBN sign-in/out sheet.  Espinoza said that the sheets are blank and he does not know if the sheets are at the jobsites or if the foremen pick them up at the yard.  He also not sure how the sheets are returned.  He surmised that the foreman could drop off the sign-in/out sheets at the yard at the end of the day; he may wait a week before dropping the sheets, or even take a picture of the sign-in/out and send it by phone text (Tr. 684; GC Exh. 14).[26]

Espinoza testified that Coello is the payroll clerk.  He said that she would see the sign-in/out sheets in preparing the payroll for the workers, but he also acknowledged that the sheets are not at every jobsites.  Espinoza also indicated that workers would call (or text) her their hours if there are no sign-in/out sheets.  He does not know what Coello does with the sign-in/out sheets after doing the payroll (Tr. 688–691).  There is no verification of the hours worked when employees call (or text) in their hours (Tr. 693).  Espinoza was not fully knowledgeable of the information contained in the payroll record.  When inquired as to what was meant by "extra

---

[26] Espinoza identified the foremen as Angel Macas, Jorge Rodriguez, and Jacek Mioduszewski (Tr. 721).

pay," he did not know.  He surmised that the extra pay next to an employee is money given to the worker for the purchase of materials (Tr. 692, 693).

Espinoza further testified that he is not familiar with other notations in the payroll record, such as "void" and "total amount of other checks", and "job analysis report."  He believed they
5   were noted by the payroll company that processes the payroll and issues the checks to the workers.  Espinoza said he is the only person who can authorize overtime (Tr. 697–700).

With regard to IBN's list of employees (GC Exh. 7), Espinoza said that Coello had prepared this report pursuant to the General Counsel's subpoena.[27]  Espinoza admitted that not all the names of his employees are listed.  Espinoza stated that he was responsible for classifying the
10   job categories of the workers, primarily based upon the majority of their duties.  He explained that a worker could be a "mason" but also could be a driver.  He stated there is no documentation to verify their job duties.  He is unsure as to how the information was provided for the hiring dates of the workers reflected in the list of employees.  He is also unsure as to how the information was gathered for the date of separation of a worker.  He assumed that Coello
15   provided the information on date of hire and separation of a worker (Tr. 701–704, 736, 738).  Espinoza said that he provided the reason to Coello when a worker resigns (Tr. 706, 707).

Espinoza testified that he provided the information on the rate of pay on the list of employees because he has personal knowledge of their wage rates.  For other workers, Coello would look up the payroll record for their wage rate.  He stated that the wage rate would be
20   different, depending on the type of jobs.  He believed that public and certified jobs (contracted by the local government) would be at a higher rate of pay.  He was unsure why some workers were not on the list (Tr. 707–711).  Espinoza could not specifically recall the reason that Jose Patricio Pereira (who was discharged for not showing up for work) was not listed as an employee who was separated from the company.  Pereira was listed as "Jose A. Pereira." (Tr. 712.)
25   Espinoza believed that the person should be Jose Patricio Pereira (Tr. 713).  Other than the three names (Pereira, Melvin Garcia, and Francisco Martinez) listed as terminated, Espinoza did not recall if there were other employees also terminated (Tr. 716, 717).  Espinoza assumed that the last day of work for the separated workers was their last day they were paid and not the last day they had worked (Tr. 733, 736).  He also stated that the company does not retain any records of
30   the reasons that an employee was absent from work (Tr. 744).

## 2. Testimony of Dayana Coello

Dayana Coello (Coello) is the payroll clerk for IBN and has been in this position since 2018 (Tr. 256).  Coello was responsible for collecting some of the documents pursuant to the General Counsel's subpoena.  She testified that the payroll records were produced by a third-
35   party payroll company named Olympic Payroll Records.  Coello would collect the hours worked by the employees and submit the information to Olympic for processing the paychecks. (Tr. 248–251; GC Exhs. 7, 8).  When she sends in her Excel sheet to Olympic, she gets the payroll register in return.  Coello would then double check with her Excel data to make sure the proper amounts
40   were issued in the checks (Tr. 266).

---

[27] GC Exh. 7 is the list of IBN employees.  There are several columns on the list, to include: employee names, job classification, date of hire, date of separation, reason (for the separation), and the hourly rate of pay.

Coello explained as best she could about the codes on the Excel sheet.  As noted above by Espinoza, certified jobs might have prevailing rates.  Coello said there is a special code for that.  The special code is used routinely on jobs from government contracts.  However, the hours
5    worked are reported by the individual worker.  She said that non-certified jobs are classified with the "200" code.  She said the code 100 is an officer worker.  She is the only employee with code "100" (Tr. 267–270; see GC Exh. 8 at pp 4 and 5).  She said that Olympic also issues the check for certified jobs (Tr. 290).  Coello responded that a paycheck might be delayed in being issued to a worker because a correction needed to be made, such as a worker receiving overtime pay
10   when his worked hours only reflected 40 hours of work.  She said that sometimes, the corrections were based on subsequent information provided by the worker that further delayed the issuance of a paycheck.  On certified jobs, any corrections are provided by the people in charge of the project (Tr. 271, 272; see, GC Exh. 8 at p. 19).

15   Coello testified that IBN does not maintain the hours worked by the employees.  She said that workers would call in or text as to the number of hours worked per week.  She then completes the payroll.  She records the information on an account sheet that she turns over to Olympic.  Coello provides the name, hours worked, rate of pay, and employee code, and sometimes the jobsite of the worker to Olympic.  As noted, she does not store the information on
20   the hours worked when she receives the information by text or called-in by the workers.  Coello said there is no validation of the hours worked.  She would, however, verified the hours worked with Espinoza for overtime or holiday work.  She said, on occasions, the hours worked is written down on a piece of paper.  After she records the information, she throws away the piece of paper.  She said that the slips of paper are not stored (Tr. 251–254).  Coello testified that workers on
25   subcontract jobs, like with Jalisco, do not call-in to her on their hours worked if they had worked for Jalisco (Tr. 292).

Coello was not aware of any sign-in/out sheets.  She again stated that workers call in their hours worked or provide a piece of paper of hours worked.  She said that payroll data is on an
30   Excel spreadsheet and, along with the general payroll register, is kept on the company computer (Tr. 255, 290); see, GC Exh. 8).  Coello is also not aware of any personnel files of employees that are kept.  She has no knowledge if discipline or other personnel actions taken were taken.  Coello said that IBN maintains the workers' W-4s, but that there are no hiring forms (Tr. 256, 257).
35

Coello testified that she did not do the search for information on the two discharged employees, Jose Patricio Pereira and Francisco Martinez.  However, she does inform Olympic that someone was fired or had resigned so that Olympic would know not to issue them any additional paychecks.  (Tr. 258–263). Coello said that Olympic put together the hiring and
40   termination dates.  She was responsible for providing the wage rates (see, list of employees at GC Exh. 7; Tr. 264).  Coello testified that the reason for the discharge of Martinez, Pereira, and Garcia "five days no-show" was provided by Espinoza.  Coello said that IBN had no documentation about their termination (Tr. 285, 286).

45   With regards to the list of IBN workers, Coello testified that she put the chart together after gathering the information.  She said the hourly pay rate is from her Excel spreadsheet (Tr.

283, 284).  Coello testified that she did not fill in the column for the job classification of each employee.  She believed that Espinoza completed that column on the list.  She said there are no list of promotions given to workers (Tr. 261, 262; see GC Exh. 7).  She said that Espinoza was responsible for providing the hourly rates for the employees listed in her Excel sheet.  She does 5    not know what "extra pay" meant that was provided by Olympic (Tr. 276,  277).

Coello said that workers are classified as "seasonal workers" when the would only work a couple of weeks.  She also said that seasonal workers might be so classified when they work on and off for a duration of time.  Coello pointed that worker Mario Vicuna was designated as a 10    seasonal because he worked on and off from June 18, 2017, through April 17, 2021 (Tr. 287). Coello testified that IBN does not keep records or documents of the duties and responsibilities of the supervisors and workers.  She has no knowledge of the supervisors' duties. (Tr. 265).

V. THE RESPONDENT'S CASE-IN-CHIEF

15    1. The testimony of Angel Macas

Angel Macas (Macas) has been employed by IBN for 14 years. He identified himself as a laborer and a foreman at the Nutley jobsite.  He held the dual position in 2021.  He knows Francisco Martinez as a laborer who works under his supervisor at the Nutley jobsite (Tr. 791, 792).  As a laborer and foreman, Macas would assign work to the workers and would also 20    perform labor work.  Macas testified that as foreman, he would give out work assignments and ensure the workers had proper safety equipment.  He had eight or nine workers at the Nutley jobsite (Tr. 797, 798).  Macas testified that he has known Martinez as a worker for two or three years at the Newark and Nutley sites.  He found Martinez to be a good worker (Tr. 804, 805).

Macas testified that Martinez stop working for IBN on March 21.  Macas did not recall 25    the last day that Martinez had worked, but recalled the work assignment ended on a Friday. Macas testified that he told Martinez to report to work on Monday at the IBN yard (Irvington, New Jersey).  Macas said that the work was not 100 percent completed at the Nutley jobsite. Macas stayed behind with four other works to finish the miscellaneous aspects of the work. Macas testified that Martinez and the rest of the workers were told to report for work at the yard 30    on Monday (Tr. 792, 793).  Macas recalled that he instructed Martinez, Segundo Sarango, and two other workers to report for work at the yard on Monday (Tr. 796, 799).  Macas said that Espinoza would be at the yard and he will decide where the workers would be working on the following Monday (Tr. 973).  Macas testified that Espinoza would probably not know which worker would show up for work on Monday, but he would assign the worker to jobs, depending 35    where the work was needed.  Macas said this has been routinely done in the past (Tr. 799, 800).

Macas testified that he was unaware that Martinez did not show up for work on Monday. He had no discussions with Espinoza over whether Martinez showed up or not at the yard.  He was not aware of Martinez' absence and did not find out that he was absent until contacted by Espinoza about two weeks later.  Macas is aware that Martinez has not shown up for work for 40    one or two weeks in the past and informed Espinoza of the same.  Macas said that in the past, after Martinez returned after one or two weeks' absence, he would be put to work (Tr. 806, 807).

34

Macas further testified that the four workers who stayed with him to finish the work in Nutley were Boris Martinez, Diego Villavicencio, and two other workers that he could not recall their names.   Macas explained it was convenient to keep these workers at the Nutley jobsite because Boris Martinez had a car and he would drive Villavicencio to Nutley and back home after work.  Macas also said that the third worker also had a car and that Macas would drive the fourth worker to the job and back home.  He testified that the rest were sent to the IBN yard (Tr. 800, 801).

Macas testified that he also knows Melvin Garcia as a worker.  He recalled that there was a Union election occurring in the spring of 2021.  Macas denied that he instructed Garcia to send him or anyone else, a picture of Garcia's ballot.  Macas also denied telling Garcia how he should vote on the ballot.  At the time of his testimony, Macas stated that he is still unaware as to how Garcia had voted  (Tr. 793, 794, 802).

## 2. The testimony of Jorge Rodriguez

Jorge Rodriguez (Rodriguez) is employed as a foreman with IBN.  He has worked for IBN for 8 years and has always been a foreman.  Rodriguez testified that he was aware of a union election occurring in spring 2021.  He insisted not speaking to any workers about the Union or the election (Tr. 811, 812).   Rodriguez repeated that he had no conversations with the employees about the Union in March, April, or May.  He recalled that Espinoza gave out flyers to the workers about the Union and that he read from the handouts (Tr. 812, 813).

Rodriguez testified that he knows Jose Patricio Pereira as a laborer under his supervision.  He asserted that Pereira was discharged after he failed to report to work after 5 days.  He believed this occurred in May.  Rodriguez could not remember the dates in May, but believed that the last day Pereira worked was on a Saturday.  He testified that Pereira then missed work from Monday through Friday of the following week.  Rodriguez said that Pereira never called him to report his absence.  He is not aware if Pereira had contacted another supervisor about his absence (Tr. 813, 814).  Rodriguez testified that when he visited the yard after the 5 days, he informed Espinoza that Pereira had not signed in for work.  He is not aware of any other worker who had missed 5 days of work without permission (Tr. 835, 836).

Rodriguez testified that he knows Nelson Benitez as a worker he had supervised.  He said that Benitez no longer works for IBN.  He believed that Benitez stopped working for IBN  in September and did not call that he was absent.  Rodriguez said that Benitez operated a small fork lifter (Bobcat) at the Newark jobsite.  The Bobcat was used 80 percent of the time to demolish the exterior walls whereas the jackhammers were used 80 percent to demolish the interior walls of the building (Tr.  815–817).  Rodriguez said that Benitez' work duties changed towards the end of April because the workers started to demolish the first floor and a Bobcat was not needed for the interior walls.  Benitez then started using a jackhammer to demolish the inside walls (Tr. 817, 838, 839).

Rodriguez recalled that there were 14 workers at the Newark jobsite in March.  He recalled only one meeting with the workers to discuss the Union in March (Tr. 824).  He said that owner Espinoza called the meeting and that he had paper handouts to give the workers.  The meeting occurred in the early morning about 7 a.m. before the workers began their assignments.

He believed that 12 to 14 workers were at this meeting.  He said that Espinoza did all the talking.  Rodriguez denied that telling the employees that he knew who supported the Union.  He also denied that Espinoza stated that he knew which workers supported the Union.  Rodriguez said that Espinoza explained about the Union  and referenced the information contained in the handouts (Tr. 817–820, 825).

Rodriguez testified that Espinoza spoke about 15 to 20 minutes during the meeting. He said the Espinoza explained about the Union and denied that he said anything about layoffs, union dues, strikes, or references to terminations.  Rodriguez could not recall specifically the topics that Espinoza spoke about (Tr. 826, 827).

Rodriguez denied that he had threatened any workers about reporting them to immigration officials.  He did tell the workers at the March meeting that,

I said to them that why is it that they want to work for the union?
That I know of, that you can't work under the union if you don't have papers,
and we don't have papers (Tr. 823, also 831).

Rodriguez stated that he did not threaten the workers with that statement (Tr. 822).  Rodriguez said that his remarks were not made during the meeting but in a private conversation with two other workers during the meeting.  He did not recall the names of the two workers (Tr. 827, 828).  He said he spoke to the workers once about needing to have documents to join the Union (Tr. 830).  Rodriguez denied that there was a second employer-sponsored meeting in April (Tr. 824).

Rodriguez stated that he also knows Ulises Javier Fuentes as a laborer who worked under his supervision in the Newark jobsite.  Rodriguez said that Fuentes is a personal friend and he had visited Fuentes' residence on numerous occasions before, during and after the union organization campaign.  He denied speaking about the Union to Fuentes when he had visited his home (Tr. 822, 823, 828).  Rodriguez specifically denied speaking to Fuentes about the Union in April (Tr. 828).  Rodriguez said that he was often with Fuentes every weekend in March, April, and May and denied knowing if Fuentes supported the Union or not (Tr. 829).

### 3.   The testimony of Nelson Martin Espinoza

Nelson Martin Espinoza (Espinoza) testified that he is the sole owner of IBN and has been in business for 19 years.  He stated that IBN is mostly in concrete demolition work and general contracting work with other contractors (Tr. 859).

Espinoza was aware that there was an ongoing union presence at the IBN jobsites as early as January or February when he first observed Simbana at a jobsite.  He testified that the Union had always been to his jobsites for the past 5 years.  Shortly thereafter, Espinoza received the RC petition from the NLRB in late March.  He said that he was not actually aware of the union organizing campaign until he received the representative petition (Tr. 860, 951, 952; Jt. Exh. 1).  Espinoza testified that he contacted his attorney (Vreeland) on the same day and a training session was arranged with his attorney on the appropriate comments and conduct he should display during the campaign and upcoming union election.

36

Espinoza testified as follows (Tr. 863, 864),

A. That I'm not allowed to supervise. I'm not allowed to treat them bad.  I'm supposed to just let them do as they want to do. I—I can't not give them a reason for their decision.

5

Q. Okay. When you say you can't supervise them, what do you mean?
A. I can't be watching them, I can't be watching them, I can't be seen what the—who they're talking to, who they're not talking or, what they're doing and what they're not.

10      Q. And what are you allowed to say to employees?
A. The things that I am allowed to talk about is the stuff about the union. I can tell them that for me, for my company, the union is not good for me. That for me, with the union on there, it doesn't benefit me in the terms that I can't compete. I can't compete with the other companies. And then when it comes in terms of  prices, I can tell them about the
15      union, the union fees and dues about it.

Espinoza testified that he had a couple of hours of training for a couple of days (Tr. 930).
Armed with this training, Espinoza visited the workers at their jobsite.  The first jobsite was Newark in February.  Espinoza also distributed flyers to the workers at the Newark jobsite.
20      Espinoza said the only he spoke.  He testified to mostly following the contents of the flyer when he spoke to the workers.  Espinoza subsequently visited workers on his other jobsites, including Paterson, Kearny and the IBN yard.  Espinoza testified that he was the only person from the company that spoke at that the Newark meeting (Tr. 862–867, 946; R. Exh. 1).  He said there were two meetings at the Newark jobsite (Tr. 946).

25

*The Discharge of Pereira and Martinez*

Espinoza was examined on his knowledge regarding the discharge of Jose Pereira and Francisco Martinez.  He testified that both were discharged for failing to report for work after 5
30      days and for not contacting himself or a supervisor for their absences.  Espinoza testified that Pereira's last day that he had worked was on a Friday.  Espinoza did not recall when in 2021.  At the time, Pereira worked at the Newark jobsite.  Espinoza testified that Pereira did not call his foreman, Rodriguez, on the following Monday or Tuesday.  Espinoza stated that on Wednesday (of the same week), he was having lunch in a Newark restaurant and observed through the
35      window that Pereira was walking by the restaurant.  Espinoza said that Pereira was approximately 15 feet away on the street.  Espinoza then contacted Rodriguez and was told that Pereira had not been at work.  Espinoza testified that he did not speak to Pereira and was not in contact with him until Sunday night of that week.  Espinoza said he received a text from Pereira asking if he could return to work.  Espinoza replied "no" because he missed 5 days of work and
40      never contacted any foreman or himself prior to Sunday night (Tr. 867–871, 932, 933).
Espinoza testified that he responded (Tr. 871),

Yeah. I did respond. I respond that it was a lack of respect for someone to text the Sunday night after already missing five days of work to just text to see if he could come back to

37

work. I responded that it's a lack of respect for the company for work, for someone to do that.

With regard to Francisco Martinez, Espinoza testified that he also missed 5 days of work
5   without notice or contact with himself or the foreman, Angel Macas.  Espinoza said that
Martinez worked at the Nutley jobsite and the workers were finishing the work, except for some
cleanup at the site.  Espinoza said that the workers were told by Macas to report to the IBN yard
on Monday for new assignments.  Espinoza said that only Martinez failed to show up and never
reported his absence from Monday through Friday (of the following week).  Espinoza testified
10  that Martinez did not arrive at the yard until the second Monday looking for work after being
absent for 5 days.  Espinoza told Martinez there was no work for him (Tr. 871–874).  Espinoza
explained,

Q.  Okay. So then why did you why did you fire Mr. Martinez?
15  A.  Because it was a whole complete week. And because he didn't let me know. He just
showed up to the yard, I let him know that you missed a week, so you have no work for
you (Tr. 875).

Espinoza insisted that foreman Macas instructed Martinez to report to work on Monday
20  at the IBN yard.  Espinoza testified Martinez never showed up at the yard on Monday and never
reported his absence on Monday or Tuesday.  Espinoza did not call him and he believed no other
foremen had called Martinez regarding his absence from work (Tr. 892–894).  Espinoza admitted
that Martinez did not show for work for 5 days in March and not on January 23, 2021 as
reflected in the list of employees (GC Exh. 7).  Espinoza stated that the January 23 date was
25  incorrect (Tr. 892).

Espinoza testified that the remaining workers at the Nutley jobsite were cleaning debris
and finishing the project.  He did not recall how many workers remained at Nutley and believed
the finishing work took from 2, 3 days to 3 weeks.  Espinoza stated that during the March
30  timeframe, IBN had several jobsites, the primarily ones being Newark, West Orange, Patterson
and Kearney. He stated that Kearney was a smaller jobsite with two or three workers with
sporadic work assignments for 3 or 4 days.  Espinoza testified that the Patterson jobsite had eight
or nine workers doing mason and labor work for townhomes and that West Orange was a major
jobsite with 15 workers performing various concrete work.  Espinoza believed that the remaining
35  Nutley workers probably went to the West Orange jobsite because that was a major demolition
site (Tr. 896–900).[28]

Espinoza also testified that Melvin Garcia was discharged for not reporting for work and
being absent for 5 days without notice to the employer.[29]  Espinoza recalled that worker Ulises

---

[28] The court reporter mistakenly translated Espinoza's Spanish testimony on this point.  The transcript stated, "I do
not recall (where the workers went), but possibly the west on the Washington street job site…" (Tr. 900).  It is
obvious that Espinoza's testimony referred to the "West Orange" jobsite and not the Newark jobsite (that is on 155
Washington Street) because West Orange was a major jobsite and the General Counsel's contention is that the
workers supporting the Union were reassigned to Newark, where the work was finishing and allegedly the workers
would then lose their jobs.
[29] As noted above, Melvin Garcia's discharge has not been alleged by the General Counsel as an unfair labor
practice in this complaint.

Fuentes asked if Espinoza was willing to rehire Garcia after he was discharged.[30]  Espinoza told
Fuentes (Tr. 5) that,

5          I responded saying that if I were to return him to work then I would have to return all of
them to work, and it would be beyond the lack of respect for me to have them miss and
then come back.

Espinoza testified there was no company policy on discharging a worker.  He stated that a
worker missing 5 days of work without an excuse and notice to his supervisor is considered an
10   abandonment of his job and can be discharged.  He insisted that workers are verbally told to
report to text or call him if they will miss a work day.  He said that there is nothing in writing of
this policy.  He said he would not discipline a worker for missing a day or two of work but
believed that three or more days of absences without notification is something he would take
disciplinary action (Tr. 930–932).  He said that Martinez and others missing 1 or 2 days of work
15   would at most, be given a verbal warning (Tr. 941).  Espinoza said that IBN does not keep
records of workers being absent from work or their work schedules (Tr. 933, 944, 945).

### The Progression of Work at the Newark Jobsite

20       Due to the amount of testimony provided by several workers regarding the progression of
work at the Newark jobsite, Espinoza explained that the Newark jobsite started in November
2020 and most of the work was finishing by summer 2021.  He said there was not much of a
need for additional workers to demolish the Newark building by the summer.  He said that the
Newark job was completed by September 2022 (Tr. 7).  Espinoza testified (Tr. 11, 12) that,
25

          Because we had already advanced enough during the – at that project, during that job site,
because we had worked really, really hard the last 6 months trying to finish everything on
the outside during that time. There was already -- the pressure had gone already. We
didn't have the pressure to work, because now it was just the little stuff, the repairing, the
30        patching. And there was no more pressure to finish what we had because we already
finished. Now we were  just working alongside, and giving the space for the steel guy and
everybody else to do their little jobs.

          They were additional workers, because that job project was pretty big. It was a really big
35        project. So there I could put five, six, seven employees, or take one, or replace one. So
around that time any other sites that ended, that is where I would send them to. I would
send them to the 155 (Newark) job site, because the work -- it was a lot of work and the
project was big on that one. That is the biggest project I've ever had.

40       Espinoza noted that at the same time, the Nutley jobsite was finishing up in March and
the workers were instructed to help complete the Newark project.  Some of the workers were left
behind to clean up the Nutley jobsite.  Espinoza recalled that Garcia, Rivera, Diego Vincenzo,

---

[30] At this point of Espinoza's testimony, the court reporter failed to transcribed the recording of Espinoza's
testimony.  As a consequence, a supplemental transcript was provided by the court reporter on about January 12,
2023 containing the missing portion of his testimony (supplement transcript to Volume 10, pp. 1-2).

JD(NY)-05-23

Luis Jimenez and Segundo Sarango were reassigned but denied that only the workers who supported the Union were reassigned to Newark (Tr. 12–15).

5   Espinoza further explained that the Newark jobsite started from the first two (bottom) floors and the demolition worked its way upwards because the workers were initially removing the interior walls and repairing the floors.  After the interior walls were removed, Espinoza stated that the workers began demolishing the exterior walls, starting from floor #19 to the bottom floors.  Espinoza stated that the removal of the exterior walls required the mini-Bobcats and jackhammers.  He stated that 80 percent of the work was with the mini-Bobcats.  After the
10  exterior walls were removed, Espinoza testified that there was additional work to remove and repair the floors of the building.  He said that for this stage of the project, the workers used more of the jackhammers and other hand-held equipment as opposed to the use of the Bobcats.  He said that the work hours for the Newark jobsite were reduced as the workers began the next portion of completing the project (Tr. 7–11).

15
Espinoza testified that the initial work at the Newark jobsite started in November 2020.  He stated that there was plenty of work for the first 3 weeks and the work schedule was Monday through Friday for 10 hours and up to 5 hours on Saturdays (Tr. 901).  He stated that the work on removing the interior walls were continuous while the workers began demolishing the exterior
20  walls.  He said that it took approximately 3 weeks to demolish the exterior walls.  He believed that  the next "phase" of the work started after the exterior walls were done (by February or March).  The next phase lasted until May or June (Tr. 902, 952).  As noted above, Espinoza considered the Newark jobsite as a major project and stated that 15 or 16 workers did the exterior walls from Monday through Friday for 9 hours and up to 5 hours on Saturday (Tr. 902, 903).

25
Espinoza stated that by June, the work at the Newark jobsite was tapering down and only ten or eleven workers were needed to perform wall and floor patchwork and to repair the surrounding sidewalk and curbs (Tr. 904).  Espinoza then testified that the completion of the Newark job took longer than expected because his workers continued to patch the holes in the
30  walls and floors made by the electricians and plumbers after the building was demolished.  He also stated that the workers had to clean up and repair the sidewalks and curbs around the building.  Espinoza testified that this phase of the job lasted about ten or eleven weeks and was not completed until September 2022 (more than 1 year later after the Newark jobsite was wrapping up by summer 2021).  He said the work schedule was Monday through Friday for eight
35  hours with occasional Saturday work for 4 hours (Tr. 904, 909, 912).

Espinoza testified that all his workers were employed by IBN.  He admitted in testimony that Villavicencio and Fuentes were sometimes paid by a company named Jalisco Concrete.  He said that Jalisco was a subcontractor at the Newark jobsite and on occasions, his workers would
40  assist Jalisco and paid by that company.  He noted that Jalisco is owned by Juan Martin Solorio and that Jalisco would pay overtime to Fuentes when Jalisco needed additional workers (Tr. 913, 914, 916; GC Exh. 15 (b) (Fuentes receiving overtime work through Jalisco); GC Exh. 12 at p. 465 (Villavicencio being paid by Jalisco).  Espinoza also noted that foreman Macas received a Jalisco check for $240.  He was not sure if that was overtime work that Macas performed for
45  Jalisco after his regular work hours (Tr. 918, 919, GC Exh. 12(b) at p. 861).  Espinoza said that Jalisco's owner, Solorio, was named as an employee of IBN because on occasions, Solorio

40

would work for IBN when workers were needed.  He said, like Fuentes and Villavicencio working for Jalisco on occasions, Jalisco would also share its workers with IBN (Tr. 919).  In addition to the aforementioned workers, there were also several workers at the West Orange jobsite that were listed on the payroll records but their checks were issued by Jalisco (Tr. 938,
5    939; GC Exhs. 12, 14).

*The Allegations Against the Respondent*

With regard to the allegations asserted by the workers during their testimony, Espinoza
10   was present throughout their testimony.  With regard to Nelson Benitez, he testified that he quit IBN because he was instructed to perform more arduous work after being removed from his Bobcat driver position because of his support for the Union.  Espinoza responded that Benitez simply did not return to work.  Espinoza denied that Benitez was removed as the Bobcat driver because of his union support.  Espinoza repeated in testimony that there was less work on the
15   Bobcat during the latter stages of the Newark project in early April.  Espinoza stated that the removal of the exterior walls with the Bobcat was now at 10 percent.  Espinoza also insisted that Benitez was not the exclusive driver of the Bobcat and that his primary duties were as a laborer (Tr. 15, 16).

20   With regard to the allegations levied by Pereira, Espinoza testified that there was meeting in March or April at the Newark jobsite.  As testified above, Espinoza was distributing the company's flyer on about the employer and its relationship with the Union.  Espinoza recalled that foreman Rodriguez was present at the meeting (Tr. 19, 20).  Espinoza denied that he told Pereira at this meeting that he was crazy to join the Union.  Espinoza testified (Tr. 20) that,
25

A. Yes. Yes, but I think they confused what I was saying.  Yes, I said that they were crazy to join. But what I meant more was that they were crazy to be part of the Union since the Union, you have to pay. You have to pay for the benefits or you have to pay for the union dues. So, and also if there are strikes. If there's any strike, you have to go and
30   participate over that. And I would say it would be crazy, since we don't do that. We, here, we just do continuous work. So it was more like an opinion of mine.

Espinoza also denied that he threatened Pereira and the workers that he would report their status to immigration officials.  Espinoza also denied that he ever heard foreman Rodriguez
35   threatened to report the workers to immigration officials (Tr. 21, 22).  Espinoza testified that it was his mistaken belief that a worker needed paper (or documentation) to belong to a union.  He said (Tr. 21) that,

Yes. I did say that, but it was more an opinion. I said that in my opinion that in order for
40   you to be part of the Union, in the time that I've, you know, I've known, in the years that I've been with this, I've known that in order for you to be part of a union, you have to have papers. That was just an opinion that I was saying.

With regards to Pereira's allegation that Espinoza knew which workers supported the
45   Union, Espinoza testified (Tr. 21) that,

Q. Nelson, do you remember Mr. Pereira testifying that during these meetings you told employees that you knew who supported or favored the Union? Do you recall his testimony?
A. No, I did not say that. I cannot say that. I cannot say who is for or who is against that.
5      There's no way of me knowing. I did not say that.

Similarly, Espinoza denied that he asked Nelson Molina whether Molina supported the Union.  He said that he was trained not to ask those kind of questions and denied he asked other workers if they supported the Union or how they voted (Tr. 23).  Following up with Molina,
10   Espinoza admitted that he did state that IBN would be more functional without a union.  He stated (Tr. 22) that,

Yes, I did say that.  Like I—I'll repeat.  Like I stated before that my company would work better without the Union because I could not compete with the other companies.  So
15   I said to my workers that if the Union were to enter, I would  have to ask permission from them for whatever other else thing.

With respect to Nelson Benitez, Espinoza was asked (Tr. 24, 25),

20   Q. Do you recall Mr. Benitez testifying that during the April 2, 2021 meeting, you said to him I know you—I know you're the head of all this shit. Do you recall that testimony?
A. No, no. I did not say that.

Q. Do you recall Mr. Benitez testifying that you told him to stop, I believe these were his
25   words, quote, ruining the head of the rest of the workers, end quote. Do you recall that testimony?
A. No, no. I did not say that.

Q. Okay. Do you recall Mr. Benitez testifying that you told the employees at the April
30   meeting that employees who signed union cards were going to be sent home and the company could hire new people.  My question first is do you remember Mr. Benitez testifying about that or testifying to that in his  matter?
A. No. I did not say that.

35   Q. Okay. You recall him testifying—hold on one second. My first question is do you recall—do you recall Mr. Benitez's testimony to that effect?
A. Yes.

Q. And it sounds like you, you deny that you said that. Did you say anything about replacement workers or hiring new workers?
40   A. I never said that I would replace or hire new workers, because I never knew who -- there is no way for me to know who did nor did not sign a card.  There is no means for me to know.  That's why I never said that.

(Espinoza's testimony continued at Vol. 10 of the tr. at p. at  876):

5    Maybe they got confused, because what I did say is, like I said before, that if we go into negotiations and there is a strike or whatever and it long at that, I had the right to replace or hire new people, but I never said anything about signing or not signing the card, but I did say that during the process, if something were to not that I could. Maybe they just got confused.

10    Espinoza also denied asking Benitez if he had signed a union card (Tr. 878).

In tandem, Espinoza denied telling Garcia that he threatened to file a lawsuit against employees supporting the Union and/or against the Union.  Espinoza believed that Garcia and other workers was mistaken about filing a lawsuit because he was only stating to the workers that

15    he was in talks with his lawyer for training on how to respond to the Union (Tr. 878).  When asked,

Okay. Do you recall Bolivar Rivera testifying that Mr. Rodriguez said, "if you want to work under the union, you should ask the union if you have if they have worked for you",

20    do you recall that?

Espinoza denied hearing foreman Rodriguez making this same or a similar statement to Rivera (Tr. 879).  Espinoza denied if he asked Rivera if he had signed a union card.

25    Espinoza also recalled Jimenez asking for a raise in May and responded (Tr. 880) and he testified that,

I respond we were not in the moment that we were not in the moment at that time.

30    Espinoza explained that the company was in the midst of the election at that time and it could be incorrectly interpreted if he was to give a raise to Jimenez during union campaign. Espinoza testified that Jimenez received a raise seven or 8 months afterwards (Tr. 880).

Espinoza admitted that he had asked employees if they had received their ballots because

35    he was concerned that not everyone had received a ballot.  With Jimenez, Espinoza testified that he told Jimenez to get a second ballot because he was informed by Jimenez that he did not sign the back of the ballot.  Espinoza testified that he was wrong for him to have Jimenez filled out his ballot in his car.  Espinoza said that Jimenez was the "delivery guy" and is always in Espinoza's car, so he just asked Jimenez to get in the car.  Espinoza denied that he saw how

40    Jimenez had voted and further denied that he was present when other workers had completed their ballots (Tr. 881, 882).  Finally, Espinoza denied that he had any motivations when he shook Jimenez' hand in the IBN yard on August 4 and stated to him, "that's good."  Espinoza said that he often shook the hands of workers as they arrived to work at the yard and that he was not upset with Jimenez (Tr. 882, 947, 948).

45

Espinoza was also questioned about the September 17, 2022 incident involving his brother and worker Bolivar Rivera. As previously testified by Rivera, Freddy Espinoza went up to Rivera and pointed his finger at him and called him "Judas of the company" and Rivera had wished bad things on the company (IBN). Rivera testified that Freddy called him "Judas" three times. Espinoza testified that Freddy Espinoza is his brother and his middle name is "Roman." He stated that Freddy is a driver and laborer. Espinoza was aware of the September 17 incident through his attorney. Espinoza testified that he proceeded to issue a letter of apology and personally handed the apology letter to Rivera at the jobsite. The letter of apology was also a reprimand to Freddy Espinoza. He also gave Rivera a verbal apology when he gave him the letter. Espinoza also stated that he distributed the letter to other workers. Espinoza insisted that Freddy was not authorized to speak on behalf of the company (Tr. 883-885, 947; R. Exh. 2(c)).

DISCUSSION AND ANALYSIS

The counsel for the General Counsel contends that Respondent violated section 8(a)(3) and (1) of the Act through a host of allegations, to include threats, intimidation, unspecified reprisal, surveillance, interrogation, interference with the union representative election, promises of benefits to workers not to support the Union, and discharge of workers supporting the Union (GC Br.).[31]

The allegations fall under the following sections of the Act:

Section 8(a)(1)—interfering with employee voting during the mail ballot election; surveilling or creating the impression that employees union activities were under surveillance; interrogating employees about their union sympathies and union activities; threatening employees with job loss because they supported the Union; creating an impression that support of the Union was futile; promising increase wages to Luis Jimenez if the Union lost the election; and threatening or otherwise coercing employees from engaging in union activities.

Section 8(a)(3)—reducing work hours and altering job assignments; assigning more onerous work to Nelson Benitez because he was believed to be the lead organizer for the Union; and terminating Jose Patricio Pereira and Francisco Martinez for their support of the Union.

---

[31] The General Counsel argues that Rodriguez and Macas are 2(11) supervisors under the Act (GC Br. at 21). It cannot be seriously argued that they were not 2(11) supervisors. Macas and Rodriguez testified that they gave out assignment orders, direct the work of the employees, scheduled their work hours and approved the workers' leave (Tr, 797, 798, 811, 812). Additionally, Pereira, Garcia, Fuentes, Rivera, Lopes, and Alvares, among others, testified that they took assignments, work schedules and hours, leave requests, and directions from Macas and Rodriguez. Although Macas and Rodriguez testified they also performed laborer's work, it is clear they engaged in several of the twelve supervisory functions listed in Sec. 2(11). I find there are no factual dispute that Macas and Rodriguez are 2(11) supervisors. The General Counsel also argues that Freddy Espinoza is Respondent's agent under Sec. 2(13) of the Act. I agree. Freddy Espinoza did not testify, but it is not disputed that he is the brother of Nelson Espinoza and speaks on behalf of Nelson. This is telling, as argued by the General Counsel, of the length Nelson Espinoza took to ameliorate Freddy's name-calling and accusations against Rivera, which resulted in Nelson Espinoza personally issuing a verbal apology to Rivera as well as a written apology to Rivera and to all the workers.

In assessing credibility, I have considered factors such as: the context of the witness's testimony, the quality of the witness's recollection, testimonial consistency, the presence or absence of corroboration, the weight of the respective evidence, established or admitted facts,
5    inherent probabilities, and reasonable inferences that may be drawn from the record as a whole. See *Double D Construction Group*, 339 NLRB 303, 305 (2003); *Daikichi Sushi*, 335 NLRB 622, 623 (2001) (citing *Shen Automotive Dealership Group*, 321 NLRB 586, 589 (1996)), enfd. Sub nom., 56 Fed. Appx. 516 (D.C. Cir. 2003).  Credibility findings need not be all or nothing propositions.[32]
10

I.      The 8(a)(1) Allegations

Section 7 of the Act guarantees employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own
15   choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  In turn, Section 8(a)(1) of the Act makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of [those] rights."  See *Brighton Retail Inc.*, 354 NLRB 441, 447 (2009).

20        The test for evaluating if the employer violated Section 8(a)(1) is "whether the statements or conduct have a reasonable tendency to interfere with, restrain or coerce union or protected activities."  *Hills & Dales General Hospital*, 360 NLRB 611, 615 (2014).  As with all alleged 8(a)(1) violations, the judge's task is to "determine how a reasonable employee would interpret the action or statement of her employer . . . and such a determination appropriately takes account
25   of the surrounding circumstances."  *Roomstore*, 357 NLRB 1690, 1690 fn. 3 (2011).

In deciding whether an employer's statement or conduct violates Section 8(a)(1), the Board applies the objective standard of whether it would reasonably tend to interfere with the free exercise of an employee's statutory rights.  The Board has established an objective test for
30   determining if "the employer engaged in conduct which would reasonably have a tendency to interfere with the free exercise of employee rights under the Act." *Santa Barbara News-Pa ress*, 357 NLRB 452, 476 (2011); *Multi-Ad Services*, 331 NLRB 1226, 1227–1228 (2000); *Westwood Health Care Center*, 330 NLRB 935, 949 (2000).

35        The Board considers the totality of the circumstances in assessing whether a statement or conduct has a reasonable tendency to interfere, restrain, or coerce employees.  *KSM Industries*, 336 NLRB 133 (2001); *Mediplex of Danbury*, 314 NLRB 470, 471 (1994).  The test for is an objective one.  *G4S Secure Solutions (USA) Inc.*, 364 NLRB No. 92, slip op. at 2–3 (2016).  "[T]test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on
40   the employer's motive or on whether the coercion succeeded or failed." *American Tissue Corp.*,

---

[32] The counsel for the Respondent had a standing objection to hearsay testimony.  To the extent that hearsay testimony was permitted, it was a state of mind exception to the rule against hearsay because the unfair labor practice allegations had a "chilling effect" when workers expressed fear of losing jobs or other retaliatory action in support of the Union.  *Lightner v. Dauman Pallet, Inc*., 823 F. Supp. 249, 252 fn. 2 (D.N.J. 1992).  Additionally, hearsay testimony is permitted in Board proceedings and I gave the appropriate probative value of the hearsay testimony weighted by corroborating and other evidence.  *Midland Hilton & Towers*, 324 NLRB 1141 fn. 1 (1997).

336 NLRB 435, 441 (2001), citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946); *Midwest Terminals of Toledo*, 365 NLRB No. 158, slip op. at 21 (2017), enfd. 783 Fed. Appx. 1 (D.C. Cir. 2019); *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014).

5            a.     The Alleged Surveillance of Workers' Protected, Concerted Activity

The amended complaint alleges that 1) on about February 2021, at the West Orange, New Jersey jobsite, Espinoza informed employees that he was watching them talk to the Union and thereby created an impression among its employees that their union activities were under
10   surveillance by the Respondent; 2) on about April 2021, at the Newark jobsite, Espinoza accused an employee of starting the union organizing campaign and thereby created an impression among its employees that their union activities were under surveillance by the Respondent;  3) on about April or May 2021, at the Newark jobsite, Espinoza accused an employee for being a union supporter and thereby created an impression among its employees that their union activities were
15   under surveillance by the Respondent; 4) on about May 18, 2021, at the Newark jobsite, Espinoza instructed an employee to cast his official NLRB mail ballot vote in his presence, thereby engaged in surveillance of employees' concerted activities; 5) on about March 2021, at the Newark jobsite, Rodriguez informed employees that he knew who signed union authorization cards and thereby created an impression among its employees that their union activities were
20   under surveillance by the Respondent; and, 6) on about March, at the Newark jobsite, Rodriguez informed employees that he saw them talk to the Union, creating an impression among its employees that their union activities were under surveillance by the Respondent (GC Exh. 1(h) at para. 8(a), (g), (h), and (i); par. 9(b), (c)).

25       Francisco Martinez signed the union card at his jobsite.  According to Simbana, foreman Angel Macas was present, as well as coworker Segundo Sarango.  Macas asked Simbana why he was on the jobsite.  He told Macas that he wanted to talk with the workers during their lunch period and started to talk with Martinez.  Simbana believed that Macas and Sarango were present when Martinez signed the card.  Simbana testified that Macas became very angry and started to
30   make phone calls.  Simbana testified that Macas allegedly identified himself as the foreman and recalled that Macas moved away from the group but does not remember how far away (Tr. 193, 194).  Martinez testified that he signed the card during his lunch hour.  Martinez believed that foreman Macas observed him signing the card (Tr. 649–651).

35       Nelson Benitez testified to a meeting called by Foreman Rodriguez on April 29.  Benitez said that Espinoza was at this meeting.  He did not recall if there were other workers around. Benitez did not attend this meeting but stated that earlier on the same day, he was putting his tools away with his brother, Francisco Benitez, when Espinoza appeared.  According to Benitez, Espinoza approached Benitez and stated to him that "I know you are the head of all this shit.
40   That you need to stop ruining the heads of the rest of the workers."  Benitez asked how he knew and Espinoza responded that the Union has its people and he has his people to report back to him (Tr. 549–554, 562, 563, 565, 566).

      Nelson Molina overheard Espinoza accusing worker Benitez that he was the instigator,
45   who had visited and talked with the workers to support the Union.  Molina recalled Benitez

JD(NY)-05-23

asking Espinoza how he knew, and Espinoza responded that he has people to inform him. Molina believed six or seven other workers overheard this conversation (Tr. 325, 326).

5    Pereira recalled that Espinoza was handing out flyers and that 12 to 14 workers were present in the meeting called by Espinoza.  Pereira testified that Espinoza commented that he knew the workers at the Newark jobsite were in support of the Union.  Pereira testified that he did not tell his supervisors that he supported the Union until after this meeting (Tr. 374–378).[33]

10    Lopes testified that Espinoza has observed him with Simbana at the West Orange jobsite in February.  Lopes testified that he was eating lunch in his car outside the West Orange jobsite and that Simbana was outside the car with the car door open.  He spoke with Simbana for 15 minutes.  Lopes testified that Espinoza told him to stop by and see him.  Lopes testified that he visited Espinoza a "few days later" and he was told by Espinoza that he observed him talking with Simbana outside the jobsite for 15 minutes and that Espinoza told Lopes that, "He said that 15 we should not speak to him because what he was saying was not the truth and—and we should not listen to him. Basically that" (Tr. 596–598, 600, 601).  Lopes believed that he was being watched closely by Espinoza because allegedly Espinoza had started to file a lawsuit against the Union (Tr. 598, 615).

20    While working at the Newark jobsite, Bolivar Rivera recalled one occasion when he was getting his tools to start the day's work when Rodriguez commented to him and other workers that he knew they were in favor of the Union and that they should all go work for the Union. Rivera believed that Armando Anaya, Nelson Benitez, Juan Alvares, and Ulises Fuentes were present when the comment was made by Rodriguez.  Rivera testified that none of the workers 25 wanted to discuss their support for the Union after Rodriguez made this comment (Tr. 469–472).

Luis Jimenez recalled a conversation with Espinoza over the phone in May regarding the upcoming election.  According to Jimenez, Espinoza inquired whether Jimenez had received his ballot to vote.  Jimenez responded that he had completed the ballot but had not sign the back of 30 the envelop.  Espinoza told Jimenez that he completed the ballot incorrectly and proceeded to provided him with the NLRB phone number to obtain another ballot.  Jimenez then received a second phone call from Espinoza asking if he had received the second ballot.  Jimenez replied in the affirmative and was instructed to bring the ballot to the IBN yard in Irvington so that Espinoza could help him complete the ballot (Tr. 421, 422, 443).  Jimenez arrived at the yard on 35 the following day and Espinoza asked if Jimenez had his ballot.  Jimenez replied he did and the two proceeded to Espinoza's car.  Inside the car and in the presence of Espinoza, Jimenez completed the ballot in support of the employer.  Jimenez testified that Espinoza was sitting next to him in the car, so he pretended not to support the Union.  Jimenez admitted that he does not know if Espinoza knows how he voted.  He said that Espinoza then took his ballot and informed 40 Jimenez that he will mail the ballot on his behalf (Tr. 422–425, 452, 453).

In contrary testimony, Espinoza testified with regards to Pereira's allegation that he knew which workers supported the Union, Espinoza testified (Tr. 21) that,

---

[33] Pereira placed the meeting in May but this meeting occurred on April 29, shortly before May.  Pereira's lack of specific recollection as to the date of the meeting is understandable and the month of May is in sufficient proximity to the April 29 date.

Q. Nelson, do you remember Mr. Pereira testifying that during these meetings you told employees that you knew who supported or favored the Union? Do you recall his testimony?

5    A. No, I did not say that. I cannot say that. I cannot say who is for or who is against that. There's no way of me knowing. I did not say that.

Similarly, Espinoza denied that he asked Nelson Molina whether Molina supported the Union.  He said that he was trained not to ask those kind of questions and denied he asked other
10    workers if they supported the Union or how they voted (Tr. 23).

With Jimenez, Espinoza testified that he told Jimenez to get a second ballot because he was informed by Jimenez that he did not sign the back of the ballot.  Espinoza testified that he was wrong for him to have Jimenez filled out his ballot in his car.  Espinoza said that Jimenez was the "delivery guy" and is always in Espinoza's car, so he just unconsciously asked Jimenez
15    to get in the car.  Espinoza denied that he saw how Jimenez had voted and further denied that he was present when other workers had completed their ballots (Tr. 881, 882).

Rodriguez denied that telling the employees that he knew who supported the Union.  He also denied that Espinoza stated that Espinoza knew the workers who were supporting the Union. Rodriguez said that he did not speak and Espinoza simply referenced the information contained
20    in the handouts (Tr. 817–820, 825).

In determining whether observation of open union activity is coercive under Section 7 of the Act, the Board applies an objective test: whether the employer's conduct, under the totality of the circumstances, would reasonably tend to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under Section 7.  *Sage Dining Services, Inc.*, 312 NLRB 845,
25    856 (1993); *Brown Transportation Corp.*, 294 NLRB 969, 971–972 (1989).  The Board considers several factors, including the duration of the observation, the employer's distance from its employees while under observation and whether the employer engaged in other coercive behavior during the observation.  *Aladdin Gaming, LLC.*, 345 NLRB 585, 586 (2005).  Under
30    Board precedent, "management officials may observe public union activity, particularly without violating Section 8(a)(1) of the Act, unless such officials do something out of the ordinary." *Arrow Automotive Industries*, 258 NLRB 860 (1981), enfd. 679 F.2d 875 (4th Cir. 1982); see also *Durham School Services*, 361 NLRB 407, 407 (2014) (observation of union activities in a public area was unlawful surveillance when manager "was observing employees in way that was
35    out of the ordinary").  Such "out of the ordinary" surveillance of union activity in public places includes an employer's "unreasonably close" observation of organizers as they finish their lunches.  *Montgomery Ward & Co.,* 692 F.2d 1115, 1128 (7th Cir.1982), enfd. 256 NLRB 800 (1981).

40    The Respondent contends that there is a lack of evidence that Espinoza and Rodriguez engaged in surveillance.  I find otherwise.  The Respondent's actions created an impression among employees that their union activities were under surveillance. The Board's test for determining whether an employer has created an impression of surveillance is whether the employee[s] would reasonably assume from the [action] in question that [their] union activities
45    had been placed under surveillance. *Tres Estrellas de Oro*, 329 NLRB 50 (1999), *citing United*

48

*Charter Service*, 306 NLRB 150 (1992). Espinoza's presence when Jimenez completed his ballot was clearly conveying an impression to the worker that he was being watched while engaged in a union activity.  This was admitted by Espinoza as being wrong and he attempted to ameliorate the situation by testifying he did not observed how Jimenez had voted.  The damage was already done with his presence in the car while Jimenez was completing his ballot.

It is alleged that Rodriguez gave the impression that the workers' union activity was being watched.  Rodriguez' general denial that he and Espinoza knew which workers supported the Union does not pass muster given the corroborating testimony by Molina, Pereira, Rivera, and Benitez.  Coupled with the timing of these unprecedented practices in the midst of an organizing campaign, Espinoza and Rodriguez created the impression that their union activities were under surveillance. See *Sysco Grand Rapids, LLC*, 367 NLRB No. 111, slip op. at 26 (2019) (supervisor's statement to an employee that he knew how the employee voted unlawfully gave the impression of surveillance because supervisor did not inform the employee how he obtained that information).  Similarly, I find that Espinoza did in fact asked Molina and Rivera if they supported the Union.  Their testimony was consistent and corroborated each other and the pattern of responsible management officials asking similar questions of the workers' support for the Union is more than just coincidental.

Espinoza admittedly testified that it was wrong to be in the presence of Jimenez when the worker completed his ballot inside Espinoza's car with him sitting next to Jimenez.  It is irrelevant if Espinoza did not observe how Jimenez completed his ballot.  It was an absolutely intimidating situation to have the owner of the company present and within observation as a worker completed his ballot.  With respect to Lopes, Espinoza did not testify as to his meeting with Lopes after he had observed Lopes for 15 minutes talking with Simbana.  Observations of workers by a manager in the ordinary course of business is not unusual and not generally violative of the Act.  Here, it is clear that there was nothing "routine" about Espinoza's surveillance of Lopes' actions.  Espinoza owns IBN, remained in close proximity to Lopes in a nonwork area immediately after observing him with Simbana, and instructed Lopes to meet with him afterwards to discuss his 15-minute observation of Lopes talking with Simbana.  Accordingly, I find that Espinoza's conduct was objectionable.  See *Hoschton Garment Co*., 279 NLRB 565, 566 (1986).

Under the circumstances, I find that the Respondent's conduct violated Section 8(a)(1).  See *Charter Communications, LLC*, 366 NLRB No. 46 (2018), enfd. 939 F.3d 798 (6th Cir. 2019) (employer unlawfully created impression that prounion employee's activities were being monitored by high-level manager who rode along with him for the first time).[34]

---

[34] Foreman Angel Macas was not questioned as to his knowledge if he observed Martinez signing his union card in front of him and Segundo Sarango.  The General Counsel has not alleged, and I do not find, that Martinez was under surveillance by foreman Macas.  Martinez testified that Macas was there having lunch with the workers and Simbana testified that Macas had walked away when he was talking to Martinez (Tr. 193, 194, 650).  In *Wal-Mart Stores, Inc.,* 340 NLRB 1216, 1217 (2003), the Board found that a manager's 30-minute observation while sitting on a bench outside the store of union handbilling taking place in a public area, unaccompanied by any coercive behavior, was not out of the ordinary and did not constitute unlawful surveillance. As such, I find that Martinez was not under surveillance by Macas to give the impression that he was being watched for his union activity.

b.  The Alleged Interference with the Union Mail Ballot Election

The General Counsel alleges that the Respondent directly interfered with the employee
voting during the mail ballot election, thusly engaged in surveillance of the employees'
protected, concerted activity.  The amended complaint alleges that Espinoza on about May 18, at
the Newark jobsite, instructed an employee to cast his official NLRB mail ballot in his presence
and thereby engaged in surveillance of the employee's protected, concerted activities in violation
of Section 8(a)(1) of the Act (GC Exh. 1(h) at para 8(i)).  Paragraph 10 of the complaint alleges
that the Respondent violated Section 8(a)(1) of the Act when Angel Macas on about May, at the
Nutley, New Jersey jobsite, instructed an employee to photograph his official NLRB mail ballot
and thereby engaged in surveillance of employees' protected concerted union activities.
Paragraph 11 of the complaint alleges that the Respondent violated Section 8(a)(1) of the Act
when the Respondent, by Freddy Espinoza on about May 2021, at the Newark jobsite, coercively
interfered with the official NLRB mail ballot election conducted in Case 22–RC–274819, and
engaged in surveillance of employees' protected, concerted union activities.

While working at the Nutley jobsite, Garcia testified that foreman Macas in about May,
instructed him to complete the election ballot and to take a snapshot of his ballot and send it to
Espinoza.  Garcia refused to do so (Tr. 526, 527, 536).  Garcia never sent or show his ballot to
Macas (Tr. 540, 541).  He said he was working in Nutley when Macas instructed him about the
ballot (Tr. 533).  In rebuttal, foreman Macas denied that he instructed Garcia to send him or
anyone else, a picture of Garcia's ballot.  Macas also denied telling Garcia how he should vote
on the ballot.  At the time of his testimony, Macas stated that he is still unaware as to how Garcia
had voted  (Tr. 793, 794, 802).

Rivera testified that in April or May, Freddy Espinoza started making phone calls to him
and asked whether Rivera has received his ballot to vote.  Rivera responded "no" in the initial
call from Freddy.  Rivera stated that Freddy would call him four or five consecutive days if he
had received the ballot.  When Rivera received his ballot, he did not want to inform Freddy
because he was afraid that Freddy would tell him how to vote.  Rivera stated that Freddy wanted
to see his completed ballot.  Rivera testified that he made a copy of the blank ballot and indicated
on the ballot that he did not vote for the Union.  He said that the copied ballot was texted to
Freddy.  Rivera stated that he completed the original ballot in support of the Union and mailed
that ballot to the NLRB (Tr. 474–477).  Rivera explained he was scared that Freddy would take
his ballot and sign the ballot in favor of IBN so he did not want Freddy to take the ballot from
him (Tr. 477).  He was told of two workers who had their ballots taken by Freddy Espinoza (Tr.
480, 481, 484, 485, 486).

Jimenez recalled a conversation with Nelson Espinoza over the phone in May regarding
the upcoming ballot election.[35]  According to Jimenez, Espinoza inquired whether Jimenez had
received his ballot to vote.  Jimenez responded that he had completed the ballot but had not sign
the back of the envelop.  Espinoza told Jimenez that he completed the ballot incorrectly and
proceeded to provided him with the NLRB phone number to obtain another ballot.  Jimenez

---

[35] My finding of the alleged interference of the ballot election pertaining to Espinoza's instruction to Jimenez to cast
his ballot in his presence was also addressed above dealing with the impression of surveillance by management of
the workers' union activity.

called and received a second ballot.  Jimenez then received a second phone call from Espinoza asking if he had received the second ballot.  Jimenez replied in the affirmative and was instructed to bring the ballot to the IBN yard in Irvington so that Espinoza could help him complete the ballot (Tr. 421, 422, 443).  On the following day after their conversation, Jimenez arrived at the yard and Espinoza asked if Jimenez had his ballot.  Jimenez replied he did and the two proceeded to Espinoza's car.  Inside the car and in the presence of Espinoza, Jimenez completed the ballot in support of the employer.  Jimenez testified that Espinoza was sitting next to him in the car, so he pretended not to support the Union.  Jimenez admitted that Espinoza did not tell him how to vote while they were in his car.  Jimenez also admitted that he does not know if Espinoza knows how he voted.  He said that Espinoza then took his ballot and informed Jimenez that he will mail the ballot on his behalf. Jimenez then left the car and started his work day (Tr. 422–425, 452, 453).

Jimenez testified that there was an audio recording of his second phone conversation with Espinoza.  He did not recall when this phone conversation actually occurred but he happened to be in Simbana's car when he received the call from Espinoza.  Jimenez testified that he gave Simbana permission to record his conversation with Espinoza.  In the audio recording, Jimenez was asked by Espinoza if he had received the ballot.  Jimenez replied, "yes."  He was asked by Espinoza to bring the ballot (to the yard) (Tr. 425–427, 434, 435; GC Exh. 9(b)).

Simbana testified that he heard the audio exchange between Jimenez and Espinoza when Jimenez sent the audio to him (Tr. 205, 206).  Simbana testified that Jimenez informed him that Espinoza had called him and asked if he had already voted.  Simbana said Jimenez responded "yes" to Espinoza.  According to Simbana, Espinoza then told Jimenez to call the NLRB for a new ballot and when he gets it, to meet him at the company yard.  According to Simbana, Jimenez went to the yard and completed the new ballot in front of Espinoza in favor of the company.  Simbana stated that his conversation with Jimenez occurred prior to the petition being withdrawn.  Simbana believed that Jimenez completed two ballots.  Simbana said that Jimenez was afraid of losing work hours and retaliation (for his support of the Union) (Tr. 150–157).

Simbana also recalled talking with worker Antolin Benitez.  Simbana said that Benitez did not vote yet, but asked by Espinoza to go to the IBN yard.  According to Simbana, Benitez was told by Espinoza to leave and "to take the ballot with him, and do whatever he wants with the ballot" (Tr. 159, 160).  The instruction by Espinoza for Benitez to go to the IBN yard with his ballot gave an intimidating signal to Benitez as to how he should vote.

In denial, Espinoza admitted that he had asked employees if they had received their ballots because he was concerned that not everyone had received a ballot.  With Jimenez, Espinoza testified that he told Jimenez to get a second ballot because he was informed by Jimenez that he did not sign the back of the ballot.  Espinoza testified that he was wrong for him to have Jimenez filled out his ballot in his car.  Espinoza said that Jimenez was the "delivery guy" and is always in Espinoza's car, so he just asked Jimenez to get in the car.  Espinoza denied that he saw how Jimenez had voted and further denied that he was present when other workers had completed their ballots (Tr. 881, 882).

The Board's principal goal in conducting representation elections is to guarantee employees' freedom in exercising their choice with respect to union representation. See *Family Service Agency, San Francisco*, 331 NLRB 850 (2000); *General Shoe Corp.*, 77 NLRB 124, 127 (1948).  Indeed, "through its entire history," the Board "has gone to great lengths to establish and maintain the highest standards possible to avoid any taint of the balloting process[.]" *Austill Waxed Paper Co.*, 169 NLRB 1109, 1109 (1968); see also *Polymers, Inc.*, 174 NLRB 282, 282 (1969), enfd. 414 F.2d 999 (2d Cir. 1969), cert. denied 396 U.S. 1010 (1970).  In pursuing that goal, the Board considers, among other things, the employees' awareness that the employer wields substantial and direct control over their livelihoods and day-to-day working conditions, power that a petitioning union does not possess in any degree.  *First Student, Inc.*, 355 NLRB 410 (2010).

I find that the Respondent interfered with the ballot casting and as such, created an impression that the workers' protected activity was under surveillance.  As noted above, the presence of Espinoza with Jimenez in an enclosed area as Jimenez was completing his ballot was an intimidating situation and interfered with Jimenez' Section 7 rights.  Freddy Espinoza did not testify and therefore, the Respondent did not fully rebut the testimony of Rivera that he was instructed by Freddy to show him the ballot after it was completed.[36]  Rivera's testimony was corroborated by Simbana, who recalled the details related to him by Rivera.  Further, the text message by Rivera was indeed sent to Freddy Espinoza.  While the testimony of Simbana regarding Antolin Benitez was not corroborated by Benitez (he did not testify), the overall intimidating interference by the Respondent with the casting of the ballots as credibly testified by Rivera, Jimenez, and Garcia makes it more likely than not that other workers were questioned about their ballots.

Accordingly, I find that the Respondent violated Section 8(a)(1) of the Act when the Respondent "interfere with, restrain, or coerce employees in the exercise of [those] rights" guaranteed under Section 7 of the Act.  See *Brighton Retail Inc.*, 354 NLRB 441, 447 (2009).

c.  The Alleged Coercive Conduct and Threats of Employees in Support of the Union

The amended complaint alleges that 1) on about April 29, at the Newark jobsite, Espinoza threatened to discharge employees because of their support for the Union; 2) on about April 29, at the Newark jobsite, Espinoza threatened to file a lawsuit against employees engaged in union activities; 3) on about April 29, at the Newark jobsite, Espinoza threatened the immigration status of employees because of their support of the Union; 4) on about May, at the Newark jobsite, Espinoza implicitly promised an employee a wage increase if the Union lost the election; 5) on about March, at the Newark jobsite, foreman Rodriguez threatened employees with a reduction in pay because of their union activities; 6) on about March, at the Newark jobsite, Rodriguez threatened the immigration status of employees because of their support for

---

[36] The Board has consistently held that the judge may consider the General Counsel's failure to call a potentially corroborating witness in deciding whether a violation of the Act has occurred.  See *C & S Distrib.*, above, 404 fn. 2 (1996).  This principle is equally applied to the failure of the Respondent to call a potential witness to rebut allegations raised in the complaint.

the Union; and, 7) on about March or April, at the Newark jobsite, Rodriguez threatened employees with termination because of their union activities.

In determining whether conduct or a threat violates Section 8(a)(1), the Board applies an objective standard as to whether the remark reasonably tends to interfere with the free exercise of employee rights, and does not look at the motivation behind the remark.  *Divi Carina Bay Resort*, 356 NLRB 316, 320 (2010), enfd. 451 Fed. Appx. 143 (3d Cir. 2011); *Joy Recovery Technology Corp.,* 320 NLRB 356, 365 (1995), enfd. 134 F.3d 1307 (7th Cir. 1998); *Miami Systems Corp.*, 320 NLRB 71, 71 fn. 4 (1995), affd. in relevant part 111 F.3d 1284 (6th Cir. 1997); *Midwest Terminals of Toledo*, 365 NLRB No. 158 (2017). When applying this standard, the Board considers the totality of the circumstances. *Mediplex of Danbury*, 314 NLRB 470, 471 (1994). The test for evaluating if the employer violated Section 8(a)(1) is "whether the statements or conduct have a reasonable tendency to interfere with, restrain or coerce union or protected activities." *Hills & Dales General Hospital*, 360 NLRB 611, 615.  This objective standard does not depend on whether the "employee in question was actually intimidated." *Multi-Ad Services*, 331 NLRB 1226, 1228 (2000), enfd. 255 F.3d 363 (7th Cir. 2001).  Rather, whether the statements are a threat is viewed from the objective standpoint of the employee, over whom the employer has a measure of economic power.  See *Mesker Door, Inc*., 357 NLRB 591, 30 595 (2011); *Inn at Fox Hollow*, 352 NLRB 1072, 1074 (2008).

As with all alleged 8(a)(1) violations, the judge's task is to "determine how a reasonable employee would interpret the action or statement of her employer…and such a determination appropriately takes account of the surrounding circumstances." *The Roomstore*, 357 NLRB 1690, 1690 fn. 3 (2011).  Upon my review, I find credible the testimony of the workers regarding the specific allegations in the amended complaint as follows,

1) On about April 29, at the Newark jobsite, Espinoza threatened to discharge employees because of their support for the Union:  Molina overheard Espinoza in April at the Newark jobsite that Espinoza accused worker Nelson Benitez that he was the instigator, who visited and talked with the workers to support of the Union.  Molina recalled Benitez asking Espinoza how he knew, and Espinoza responded that he has people to inform him.  Molina believed six or seven other workers overheard this conversation (Tr. 325, 326).  Benitez testified that there was a meeting called by foreman Rodriguez on April 29.  Benitez said that Espinoza was at this meeting.  He did not recall if there were other workers around.  According to Benitez, Espinoza approached Benitez and stated to him that "I know you are the head of all this shit.  That you need to stop ruining the heads of the rest of the workers."  Benitez asked how he knew and Espinoza responded that the Union has its people and he has his people to report back to him.  Benitez asserted that Espinoza said that everyone will be sent home during the election process and the company will hire new worker.  It is alleged that Espinoza also stated to him that the workers that had signed authorization cards will not be coming back to work.  (Tr. 549–554, 562, 563, 565, 566).  Rivera also recalled the incident with Espinoza at Newark jobsite on April 29.  Rivera testified that Espinoza was handing out flyers in disfavor of the Union.  Rivera was allegedly asked by Espinoza if he had signed the union card and Rivera lied when he replied, "no."  Rivera stated that Espinoza then commented that "…all the Salvadorians had betrayed him."  Rivera stated that Molina was present.  Rivera also recalled another occasion when he was going to work with Nelson Benitez and Espinoza directly accused Benitez that he was the lead

worker in supporting the Union.  Rivera believed Armando Anaya was standing nearby and overheard this accusation made by Espinoza (Tr. 472, 473).

The threat of discharge or retaliation need not be explicit.  In specifically assessing
5   whether a remark constitutes a threat, the appropriate test is "whether the remark can reasonably be interpreted by the employee as a threat." *Smithers Tire*, 308 NLRB 72 (1992); *Santa Barbara New-Press*, 357 NLRB 452, 476 (2011).  In this situation, the threats were explicit.  I find the remarks made by Espinoza to Benitez were reasonably interpreted as threatening with his loss of employment because he was the alleged ringleader of the workers' union organizing.  The
10  comments made to the other workers reasonably restrained and interfered with unfettered union and concerted protected activities in violation of the workers' Section 7 rights.  I find that such remarks as "the workers would be sent home after the election;" that "certain workers had betrayed Espinoza;" that the "Respondent will prevail against the Union and all who had supported the Union will be discharged" were corroborated and said by either Espinoza or
15  Rodriguez.  Espinoza' threat of job loss due to such activity was a benchmark Section 8(a)(1) violation.  See *Baddour, Inc.*, 303 NLRB 275 (1991) (statement unlawfully warned that union strikers could lose their jobs and be replaced by new permanent workers); *Mediplex of Danbury*, 314 NLRB at 471 (statement unlawfully threatened retaliation in response to protected activity).

20  Each of the three workers testified and corroborated that similar threats were made by Espinoza.  Their testimony over receiving threats of termination by Espinoza because of their Union support was consistent and did not falter under cross-examination.  The Board "has long held that such statements by an employer implicitly threaten discharge because they convey the impression that the employer considers complaining about working conditions and engaging in
25  union activity incompatible with continued employment." *Equipment Trucking Co.*, 336 NLRB 277 (2001).  The threats, moreover, made by Espinoza, the owner of IBN, is a factor that the Board has long recognized as significant.  "The threats were made by Respondent's general manager, a man who possessed the power not only to threaten but also to turn threat into reality." *General Stencils, Inc.* 195 NLRB 1109, 1110 (1972). ).  Under these circumstances, Espinoza's
30  remarks were clearly coercive, and Respondent thus violated Section 8(a)(1) of the Act.

2) On about April 29, at the Newark jobsite, Espinoza threatened to file a lawsuit against employees engaged in Union activities:  Pereira testified in a meeting, Espinoza commented that he knew the workers at the Newark jobsite were in support of the union while he was handing
35  out the company's flyer (Tr. 374–378).  Pereira recalled Espinoza threatening to file a lawsuit against the workers. He recalled specifically that Espinoza said "…because of the union, he would do a lawsuit on the person that was organizing the union" (Tr. 390, 391).  Lopes was present at this meeting and believed he was being watched closely by Espinoza due to his talks with Simbana (Tr. 612, 613).  Lopes believed that he was being watched by Espinoza because
40  Espinoza had started to a lawsuit against the union (Tr. 598, 615).  Garcia testified to a discussion about the Union in April 29 and recalled Espinoza stating that he will sue the employees supporting the Union.  Garcia testified that he took the remark as Espinoza's attempt to intimidate the workers for joining the Union.  Garcia believed there were a number of workers present when the remark was made by Espinoza (Tr. 525, 526, 540).  Garcia testified that
45  Espinoza's threat to sue also included suing the Union (Tr. 534).

Espinoza denied telling Garcia that he threatened to file a lawsuit against employees supporting the Union and/or against the Union.  Espinoza believed that Garcia and other workers was mistaken about filing a lawsuit because he was only stating to the workers that he was in talks with his lawyer for training on how to respond to the Union (Tr. 878).

5

The threats in question need not be explicit if the language used by the employer or his representative can reasonably be construed as threatening.  *NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 49 (9th Cir. 1970).  In specifically assessing whether a remark constitutes a threat, the appropriate test is "whether the remark can reasonably be interpreted by the employee as a

10    threat." *Smithers Tire*, 308 NLRB 72 (1992); *Santa Barbara New-Press*, 357 NLRB 452, 476 (2011).  I find that the remark about filing a lawsuit against the Union and/or workers was clearly a threat to intimidate the workers not to support the Union, or alternatively, to be subjected to a lawsuit if they decided to support the Union.  Espinoza testified that his remark was taken out of context and that he was only referring to his talks with his attorney.  However, "It is well settled

15    that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or on whether the coercion succeeded or failed." *American Tissue Corp.*, 336 NLRB 435, 441–442 (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.3d 811, 814 (7th Cir. 1946)).  I find that the remarks by Espinoza to file a lawsuit against the Union and/or the workers who had supported the Union were sufficiently corroborated by the credible

20    testimony of Pereira, Garcia, and Lopes.  Here, even if the remarks were taken out of context or were confused by the workers, it is clear that the remarks made by Espinoza tended to sow fear among the workers.  Merely mentioning lawyers and talks with lawyers can reasonably be interpreted as intimidating by immigrant workers who are unfamiliar with the legal system and therefore, I find his remarks can reasonably be construed as threatening and violative of Section

25    8(a)(1) of the Act.

3) On about April 29, at the Newark jobsite, Espinoza threatened the immigration status of employees because of their support of the Union: Pereira recalled in the meeting with Espinoza on April 29 that that Espinoza repeated that the workers needed papers to join the

30    Union and that they were crazy to support the Union.  Pereira believed that 12 to 14 workers heard the remarks (Tr. 369, 370, 386).

Espinoza denied that he threatened Pereira and the workers that he would report their status to immigration officials.  Espinoza also denied that he ever heard foreman Rodriguez

35    threatened to report the workers to immigration officials (Tr. 21, 22).  Espinoza testified that it was his mistaken belief that a worker needed paper (or documentation) to belong to a union.  He said (Tr. 21) that,

Yes. I did say that, but it was more an opinion. I said that in my opinion that in order for

40    you to be part of the Union, in the time that I've, you know, I've known, in the years that I've been with this, I've known that in order for you to be part of a union, you have to have papers. That was just an opinion that I was saying.

4) On about March, at the Newark jobsite, Rodriguez threatened the immigration status

45    of employees because of their support for the Union:  Directly related to Espinoza's remark, of the need to have papers to join the Union, Rodriguez made similar comments to the workers.

Molina testified that Rodriguez, in a group conversation in March, told him and 14 to 16 other workers that they did not have the paper to join the Union.  He believed Rodriguez was referring to immigration residency (green) cards and/or social security cards (Tr. 322, 323).

5      Molina testified that Rodriguez told the workers that,

one of you guys, I don't know who, but one of you guys are talking to a union personnel and you guys are not able to apply for -- under a union representation because you don't have the papers. If you want is to work under a union regiment, then go ask that other
10     person that you're talking to (Tr. 346).

Molina conceded that no one threatened him about reporting the status of the workers to immigration.  He also never heard any other worker being threatened about their immigration status (Tr. 346, 347).

15

Pereira testified that he was with a group of workers at the Newark jobsite discussing about the Union when Rodriguez told them that they were crazy (to join the Union) and that the workers needed their paper. Pereira said this comment occurred in March, but that Rodriguez would always make that comment, usually one or at most, two workers (Tr. 367–369).

20

Fuentes also recalled the comment made by Rodriguez at the Newark jobsite about May. He stated that there were 8 to 10 workers starting work on the 1st floor of the building.  Fuentes testified that Rodriguez stated to the group that "…we can't be part of the Union because of that thing, you know, that thing of not being legal because we were illegals" (Tr. 495, 502, 503).
25     Fuentes admitted that none of the supervisors or Espinoza threatened to report their immigration status to the government (Tr. 505).

Alvares also recalled a second discussion with the workers about the Union around the same time frame.  He said that supervisor Rodriguez was also present at this second group
30     discussion.  Alvares testified that Rodriguez said, "What are you guys doing being part of the union?…you guys don't have documents."  Alvarez believed that Rodriguez was referring to those workers that are lacking immigration status documents.  Alvares recalled that Francisco Benitez and Oliver Fleinez were present when the remake was made by Rodriguez (Tr. 636, 637).

35     Rodriguez denied that he had threatened any workers that he would report them to immigration officials.  He did tell the workers at the March meeting that,

I said to them that why is it that they want to work for the union?
That I know of, that you can't work under the union if you don't have papers,
40     and we don't have papers (Tr. 823, also 831).[37]

Rodriguez stated that he did not threaten the workers with that statement (Tr. 822).

---

[37] There was some confusion in Rodriguez' testimony as to whether he testified that the workers needed papers to work for the Union or papers needed to join the Union.  It is obvious that Rodriguez meant that a worker needed "papers" to join the Union, which is consistent with Espinoza's testimony on this point.

JD(NY)-05-23

The credible evidence corroborated by the testimony of several workers show that Espinoza and Rodriguez made the remarks about needing either immigration documents or social security cards showing their legal residency in the United States.  Neither Espinoza nor Rodriguez denied making these remarks.  The Respondent argues that their remarks about needing "papers" were based upon their mistaken belief as to what is needed to join the Union. The Respondent also argues that neither Espinoza nor Rodriguez threatened to report the workers to immigration officials.

It is well settled that coercive and threatening statements are measured not by the subjective views of either the speaker or the listener, but by whether the remarks had the reasonable tendency to interfere with the free exercise of Section 7 rights.  Espinoza and Rodriguez representing to the workers that certain documentation was needed to join the Union interfered with their Section 7 rights to join and support the Union.  See *NLRB v. Illinois Tool Works*, 153 F.2d 811, 816 (7th Cir. 1946).  In telling the workers that unspecified documents were needed to join the Union, even if the remarks were misplaced, sends a signal to the workers that the Respondent was restraining the workers' Section 7 rights.  Under these circumstances, the remarks made by Espinoza and Rodriguez were clearly coercive, and Respondent thus violated Section 8(a)(1) of the Act.  See *Ellison Media Co.,* 344 NLRB 1112, 1113 (2005); *George L. Mee Memorial Hospital*, 348 NLRB 327 (2006); *Armstrong Machine Co.,* 343 NLRB 1149, 1151 (2004).

5) On about May, at the Newark jobsite, Espinoza implicitly promised an employee a wage increase if the Union lost the election:  Luis Jimenez testified he asked Espinoza for a raise in May at the IBN yard.  At the time, Jimenez was receiving $18 dollars per hour and requested $1 dollar raise.  According to Jimenez, Espinoza responded, "let's wait till the next pay period." Jimenez speculated that Espinoza was referring to the results of the elections.  Jimenez testified that he received a $1 dollar raise but not until in early 2022 after he had asked a second time for a raise (Tr. 430, 431).  Also, Nelson Molina stated that his rate of pay was increased from $17 to $19 after the union withdrew the petition (Tr. 338–340).

The burden is on the Respondent to demonstrate that Espinoza's remark was not due to union activity.  *STAR, Inc.,* 337 NLRB 962, 962 (2002) (employer may rebut inference that grant of benefits during critical period is coercive "by establishing an explanation other than the pending election for the timing of the announcement or bestowal of the benefit."); see also *Onan Corp.*, 338 NLRB 913, 915 (2003) (employer had the burden to prove that announcement would have come at the time in question with or without a union campaign).

Espinoza recalled Jimenez asking for a raise in May and responded and he testified that, "I respond we were not in the moment that we were not in the moment at that time" (Tr. 880). Espinoza explained that the company was in the midst of the election at that time and it could be incorrectly interpreted if he was to give a raise to Jimenez during union campaign (Tr. 880).

It is undisputed that the event occurred as described by Jimenez and Espinoza.  The General Counsel argues that the remark was made to entice Jimenez' vote for the employer with a promise of a raise after the pending election.  The Respondent takes a different interpretation

and argues it would look bad if Jimenez got a raise and none of the workers received the same benefit.  I find that the Respondent failed to meet its burden to unambiguously explain to Jimenez that bestowing a benefit during the critical period was to maintain the existing practices regarding terms and conditions of employment.  My finding is based upon the fact that the ballots were being completed by the workers in May.  It is not clear whether this conversation occurred before or after Jimenez had voted while in the presence of Espinoza.  Espinoza statement that "…we are not in the moment at that time" was coercive to Jimenez and he reasonably interpreted that his support for the employer would result in a raise after the Union losses the election.  The Respondent also failed to rebut Molina's testimony that he received a raise from $17 to $19 dollars per hour after the Union withdrew its petition.  As such, I find that testimony as credible and the Respondent violated Section 8(a)(1) for bestowing or attempting to bestow a wage benefit to employees in support of the employer.

6) On about March, at the Newark jobsite, foreman Rodriguez threatened employees with a reduction in pay because of their union activities:  Garcia testified that he was working at the Newark jobsite when his hours were reduced.  He was told by supervisor Rodriguez that his hours were reduced before he supported the Union.  Garcia believed three workers were present when the comment was made (Tr. 523, 524).  Alvares testified that his work hours were reduced in April.  After his hours were reduced, Alvares recalled discussing the change in his hours with coworkers in either March or April at the Newark jobsite.  He believed there were eight workers in this group discussion.  He recalled that supervisor Rodriguez was present and commented, "This is what you guys wanted.  This is what you guys were looking for.  The owner is furious."  The workers believed that Rodriguez was referring to the Union and that Espinoza was furious (Tr. 633–636).

Rodriguez generally denied making these remarks.  However, I find credible the corroborating testimony of Garcia and Alvares that these remarks were made.  Here, the Respondent violated Section 8(a)(1) when it communicated to employees that they will jeopardize their job security, wages, or other working conditions if they support the Union.  *Metro One Loss Prevention Services Group*, supra, 356 NLRB at 89–90 (employer statement that employees should be grateful for their years of service and pay rates and warning that it could get much worse if a union came in constituted unlawful threat).[38]

d.  The Respondent Violated Section 8(a)(1) of the Act when it Interrogated Employees Regarding their Union Sympathies, Membership and Activities

The amended complaint alleges that (1) on about April, at the Newark jobsite, Espinoza interrogated employees about their union sympathies, membership, and activities; and (2) on about May, Rodriguez went to its employees' homes and interrogated employees about their union sympathies (GC Exh. 1(h) at para. 8(f) and para. 9(f)).

---

[38] Par. 9(e) of the amended complaint alleges that Rodriguez about March or April 2021, at the Newark jobsite, threatened employees with termination because of their union activities.  Upon my review of the record, I do find that this allegation was substantiated.  I also note that the General Counsel did not argue this allegation in par. 9(e) through witnesses or in the posthearing brief.  As such, I recommend that this allegation be dismissed.

It is alleged that in April, Espinoza asked Nelson Benitez and his brother if they had signed their union cards.  On another occasion during the same timeframe, it is alleged that Espinoza asked Nelson Molina and Juan Alvarez if they were represented by the Union.  Benitez recalled a group meeting on about April 9 with Espinoza at the Newark jobsite.  Benitez said that his brother, Francisco was with him and that supervisor Rodriguez was with Espinoza.  Espinoza asked if Benitez signed the authorization card.  Benitez replied, "yes."  Espinoza told them there was no future with the Union (Tr. 548, 549).

Bolivia Rivera also recalled meeting with the Espinoza at the April 29 meeting at the Newark jobsite.  Rivera testified that Espinoza was handing out flyers in disfavor of the Union.  Rivera was allegedly asked by Espinoza if he had signed the union card and Rivera lied and replied, "no."  Rivera stated that Espinoza then commented that "…all the Salvadorians had betrayed him."  Rivera stated that Molina was present (Tr. 472, 473).[39]

Nelson Molina testified a conversation during a meeting in April.  Molina testified that Espinoza was handing out flyers at the Newark jobsite with Rodriguez.  Ivan Bolivar was nearby.  Molina testified that Espinoza asked if he was part of the people was being represented by the Union.  Molina responded, "yes" to Espinoza.  He told Espinoza that he supported the Union.  He believed Bolivar also stated that he supported the Union (Tr. 323–325).

Espinoza denied that he asked Molina whether Molina supported the Union or that he asked the other workers if they had signed authorization cards.  He said that he was trained not to ask those kind of questions and denied he asked other workers if they supported the Union or how they voted (Tr. 23 at supplemental transcript to Vol. 10).

It is alleged that in late April or early May, Rodriguez asked if Fuentes had signed his union card.  Fuentes testified that foreman Rodriguez was a friend and he often visit Fuentes' residence on a social basis.  Fuentes testified that on one occasion in either late April or early May, Rodriguez was at his residence and asked if Fuentes had signed the union card.  Fuentes testified that he lied to Rodriguez and denied signing the card because of their friendship.  Fuentes said that Rodriguez asked him in front of his house but there were no one else around.  Fuentes believed Rodriguez asked him about 15 days after he had actually signed the union card.  (Tr. 496, 496, 497, 500, 505).

Rodriguez stated that he knows Fuentes as a personal friend.  He had visited Fuentes' residence on numerous occasions before, during, and after the union organization campaign.  He denied speaking about the Union to Fuentes when he had visited his home (Tr. 822, 823, 828).  Rodriguez specifically denied speaking to Fuentes about the Union in April (Tr. 828).  Rodriguez said that he was often with Fuentes every weekend in March, April and May but denied knowing if Fuentes supported the Union because they did not discuss such matters as personal friends (Tr. 829).

---

[39] Counsel for the General Counsel mistakenly attributed the comment made by Espinoza, "all Salvadorians had betrayed him" to Juan Alvares (GC Br. at 9).  However, the cited transcript page by the General Counsel containing this remark was made by Espinoza to Bolivar Rivera (Tr. 472).

The lead Board case regarding the legality of interrogations is *Rossmore House,* 269 NLRB 1176 (1984), affd. 760 F.2d 1006 (9th Cir. 1985). Pursuant to the *Rossmore* test,

5

Under Board law, it is [well established] that interrogations of employees are not per se unlawful, but must be evaluated under the standard of "whether under all the circumstances the interrogation reasonably tended to restrain, coerce, or interfere with rights guaranteed by the Act."

10

In making that determination, the Board considers such factors as the background, the nature of the information sought, the identity of the questioner, the place and method of interrogation, and whether or not the employee being questioned is an open and active union supporter. *Norton Audubon Hospital,* 338 NLRB 320, 320–321 (2002); also, *Intertape Polymer Group*, 360 NLRB 114 (2014). The core issue is whether the questioning would reasonably tend to interfere with, restrain, or coerce employees in the exercise of their statutory rights. This is an

15 objective standard. *Multi-Aid Service*, 331 NLRB 1126 (2000), enfd. 255 F.3d 363 (7th Cir. 2001).

In applying the totality of the circumstances test, and considering the backdrop of an ongoing union organization effort , I find the allegations of interrogating Rivera, Molina, Benitez

20 and Fuentes about their card signing and union sympathies as coercive and violated Section 8(a)(1) of the Act. See *Association of Community Orgs. for Reform Now*, 338 NLRB 886 (2003). Molina testified that Espinoza asked if he signed the union card. Molina testified that Rivera was present when this question was asked by Espinoza. Rivera corroborated that he was present and was also interrogated by Espinoza about his card signing and affiliation with the

25 Union. Their testimony was consistent. I also find that Benitez credibly testified that he and his brother was asked if they had signed union cards. I find his testimony credible given that Espinoza called the meeting to discuss the Union with the workers and had asked this same question of Molina and Rivera. Additionally, given the totality of the circumstances during the meeting on April 29 meeting, the interrogation questions on union sympathies and union card

30 signing are undoubtedly consistent with the other coercive and threatening statements made by Espinoza, as described above. The timing and place of the interrogation is suspect since it comes immediately before and during the Respondent's meeting with the workers.

With respect to Rodriguez and Fuentes, I find that Fuentes was indeed interrogated by

35 Rodriguez about his union card signing. It is not denied that both are personal friends but Rodriguez cannot simply separate his friendship from that of a supervisor of Fuentes. I find it was not credible that the topic of the Union never came up during all their personal social gatherings throughout the spring. Again, the Union organizing campaign was ongoing at this time and it is difficult to believe Rodriguez that he did not mention the Union at all to Fuentes on

40 a social level. In addition, I reach this conclusion based also upon the comments and threats made by Rodriguez exhibiting his animus towards the union, as noted above.[40]

---

[40] Simbana testified that Armando Anaya told him that supervisor Emmanuel Noyola interrogated Anaya if he had already voted and wanted to stop by his house (Tr. 170, 171). However, I give little or no probative value to this statement inasmuch as Anaya was not called as witness to corroborate Simbana's statement.

Accordingly, I find that the inquiries made by Espinoza and Rodriguez as to whether Molina, the Benitez brothers, Rivera, and Fuentes had signed union authorization cards were coercive and restrain their Section 7 rights.  Employees have a right to support for or against

5    union representation without their views being made known to management.  *Readyjet, Inc.,* 365 NLRB. No. 120 (2017).

       e.   The Respondent Violated Section 8(a)(1) of the Act when Espinoza Made Statements on the Futility of Joining the Union

10

The amended complaint alleges that on about April 9, at the Newark jobsite, Espinoza informed employees that there is no future with the Union as their bargaining representative (GC Exh. 1(h) at par. 8(b)).

15    Benitez testified that prior to the meeting,  Benitez said he met Espinoza earlier on the same day before the meeting while he was putting his tools away with his brother, Francisco Benitez.   According to Benitez, Espinoza approached Benitez and stated to him that "I know you are the head of all this shit.  That you need to stop ruining the heads of the rest of the workers."  Espinoza also allegedly stated that the Union promises nice things but never delivered

20    and that the Union will take half of his salary (Tr. 549–554).

Lopes testified that Espinoza has observed him with Simbana at the West Orange jobsite. Lopes testified that he had a second conversation with Espinoza a "few days later."  Lopes was told by Espinoza that he observed him talking with Simbana outside the jobsite for 15 minutes

25    and that Espinoza told Lopes that,  "He said that we should not speak to him because what he was saying was not the truth and—and we should not listen to him. Basically that" (Tr. 596–598, 600, 601).  Lopes recalled a second incident with Espinoza delinating the Union.  Espinoza discussing the Union in February with a group of workers at the West Orange jobsite.  According to Lopes, Espinoza was discussing the upcoming election and that they should not vote for the

30    Union.  Lopes testified that Espinoza said that "…he just said that we shouldn't vote for the union, that the people who work for the union were liars, and they always tell lies and stuff like that." (Tr.  594, 595, 600).

The Respondent argues that the comments attributed to Espinoza did not convey that

35    joining the Union was an act of futility because there was no future with the Union (R. Br. at 10, 11).  Espinoza testified (Tr. 20) that,

A. Yes. Yes, but I think they confused what I was saying.  Yes, I said that they were crazy to join. But what I meant more was that they were crazy to be part of the Union

40    since the Union, you have to pay. You have to pay for the benefits or you have to pay for the union dues. So, and also if there are strikes. If there's any strike, you have to go and participate over that. And I would say it would be crazy, since we don't do that. We, here, we just do continuous work. So it was more like an opinion of mine.

Following up with Molina, Espinoza explained that he did state that IBN would be more functional without a union.  He stated (Tr. 22) that,

> Yes, I did say that.  Like I -- I'll repeat.  Like I stated before that my company would work better without the Union because I could not compete with the other companies.  So I said to my workers that if the Union were to enter, I would  have to ask permission from them for whatever other else thing.

Under the circumstances, I find that Espinoza's pronouncements amounted to unlawful statements of futility regarding the bargaining process in violation of Section 8(a)(1) of the Act.  See *Federated Logistics & Operations,* 340 NLRB at 266–267 (statement that the selection of the union would be futile as the employees would receive no wage increases until the parties negotiated a contract which could take a long time was unlawful).  Espinoza told Lopes and other workers that the Union always tell lies is an unspecified threat and violative of Section 7 rights for workers to be free of  coercive conduct.  See, e.g., *SDK Jonesville Division, LP*, 340 NLRB 101, 101–102 (2003) (unspecified threat that it was not in employee's best interest to be involved with the union found violative, citing *Keller Ford*, 336 NLRB 722 (2001), enfd. 69 Fed. Appx. 672 (6th Cir. 2003).  Espinoza told Benitez that the Union will take half of his pay and the comment to Molina about workers are crazy to join the Union conveys that joining the Union made no sense and the Union would just take their wages.

Even if Espinoza's remarks were his own opinion, his remarks conveyed a sense of futility for the workers to join the Union because he is the sole owner of IBN and can make his opinion a reality for the workers.  As the Board explained in *North Star Steel Co*., 347 NLRB 1364, 1365 (2006), an employer violates the Act by implying to employees "that collective bargaining would be futile because such bargaining would not result in the employees obtaining benefits other than what [the employer] chose to give them[.]" See also, *Smithfield Foods*, 347 NLRB 1225, 1230 (2006) (top official's statement that employer was in complete control of future negotiations was unlawful); *Aqua Cool*, 332 NLRB 95, 95 (2000) (statement that employees were unlikely to win anything more at the bargaining table than non-represented employees was unlawful).

Accordingly, I find that the Respondent violated Section 8(a) (1) of the Act when Espinoza  informed employees that there is no future with the Union as their bargaining representative.

## II.  The 8(a)(3) and (1) Allegations

Section 8(a)(3) of the Act prohibits an employer from discriminating against employees to hinder or promote union membership.  Section 7 of the Act guarantees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities of the purpose of collective bargaining or other mutual aid or protection."  Section 8(3) prohibits employers from discriminating in regard to an employee's "tenure of employment . . . to encourage or discourage membership in any labor organization." An employer violates Section 8(a)(3) by

disciplining or taking adverse actions against employees for antiunion motives. *Equitable Resources*, 307 NLRB 730, 731 (1992).

5

In determining whether an employer's activity violates the Act, the Board applies the test outlined in *Wright Line*, 251 NLRB 1083 (1980), enfd. on other grounds. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Corp*., 462 U.S. 393, 399–403 (1983). The General Counsel has the burden of establishing that the employee's protected activity was a motivating factor in the adverse employment action. The elements commonly required to support such a showing are union and or other protected activity by the

10

employee, employer knowledge of that activity, and antiunion animus on the part of the employer. *East End Bus Lines, Inc.*, 366 NLRB No. 180 (2018), slip op. at 1; see *Allstate Power Vac., Inc.*, 357 NLRB 344, 346 (2011), citing *Willamette Industries*, 341 NLRB 560, 562 (2004); see also *Austal USA, LLC*, 356 NLRB 363, 363 (2010).

15

Once the General Counsel makes that showing, "the burden of persuasion shifts to the employer to demonstrate that the same action would have been taken even in the absence of the protected conduct." *Donaldson Bros. Ready Mix, Inc*., 341 NLRB 958, 961 (2004), citing *Wright Line*, supra at 1089. See also *Cintas Corp.,* 372 NLRB No. 34, slip op at 5 (2022), citing *Metropolitan Transportation Services*, 351 NLRB 657, 659 (2007) (employer's burden not met

20

by merely showing a legitimate reason); *Willamette Industries*, 341 NLRB 560, 563 (2004). When the stated motives for an employer's adverse respondent's actions "are found to be false, the circumstances may warrant an inference that the true motive is an unlawful one that the respondent desires to conceal." *Fluor Daniel, Inc*., 304 NLRB 970, 970 (1991) (citing *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966)), enfd. 45 mem. 976 F.2d 744

25

(11th Cir. 1992).

a. Reducing Work Hours Violated Section 8(a)(3) and (1) of the Act

30

Paragraph 12(a) of the amended complaint alleges that the Respondent reduced employees work hours on about April 2021 in violation of Section 8(a)(3) and (1) of the Act (GC Exh. 1(h)). The counsel for the General Counsel argues that the Respondent took adverse action against bargaining unit workers who supported the Union by reassigning them to the Newark jobsite and then subsequently reduced their hours of work. It is alleged by the General Counsel that the Respondent had knowledge of those workers who supported the Union and therefore,

35

only they were reassigned and had their work hours reduced (GC Br. at 45–50).

As noted in my findings, several workers in support of the Union testified that Espinoza, Foremen Rodriguez and Macas knew of their support of the Union and they were subsequently reassigned to the Newark jobsite and had their work hours reduced. Some workers testified that

40

they were fearful of losing their jobs once the hours were reduced. In summarizing their testimony, I find the following,

-   Molina recalled two meetings with Espinoza in April and/or May. Espinoza was distributing flyers about the company and the Union at the Newark jobsite with

45

foreman Rodriguez present. Another worker named Ivan Bolivar was nearby. Molina told Espinoza that he supported the Union. He believed Bolivar also stated that he

supported the Union (Tr. 323–325).  In the second meeting at the Newark jobsite, Molina overheard Espinoza accusing worker Nelson Benitez that he was the instigator, who visited and talked with the workers to support of the Union.  Molina recalled Benitez asking Espinoza how he knew, and Espinoza responded that he has people to inform him.  Molina believed six or seven other workers overheard this conversation (Tr. 325, 326).

- Subsequently, Molina had his work hours were reduced after informing Espinoza that he supported the Union.  He testified working a ten hour shift from Monday to Friday and eight hours on Saturday.  He testified his work hours were cut to 40 hours per week in about March, April or May.  Molina testified that 14 to 16 workers supported the union based upon his conversations and exchanges with them.  He asserted that all the workers that supported the Union were transferred to the Newark jobsite.  He mentioned a worker named Juan Gabriel Villalta and another worker, named Victor (Uoclla), who were transferred from the Orange jobsite to Newark (Tr. 327, 328, 346).  Molina also believed that the 14 to 16 workers who supported the Union was transferred to the Newark jobsite so that their work hours could be reduced and that they will be sent home when there was no work available (Tr. 331).

- Pereira testified that he was with a group of workers at the Newark jobsite discussing about the Union when foreman Rodriguez told them that they were crazy (to join the Union) and that the workers needed their paper. Pereira said this comment occurred in March, but that Rodriguez would always make that comment, usually in the presence of one or at most, two workers (Tr. 367–369).  Pereira recalled another occasion in a meeting with Espinoza on April 29 in a group at the Newark jobsite.  Pereira said that Espinoza repeated that the workers needed papers to join the Union and that they were crazy to support the Union.  Pereira believed that 12 to 14 workers heard the remarks (Tr. 369, 370, 386).

- In a second meeting called by Espinoza, Pereira recalled that Espinoza said he knew the workers at the Newark jobsite were in support of the union. Pereira recalled that Espinoza was handing out flyers and that 12 to 14 workers were present for his comments (Tr. 374–378).  He also recalled Espinoza threatening to file a lawsuit against the workers. He recalled this was said once by Espinoza.  He did not recall when this comment was made but specifically testified Espinoza said "…because of the union, he would do a lawsuit on the person that was organizing the union" (Tr. 390, 391).

- Pereira complained that soon afterwards, his work hours at the Newark jobsite were reduced.  He testified working nine or ten hours per day when the Union was organizing but after the meetings with Espinoza, his hours were reduced to 8 hours per day from Monday to Friday and no work on Saturday.  Pereira recalled generally talking about the reduced hours with his co-workers and Rodriguez overheard the remarks.  Pereira said that Rodriguez told the group that "…you guys asked for it, you guys were asking for it, that's why the hours were cut."  Pereira testified that

workers Melvin Garcia, Juan Alvarez and Javier Perrira were in this group discussion (Tr. 370–374, 385).

-   Garcia testified that his work hours were reduced, but he did not recall if his hours
    were reduced before or after he signed the union card.  Garcia stated that his work
5   hours were from 7 a.m. to 4:30 p.m. Monday through Friday.  He said the hours were
    reduced to 7 a.m. to 3:30 p.m., but he continued to work on Saturday until 12 noon.
    Garcia testified that he was working at the Newark jobsite when his hours were
    reduced.  He was told by supervisor Rodriguez that his hours were reduced before he
10  supported the Union.  Garcia believed three workers were present when the comment
    was made (Tr.  523, 524).

-   Rivera testified that after his assignment to Nutley, he spoke to other workers about
    supporting the Union.  He recalled discussing the Union with Diego Avia Vincenzo,
15  Luis Jimenez, Melvin Garcia, and Segundo Sarango.  Rivera recalled specifically
    telling them that he supported the Union.  Rivera believed that Sarango is the cousin
    to supervisor Macas (Tr. 464, 465).  He testified that himself and four other workers
    were transferred to the Newark jobsite.  Rivera recalled that Melvin Garcia, Luis
    Jimenez, Segundo Sarango, Diego Avia Vincenzo were transferred with him and that
20  they supported the Union (Tr. 465, 466, 483, 484).

-   Rivera maintained that Diego Avia Vincenzo and Segundo Sarango knew that the
    group of workers that transferred to Newark supported the Union.  Rivera testified
    that the group of workers supporting the Union no longer talked about the Union
25  because they knew Sarango and Vincenzo would inform supervisors Macas in Nutley
    or Rodriguez in Newark of their support for the Union.  Rivera also testified that
    Vincenzo and Sarango received higher wages and overtime work when they were the
    reassigned to another jobsite while his work hours were reduced at the Newark jobsite
    (Tr. 466–469).
30
-   Rivera also recalled an incident with the owner of IBN, Espinoza, in late March or
    April at the Newark jobsite.  Rivera testified that Espinoza was handing out flyers in
    disfavor of the Union.  Rivera stated that Espinoza commented directly to Nelson
    Benitez that he was the lead worker in supporting the Union and that "…all the
35  Salvadorians had betrayed him." Rivera stated that Molina was present and also
    overheard this remark and believed that Armando Anaya was standing nearby (Tr.
    472, 473).

-   Benitez recalled a group meeting on about April 9 with Espinoza at the Newark
40  jobsite.  Benitez said that his brother, Francisco, was with him and that supervisor
    Rodriguez was with Espinoza.   Espinoza asked if Benitez signed the authorization
    card.  Benitez replied, "yes."  Espinoza told them there was no future with the Union
    (Tr. 548, 549).  Benitez testified that there was a second meeting called by supervisor
    Rodriguez on April 29.  Benitez said that Espinoza was at this meeting.  According to
45  Benitez, Espinoza approached Benitez before the meeting and stated to him that "I
    know you are the head of all this shit.  That you need to stop ruining the heads of the

rest of the workers." Benitez asked how he knew and Espinoza responded that the Union has its people and he has his people to report back to him (Tr. 549–554, 562, 563, 565, 566).

5      -     Benitez complained that shortly thereafter, his work hours were reduced. Benitez work hours were reduced in late April when he used to work nine to eleven hours, he was only working eight hours from Monday to Friday. He stopped working on Saturdays and was sent home when during inclement weather (Tr. 554–556, 567).

10     -     Lopes testified that Espinoza had observed him with Simbana at the West Orange jobsite one or two days after a meeting in early spring 2021. He spoke with Simbana for 15 minutes. Lopes was told by Espinoza that he observed him talking with Simbana outside the jobsite for 15 minutes and that Espinoza told Lopes that, "He said that we should not speak to him because what he was saying was not the truth

15           and -- and we should not listen to him. Basically that." Lopes said no one else was present when the remarks were made by Espinoza. (Tr. 596–598, 600, 601).

      -     Lopes also complained about his reduced work hours after signing the union card and speaking with Simbana. Lopes testified that he worked eight hours Monday through

20           Friday after he was subsequently reassigned to the Newark jobsite. He also complained of having his hours reduced on Saturdays. He testified that he formerly worked ten to twelve hours Monday through Friday at Newark and at other jobsites (Tr. 602, 603).

25     -     Alvares testified that his work hours were reduced in April. He stated that he had always worked nine hours Monday through Friday and eight hours on Saturday at the Newark jobsite. He said his work was reduced to eight hours per day Monday through Friday and received only four hours of work on Saturday (Tr. 632, 633). After his hours were reduced, Alvarez recalled discussing the change in his hours

30           with co-workers in either March or April at the Newark jobsite. He believed there were eight workers in this group discussion. He recalled that supervisor Rodriguez was present and commented, "This is what you guys wanted. This is what you guys were looking for. The owner is furious." The workers believed that Rodriguez was referring to the Union and that Espinoza was furious (Tr. 633–636).

35

       I find that the counsel for the General Counsel met her burden to establish that the workers' support of the Union was a motivating factor for their reduced hours. The summary of their statements, above, corroborated the discriminatory statements made by Espinoza and Rodriguez that cannot be made-up by the workers. The workers were credible and consistent in

40     their testimony and sufficiently detailed as to what was said, the time and location of where the comments were made that their testimony cannot be discounted. Where the General Counsel makes a strong showing of discriminatory motivation, the employer's defense burden is substantial. *East End Bus Lines, Inc.*, above, slip op. at 1; see also *Bally's Park Place, Inc.*, 355 NLRB 1319, 1321 (2010) (reversing judge and finding violation because judge "did not consider

45     the strength of the General Counsel's case in finding that the Respondent met its *Wright Line*

rebuttal burden"), enfd. 646 F.3d 929 (D.C. Cir. 2011); *NLRB v. CNN America, Inc.*, 865 F.3d 740, 759 (D.C. Cir. 2017).

5   In rebuttal to these allegations, Espinoza denied that only workers who supported the Union were transferred to Newark and given reduced work hours.  He also denied that discriminatory comments about the Union were made by himself and the foremen.  He testified that some workers were reassign to the Newark jobsite to complete the remaining work and were cleaning debris and finishing up.  Espinoza noted that at the same time, the Nutley jobsite was almost completed and the workers were instructed to help complete the Newark project.
10   Some of the workers were left behind to clean up the Nutley jobsite.  Espinoza recalled that Garcia, Rivera, Diego Vincenzo, Luis Jimenez and Segundo Sarango were reassigned but denied that only the workers who supported the Union were reassigned to Newark (Tr. 12–15).  Espinoza stated that by June, the work at the Newark jobsite was tapering down and only ten or eleven workers were needed to perform wall and floor patchwork and to repair the surrounding sidewalk
15   and curbs (Tr. 904).

Espinoza testified that the completion of the Newark job took longer than expected because after the building was demolished, his workers continued to patch the holes in the walls and floors made by the electricians and plumbers.  He also stated that the workers had to clean
20   up and repair the sidewalks and curbs around the building.  Espinoza testified that this phase of the job lasted about ten to eleven weeks and not completed until September 2022.  He said the work schedule was Monday through Friday for eight hours with occasional Saturday work for four hours (Tr. 904, 909, 912).

25   Assuming the finding of the Respondent's antiunion animus was not sufficient to establish that the reduced work hours was a violation of Section 8(a)(3) and (1) of the Act, I also find that the so-called legitimate reason for the reduced work hours is a pretext.

Espinoza testified that the work hours were reduced in Newark because the workers were
30   finishing the project.  However, he also testified that the needed work at the Newark jobsite was not completed and continued until September 2022 (during this proceeding).  He testified that the Newark jobsite was a major project and there was pressure to complete the job, especially because of the delays due to the COVID-19 pandemic (Tr. 905).  As such, there was more than sufficient work for the employees without having to reduced their hours.  In addition, I find that
35   Rivera credibly testified that the two workers who had supported the employer, Diego Avia Vincenzo and Segundo Sarango, were initially assigned to Newark from Nutley but they were then subsequently reassigned to other jobsites and received higher wages and overtime work when they were the reassigned.  Espinoza also testified that during the spring, IBN had several jobsites, the primarily ones being Newark, West Orange, Patterson, and Kearney.  Espinoza
40   testified that the Patterson jobsite had eight or nine workers doing mason and labor work for townhomes and that West Orange was a major jobsite with 15 workers performing various concrete work.  Espinoza believed that the remaining Nutley workers probably went to the West Orange jobsite because that was a major demolition site (Tr. 896–900).  Obviously there was plenty of work to go around for the employees and I find suspicious that only those identified as
45   supporting the Union was sent to Newark and the ones remaining with Foreman Macas were sent to a major jobsite in West Orange.  Finally, Espinoza identified that there were three foremen at

IBN, namely as Angel Macas, Jorge Rodriguez and Jacek Mioduszewski (Tr. 721).  There has been no unfair labor practice  allegations made against foreman Mioduszewski.  This is telling because the workers who had their work hours reduced only accused Foremen Rodriguez and Macas of antiunion animus.

5

Taken in the context of the Respondent's coercive conduct and comment from the moment Espinoza knew of the Union organizing campaign in early spring 2021, it is clear that the Respondent was sending a message that other workers engaged in union activity could encounter a similar reduction of work hours. See *Dynasteel Corp.*, 346 NLRB 86, 88 (2005)

10   (animus demonstrated by other contemporaneous unlawful conduct).  Based on such extensive antiunion animus, the suspicious timing of the reduced work hours, Espinoza's reaction to the Union organizing campaign, and the lack of a legitimate explanation for the sudden implementation of the reduced hours once the Union supported workers arrived at the Newark jobsite, and the overwhelming circumstantial evidence established by testimony of the workers, I

15   find that the decision to reduce the work hours was unlawfully motivated.  The Respondent also failed to meet its *Wright Line* burden to show that the reduced hours would have occurred even in the absence of union activity.

Based on the Respondent's extensive union animus and the lack of a legitimate
20   explanation as to why certain employees experienced reductions in hours, I infer that the reduced work hours were unlawfully motivated.  Accordingly, the Respondent discriminated against the bargaining unit employees who had their work hours reduced because they engaged in union activity and the Respondent had knowledge of such activity.  *Somerset and Valley Rehabilitation and Nursing Center*, 358 NLRB 1361, 1363–1364 (2012) (unlawful for an employer to reduce

25   employees' hours of work if the action was motivated by union animus.  Under the circumstances, the Respondent violated Section 8(a)(3) and (1) of the Act.

b.   Assigning More Onerous Work to Nelson Benitez did not
Violate Section 8(a)(3) and (1) of the Act

30

Paragraph 12(b) of the amended complaint alleges that about April 2021, the Respondent altered employee job assignments in violation of Section 8(a)(3) and (1) of the Act (GC Exh. 1(h)).  The only employee identified by the General Counsel that had his job assignment altered was Nelson Benitez (Benitez).  The General Counsel alleges that Benitez was assigned more

35   onerous and rigorous work because he was allegedly known as the Union's lead organizer by IBN (GC Br. at 53).

Benitez was a machine operator and has been employed with IBN at the Newark jobsite since 2016.  Benitez resigned working at IBN in November.  He testified leaving the company
40   because he was being intimidated and retaliated against by Rodriguez and Espinoza because he supported the Union.[41]  He also complained about his work assignment was altered and his hours were reduced (Tr. 544, 545).

---

[41] The General Counsel did not allege that Benitez was constructively discharged and the record was not fully developed to determine the validity of this claim.

Benitez recalled a group meeting on about April 9 with Espinoza at the Newark jobsite. Benitez said that his brother, Francisco, was with him and that supervisor Rodriguez was with Espinoza. Espinoza asked if Benitez signed the authorization card. Benitez replied, "yes." Espinoza told them there was no future with the Union (Tr. 548, 549).

5

Benitez testified that there was a second meeting called by supervisor Rodriguez on April 29. Benitez said that Espinoza was at this meeting. He did not recall if there were other workers around. Benitez stated that earlier on the same day, he was putting his tools away with his brother, Francisco Benitez, when Espinoza appeared. According to Benitez, Espinoza

10 approached Benitez and stated to him that "I know you are the head of all this shit. That you need to stop ruining the heads of the rest of the workers." Benitez asked how he knew and Espinoza responded that the Union has its people and he has his people to report back to him (Tr. 549–554, 562, 563, 565, 566).

15 Benitez complained that shortly thereafter, his work duties and hours were changed. Benitez performed mostly motorized machinery work but was now instructed to do demolition work by hand. He insisted that he rarely performed demolition work prior to April. His work hours were reduced in late April when he used to work nine to 11 hours, he was only working eight hours from Monday to Friday. He stopped working on Saturdays and was sent home when

20 during inclement weather (Tr. 554–556, 567).[42]

Foreman Rodriguez testified that he supervised Benitez. Rodriguez said that Benitez operated a small fork lifter (Bobcat) at the Newark jobsite. The Bobcat was used 80 percent of the time to demolish the exterior walls whereas the jackhammers were used 80 percent to demolish the interior walls of the building (Tr. 815–817). Rodriguez said that Benitez' work

25 duties changed towards the end of April because the workers started to demolish the first floor and a Bobcat was not needed for the interior walls. Benitez then started using a jackhammer to demolish the inside walls (Tr. 817, 838, 839).

Espinoza responded that Benitez simply did not return to work and not because his job

30 was altered or his work hours reduced. Specifically with regard to the altered job assignment, Espinoza denied that Benitez was removed as the Bobcat driver because of his union support. Espinoza repeated in testimony that there was less work on the Bobcat during the latter stages of the Newark project by early April. Espinoza stated that the removal of the exterior walls with the Bobcat was now at 10 percent. Espinoza also insisted that Benitez was not the exclusive

35 driver of the Bobcat and that his primary duties were as a laborer (Tr. 15, 16).

I find the testimony of Rodriguez and Espinoza credible on this issue.[43] First, the Newark jobsite was at another phase of the operation by April and the exterior walls were completely or almost fully demolished. The employees then started performing work on the interior walls and

40 the floors. As a consequence, there was less of a need for mini-motorized equipment, like a Bobcat, to demolish and remove debris. Espinoza and Rodriguez consistently testified that work

---

[42] The reduction of the worker's hours is discussed above.

[43] In finding that they were credible does not mean that Espinoza and Rodriguez were credible throughout their testimony. Credibility findings need not be an all or nothing proposition-indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness' testimony. *Daikichi Sushi*, above.

with the Bobcat was at 80 percent when the exterior walls were being demolished and the use of the Bobcat was reduced to less than 20 percent by April.  To find work for Benitez, he started to use the jackhammer and other hand-held equipment to demolish the interior walls.  Second, what is critical is that all the workers testifying at this proceeding stated that they were laborers.[44]

5   Only Benitez testified that he drove a motorized cab.  However, he also testified that he did laborer's work like the others, as evidenced by him retrieving his tools with his brother every morning.  Also of significance is that there are no job classifications for any of the workers according to the credible testimony of Dayana Coello.  As such, Benitez cannot credibly argue that he was hired only as a cabdriver as opposed to being a laborer.  Finally, and equally as

10   critical, Benitez did not testify that he observed and did not name any of the workers who replaced him as the driver of the cab, although he was present during the demolition of the interior walls.  At the minimal, that would at least give his testimony some credibility that his job was altered and he was replaced by another work in his former position as a cab driver.

15   Upon my review and consideration, I recommend the dismissal of this allegation as stated in paragraph 12(b) of the amended complaint.

c.   The Discharge of Jose Patricio Pereira and Francisco Martinez
Violated Section 8(a)(3) and (1) of the Act

20

Paragraph 12(c) of the amended complaint alleges that about May 2021, Respondent discharged employees Jose Patricio Pereira and Francisco Martinez in violation of Section 8(a)(3) and (1) of the Act (GC Exh. 1(h)).

25   Jose Pereira (Pereira) was a laborer with IBN for 11 years and was discharge in May while working at the Newark jobsite (Tr. 360, 361).  Pereira testified that he was not informed by IBN to update his address for the ballot voting.  Pereira had used his former address for receipt of the voting ballot because he was fearful that IBN would abscond with his ballot. Pereira testified that Simbana gave him a ballot when he did not receive a ballot at his old address (Tr.

30   405, 406).

Pereira testified that he was with a group of workers at the Newark jobsite discussing about the Union when Rodriguez told them that they were crazy (to join the Union) and that the workers needed their paper. Pereira said this comment occurred in March, but that Rodriguez

35   would always make that comment, usually one or at most, two workers (Tr. 367–369).  Pereira recalled another occasion in a meeting with Espinoza on April 29 in a group at the Newark jobsite.  Pereira said that Espinoza repeated that the workers needed papers to join the Union and that they were crazy to support the Union.  Pereira did not recall anything else was said by Espinoza. Pereira believed that 12 to 14 workers heard the remarks (Tr. 369, 370, 386).

40

In another meeting called by Espinoza in May, Espinoza commented that he knew the workers at the Newark jobsite were in support of the union.  Pereira recalled that Espinoza was handing out flyers and that 12 to 14 workers were present for his comments (Tr. 374–378).  He also recalled Espinoza threatening to file a lawsuit against the workers. He recalled this was said

45   once by Espinoza.  He did not recall when this comment was made but specifically testified

---

[44] Luis Jimenez testified that he was a driver and a laborer.

Espinoza said "…because of the union, he would do a lawsuit on the person that was organizing the union" (Tr. 390, 391).

5   Pereira complained that soon afterwards, his work hours at the Newark jobsite were reduced by IBN.  He testified working 9 or 10 hours per day when the Union was organizing but after the meetings with Espinoza, his hours were reduced to 8 hours per day from Monday to Friday and no work on Saturday.  Pereira recalled generally talking about the reduced hours with his coworkers and Rodriguez overheard the remarks.  Pereira said that Rodriguez told the group that "…you guys asked for it, you guys were asking for it, that's why the hours were cut."

10  Pereira did not recall when this comment was made by Rodriguez but did recall that it was in 2021 and that workers Melvin Garcia, Juan Alvarez and Javier Perrira were in this group discussion (Tr. 370–374, 385).

Pereira was discharged by IBN in May.  Pereira was told by Espinoza by a phone text that there was no work.  Pereira denied that he disrespected Espinoza.  Pereira's last work day
15  was on a Saturday, May 1.  Pereira testified that he only missed 2 or 3 days of work but the record is clear that he did not work from Monday through Friday of the following week due to an illness.  Pereira also admitted that he never called his supervisors or Espinoza that he was not coming to work.  He admitted not getting permission to miss work and did not call IBN of his absence until May 9.  Pereira believed he was terminated due to his support for the Union (Tr.
20  378–382; 398).

Foreman Rodriguez testified that he knows Pereira as a laborer under his supervisor.  He asserted that Pereira was discharged after he failed to report to work after 5 days.  He believed this occurred in May.  Rodriguez could not remember the dates in May, but believed that the last day Pereira worked was on a Saturday.  He testified that Pereira then missed work from Monday
25  through Friday of the following week.  Rodriguez said that Pereira never called him to report his absence.  He is not aware if Pereira had contacted another supervisor about his absence (Tr. 813, 814).  Rodriguez testified that when he visited the yard after the 5 days, he informed Espinoza that Pereira had not signed in for work.  He is not aware of any other worker who had missed 5 days of work without permission (Tr. 835, 836).

30  Francisco Martinez (Martinez) was a laborer with IBN since July 2019.  He performed demolition work at the Newark jobsite.  Martinez testified that Angel Macas was his supervisor at the Nutley jobsite (Tr. 646–649).  Simbana testified that Martinez signed the card at the Nutley jobsite and observed that supervisor Macas was present, as well as worker Segundo Sarango.
35  Macas asked Simbana why he was on the jobsite.  Simbana testified that he told Macas that he wanted to talk with the workers during their lunch period.  Simbana started to talk with Martinez and told him the purpose of the card.  Simbana believed that Macas was present when Martinez signed the card.  Simbana testified that Macas was angry because he started to make frenetic phone calls in his presence (Tr. 128–130).

40  Martinez was discharged from his job approximately 2 months after signing his union card on March 18.  Martinez testified that after completing the day's work at the Nutley jobsite, he was told to go home (Tr. 652).  Martinez said that the work was completed at the Nutley jobsite. He did not recall if the other workers were also told to go home  (Tr. 656, 657).
45  Martinez said that Macas told him that owner Espinoza will call him (Martinez).  Martinez

testified that he waited for Espinoza to call him.  He said he waited a week but never received a call from Espinoza.  He then decided to visit the IBN yard (Tr. 653, 654).  When he arrived at the yard, he spoke to Espinoza.  He said that Espinoza started the conversation by telling him there was no work for him.  Martinez did not say anything to Espinoza and apparently, left the area
5     (Tr. 654, 655).

Foreman Macas testified that Martinez stop working for IBN on March 21.  Macas did not recall the last day that Martinez had worked, but recalled the work assignment ended on a Friday.  Macas testified that he told Martinez to report to work on Monday at the IBN yard.
10    Macas stayed behind with four other works to finish the miscellaneous aspects of the jobsite. Macas testified that Martinez and the rest of the workers were told to report to work at the yard on Monday (Tr. 792, 793).

Espinoza testified that Pereira and Martinez were discharged for failing to report for work
15    after 5 days and for not contacting himself or a supervisor for their absences.  Espinoza testified that Pereira's last day that he had worked was on a Friday.  Espinoza testified that Pereira did not call his supervisor, Rodriguez, on the following Monday or Tuesday.  Espinoza stated that on Wednesday (of the same week), he was having lunch in a Newark restaurant and observed Pereira walking by through the restaurant window.  Espinoza said that Pereira was approximately
20    15 feet away on the street.  Espinoza then contacted Rodriguez and was told that Pereira had not been at work.  Espinoza testified that he never spoke to Pereira and was not in contact with him until Sunday night of that week.  Espinoza said he received a text from Pereira asking if he could return to work.  Espinoza replied "no" because he missed 5 days of work and never contacted any foreman or himself until Sunday night.  Espinoza did not ask Pereira at the time the reasons
25    Pereira had missed work (Tr. 867–871, 932, 933). With regard to Martinez, he was simply told by Espinoza that there was no work for him when Martinez appeared at the IBN yard looking for work after his absence.

Where the employer's motive for its action against an employee is alleged to be on
30    account of the employee's union, concerted or protected activity, the appropriate analysis is provided by *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). See *Auto Nations, Inc.*, 360 NLRB 1298, 1301 (2014), enfd. 801 F.3d 767 (7th Cir 2015).  As noted above, under *Wright Line*, the General Counsel has the burden of  establishing that the employee's protected activity was a motivating factor in the adverse
35    employment action. The elements commonly required to support such a showing are union or other protected activity by the employee, employer knowledge of that activity, and antiunion animus on the part of the employer.  *East End Bus Lines, Inc.*, 366 NLRB No. 180 (2018), slip op. at 1; see *Allstate Power Vac., Inc.*, 357 NLRB 344, 346 (2011), citing *Willamette Industries*, 341 NLRB 560, 562 (2004); see also *Austal USA, LLC*, 356 NLRB 363, 363 (2010).
40
Once the General Counsel makes that showing, the burden of persuasion "shift[s] to the employer to demonstrate that the same action would have been taken even in the absence of the protected conduct." *East End Bus Lines, Inc.*, above, slip op. at 1; *Allstate Power Vac.*, above at 346 (quoting *Donaldson Bros. Ready Mix, Inc.*, 341 NLRB 958, 961 (2004); see also *Austal*
45    *USA*, above at 364. To establish this affirmative defense, "An employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the

same action would have taken place even in the absence of the protected activity." *Consolidated Bus Transit*, 350 NLRB 1064, 1066 (2007), quoting *W. F. Bolin Co.*, 311 NLRB 1118, 1119 (1993).

5        I find that the counsel for the General Counsel met her burden to establish that the protected activity in support of the Union was a motivating factor for the discharge of Pereira and Martinez. Here, the General Counsel has shown that Macas, Rodriguez and Espinoza were well aware of the discharged workers' support for the Union. Macas was present when Martinez signed his union card at the Nutley jobsite and immediately started to make phone calls.
10  Rodriguez and Espinoza both mistakenly stated that immigration papers were required to join the Union to Pereira and other workers at the Newark jobsite. As noted above, such comments are inappropriate as they are implicitly threats to report the workers to immigration officials.

15      Discriminatory motive of the adverse employment action taken may be established in several ways including through statements of animus directed to the employee or about the employee's protected activities, *Austal USA, LLC,* above, at 363; the timing between discovery of the employee's protected activities and the discipline, *Traction Wholesale Center Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000); evidence that the employer's asserted reason for the
20  employee's discipline was pretextual, such as disparate treatment of the employee, shifting explanations provided for the adverse action, failure to investigate whether the employee engaged in the alleged misconduct, or providing a nondiscriminatory explanation that defies logic or is clearly baseless, *Lucky Cab Co.*, 360 NLRB 271 (2014); *ManorCare Health Services – Easton,* 356 NLRB 202, 204 (2010); *Greco & Haines, Inc.,* 306 NLRB 634, 634 (1992); *Wright Line*, 251 NLRB at 1088 fn. 12, citing *Shattuck Denn Mining Co. v. NLRB*, 362 F.2d 466,
25  470 (9th Cir. 1966); *Cincinnati Truck Center*, 315 NLRB 554, 556–557 (1994), enfd. Sub nom. *NLRB v. Transmart, Inc.*, 117 F.3d 1421 (6th Cir. 1997)).

      Animus can be inferred from the relatively close timing between an employee's protected concerted activity and his discipline. *Corn Brothers, Inc.*, 262 NLRB 320, 325 (1982) (timing of
30  discharge within a week of union organizing meeting evidence of antiunion animus); *Sears Roebuck & Co*., 337 NLRB 443, 451(2002) (timing of discharge, several weeks after employer learned of protected concerted activities, indicative of retaliatory motive).

      I find that the timing of the two discharges during the union organizing campaign
35  establishes a discriminatory animus. Here, Pereira was discharged in May and Martinez discharged in March. The Union organizing was ongoing since early December 2020 and continued through 2021. Martinez' discharge in March was when the Union campaign was starting and Macas made phone calls that Martinez was talking to Simbana after Martinez had signed his union card. Pereira's discharge in May was particularly glaring because the Union
40  shortly, thereafter, withdrew its' representative petition and the election was cancelled towards the end of May. Indeed, "timing alone may be sufficient to establish that union animus was a motivating factor in a discharge decision." *Sawyer of NAPA,* 300 NLRB 131, 150 (1990); *NLRB v. Rain-Ware,* 732 F.2d 1349, 1354 (7th Cir. 1084); *NLRB v. Windsor Industries,* 730 F.2d 860, 864 (2d Cir. 1984); *Manor Care Health Services—Easton,* 356 NLRB 202, 204, 226 (2010)
45  (Proximity in time between discriminatee's union activity and discharge supports finding of unlawful motivation for the termination); *LaGloria Oil & Gas,* 337 NLRB 1120, 1123, 1132

(2002). ("Discharge shortly after Employer learned of employee's union activities, strongly supports a finding that discharge motivated by union animus").

     I also find additional antiunion animus was demonstrated in the conversation between
5  Ulises Fuentes and Espinoza.  Fuentes testified that he know Melvin Garcia and that he was discharged by IBN.  Fuentes recalled that he was having lunch with supervisor Rodriguez (because of their friendship) at a restaurant when Espinoza and his brother entered the restaurant. Fuentes testified that it was just a coincidence that the Espinoza brothers were having lunch at the same time.  Fuentes raised with Espinoza about returning Garcia to work.  According to
10  Garcia, Espinoza replied that if he takes Garcia back, then Jose Pereira would also want his job back (Tr. 497–500, 501, 502).  Espinoza recalled that worker Fuentes asked him if he was willing to take back Garcia after he was discharged.  Espinoza told Fuentes (Tr. 5 at supplemental transcript to Vol. 10) that,

15         I responded saying that if I were to return him to work then I would have to return all of them to work, and it would be beyond the lack of respect for me to have them miss and then come back.

     I find it was not a lack of respect that Espinoza was concerned about.  It was his concern
20  over the rehiring Garcia, Pereira and Martinez as workers who had supported the Union.

     In addition to find there was antiunion animus based upon the proximity in time between the union activity of Martinez and Pereira and their discharged, there was shifting explanations for their discharge that I find as not credible and was pretextual.
25

     Espinoza admitted that Martinez did not show for work for 5 days in March and not on January 23, 2021, as reflected in the list of employees (GC Exh. 7).  Espinoza stated that the January 23 date was incorrect (Tr. 892).  Martinez testified that he was told by foreman Macas that Espinoza will call him about work.  I find that Martinez credibly testified that he was told by
30  Macas that Espinoza would call or text him for work.  Martinez simply waited 5 days for a message to report to work.  When he did not receive a message to report, he appeared at the IBN yard seeking work.  Upon meeting Espinoza at the yard, Martinez was told there was no work. Obviously, there was plenty of work for the laborers and Martinez.  Espinoza testified that workers were needed in West Orange, Patterson, Kearny, as well as at the Newark jobsite.  Thus,
35  it is not clear if Espinoza informed Martinez that there was no work for him due to his unreported absence.  Martinez testified that he was simply told there was no work.

     With regards to Pereira, he was had been employed by IBN for 11 years.  Pereira testified that he was sick from Monday to Friday.  Admittedly, he did not report his illness to Espinoza or
40  to Rodriguez.  However, there is no documented evidence that Pereira had previously been absent without notice to the employer and was subjected to prior discipline.  It is alleged that Pereira was seen by Espinoza walking on the sidewalk near a restaurant that Espinoza just happened to be eating lunch on Tuesday of that same week.  Espinoza testified that he called Rodriguez if Pereira was at work and received a reply from Rodriguez that Pereira was not at
45  work.  However, Rodriguez never testified that he received a call from Espinoza on that Tuesday (or Wednesday).  Rodriguez testified that he visited the IBN yard on Friday and informed

Espinoza that Pereira had not reported to work.  I find that it was not credible that Espinoza observed Pereira walking on the sidewalk on Tuesday when Rodriguez never testified he received such a call and that, according to Rodriguez, he first informed Espinoza of Pereira's absence 5 days later at the yard.

5

     Nelson Benitez was aware that Francisco Martinez and Jose Pereira were terminated.  He knew them from working at the Newark jobsite.  Benitez said that they both informed him that they were been "dumped" by IBN.  Benitez recalled that both were replaced by two different workers.  He believed they were new workers and had not previously been employed by IBN

10 (Tr. 556–559, 569).  I find Benitez' testimony as credible, especially since there is no documentation as to the reason for the discharge of Martinez and Pereira.  Dayana Coello, who was responsible for searching for personnel records pursuant to the General Counsel's subpoena, testified that IBN does not keep such personnel records.

15      Further, Espinoza confirmed that there was no company policy on discharging a worker.  He stated that a worker missing 5 days of work without an excuse and notice to his supervisor is considered an abandonment of his job and can be discharged.  He insisted that workers are verbally told to report to text or call him if they will miss a work day.  He said that there is nothing in writing of this policy.  Espinoza noted that the company also do not keep records of

20 workers being absent from work, their disciplinary records or of their work schedules (Tr. 933, 944, 945).  I find that managing employees' work schedules and absences in such a manner, where there is no written policy; that there is an assumption that the workers knew that absences for 1 or 2 days was fine without notice to a supervisor, but 5 days absences without notice was not; or that workers knew they allowed to verbally text or call in that they miss a day of work,

25 but they would be discharged if they missed 5 days; tend to lead to subjective discretion and arbitrary decisions by management to dismiss workers for their union activity without the accountability of documentation for the discharges.

     Not giving the workers an opportunity to explain their absences supports the position that

30 the Respondent wanted to eliminate union supporters with vague reasons.  Pereira was not asked whether he was too ill to notify Espinoza of his absence.  Martinez was not told at the time of his appearance at the yard how he disrespected Espinoza.  He was simply told there was no work, which was a pretextual excuse.  See, *Lucky Cab Co.*, 360 NLRB 271, 274 fn. 13 (2014) (denying discharged employees the opportunity to explain their alleged misconduct is evidence of pretext);

35 *Alstyle Apparel*, 351 NLRB 1287, 1288 (2007) (decision to discharge employees before giving them an opportunity to explain the allegations against them supports a finding the discharges were discriminatorily motivated and not based upon a reasonable belief of misconduct).  The totality of circumstances here demonstrates that the protected and union activities engaged in by Pereira and Martinez was a motivating factor in the Respondent's decision to terminate them in

40 the midst of an ongoing union campaign and a pending election vote.  See *Cardinal Home Products*, 338 NLRB 1004, 1010 (2013).  In these circumstances, the Respondent unlawfully discriminated against Pereira and Martinez in violation of Section 8(a)(3) and (1).

     Accordingly, I find that the reasons for the discharge of Pereira and Martinez were due to

45 the Respondent's antiunion animus against workers who had supported the Union and further,

that the reasons were pretextual and false even in the absence of their union activity.

## The General Counsel Request for a Gissel Bargaining Order

5      The General Counsel's request for an order granting the extraordinary remedy of a bargaining order designating the Union as the legal representative of Company's employees must be analyzed under *NLRB v. Gissel Packing Co*., 395 U.S.575, 610.  In *Gissel*, the Supreme Court held that a bargaining order is warranted when "an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside." Id. The traditional remedy
10   for unfair labor practices is to hold an election once the atmosphere has been cleared of past misconduct; a bargaining order thus is an extraordinary remedy applied when it is unlikely that the atmosphere can be cleansed. *Aqua Cool*, 332 NLRB 95, 97 (2000). The issuance of a bargaining order seeks to balance the rights of employees who favor unionization, and whose majority strength has been undermined by the employer's unfair labor practices, against the
15   rights of those employees opposing the union who may choose to file a decertification petition at the appropriate time pursuant to Section 9(c)(1). See *Overnite Transportation Co.*, 329 NLRB 990, 990, 996 (1999).

20      In *Gissel*, the Supreme Court identified two categories of employer misconduct that warrant imposition of a bargaining order. Category I cases are "exceptional" and "marked by 'outrageous' and 'pervasive' unfair labor practices." 395 U.S. at 613. Consideration of a bargaining order examines the nature and pervasiveness of the employer's practices. *Holly Farms Corp.*, 311 NLRB 273, 281 (1993) (citing *FJN Mfg*., 305 NLRB 656, 657 (1991).
25   Category II cases are "less extraordinary" and marked by less pervasive practices which nonetheless still tend to undermine majority strength and impede the election processes." Id. at 614. In category II cases, the "possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight and . . . employee sentiment once expressed through cards would, on balance, be better protected by a bargaining
30   order." Id. at 614–615; see also *California Gas Transport*, 347 NLRB 1314, 1323 (2006), enfd. 507 F.3d 847 (5th Cir. 2007).

35      In considering the impact of the unfair labor practice violations, it is evident that the traditional Board remedies—a rerun of the election, a cease and desist order, and a notice posting—would be insufficient under the circumstances. The aforementioned 8(a)(3) and (1) violations constituted overwhelming evidence of conduct by the Respondent during the 5 months leading up to the election which eroded the ideal conditions necessary to facilitate the free choice of employees and determine their uninhibited desires. *Jensen Enterprises*, 339 NLRB 877 (2003); *Robert Orr-Sysco Food Servs.,* 338 NLRB 614 (2002) (narrowness of the vote is a
40   factor); *Clark Equipment Co*., 278 NLRB 498, 505 (1986) (factors include the number of violations, their severity, the extent of dissemination, the size of the unit and other relevant factors); *Playskool Mfg. Co.*, 140 NLRB 1417 (1963); *General Shoe Corp.,* 77 NLRB 124 (1948).

45      The New Jersey Building Laborers District Council representation petition was initially filed on May 20, 2021, was based upon the Union obtaining a majority support by May 1.

Simbana testified extensively on how he solicited union authorization cards from the workers. His testimony was largely unrebutted by the Respondent.  Simbana  testified on obtaining 27 union authorization cards based upon the names on the Excelsior voter list.  He then obtained 15 additional authorization cards signed by workers not named on the *Excelsior* list.  Simbana
5     ensured that the additional workers were actually employees of the Respondent.  The 15 additional workers as employees of IBN  had not been largely disputed by the Respondent.  The voter list also included Macas and Rodriguez who were ineligible to vote because of their supervisory status.  Based upon a motion by the General Counsel to amend and correct the number of signed authorization cards, the Union actually obtained a majority support with 25
10    and not 27 out of the 49 employees in the voting unit, a razor-thin majority.

The IBN workers testified extensively to unfair labor practice violations, to include interrogations, threats in reporting their status to immigration officials, threats of termination, threats of lawsuits, the futility of joining a union, their reduced hours of work because they
15    supported the Union, discharges, a wage increase for a worker to not support the Union, and the interference with the ballot voting.  Simbana testified that only five or six workers attended a Union sponsored barbeque party on June 20 even though he invited over 15 workers (Tr. 177). He testified that Jimenez informed him that that the workers did not want to come because they were scared, their work hours reduced, and not given as much work (Tr. 180).  Simbana also
20    testified that he invited 10 workers to a meeting at the union office in October and only 5 or 6 workers were in attendance.  Jimenez again informed Simbana that the workers did not want to come they were afraid of losing their jobs. He was told that the workers were not getting work, hours being cut and they will lose jobs when the jobsite work was completed  (Tr. 181, 182).

25    The relevant inquiry here, where the Union had a card majority at the time it filed a representation petition, warrants a *Gissel* Category II analysis based on the "'seriousness of the violations and the pervasive nature of the conduct, considering such factors as the number of employees directly affected by the violations, the size of the unit, the extent of the dissemination among employees, and the identity and position of the individuals committing the unfair labor
30    practices.'" *Hogan Transports, Inc*., 363 NLRB 1980, 1986 (2016) (quoting *Intermet Stevensville*, 350 NLRB 1349, 1359 (2007)).

From January until the representative petition was withdrawn by the Union, the Respondent committed numerous  unfair labor practices and made it extremely unlikely that a
35    fair rerun of the election could ever be held.  See *California Gas Transport, Inc.*, 347 NLRB 1314 (2006), enfd. 507 F.3d 847 (3d Cir. 2007) (interaction between unit and non-unit employees meant discharges of non-unit employees would have lasting impact on unit employees). The Respondent's conduct after the withdrawal of the petition is also relevant in considering whether the holding of a fair election in the future is possible. See *Alumbaugh Coal
40    Corp.*, 247 NLRB 895, 914 fn. 41 (1980), enfd. in pert. part 635 F.2d 1380 (8th Cir. 1980) (in determining whether a Gissel bargaining order is appropriate, the Board reviews all the unfair labor practices committed by the respondent, not just those committed during the critical period). These violations include: the antiunion animus exhibited by Freddy Espinoza calling Rivera "Judas" and wishing bad things on the company resulting in a letter of apology by the
45    Respondent; the continuing fear of reprisal by the Respondent as demonstrated by their reluctance to attend union functions; the continued refusal to take back the fired employees

because the Respondent did not want to rehire workers who had supported the Union; and the wage increase for Jimenez several months after the Union withdrew its petition, are in fact the very type of "hallmark violations" that require a bargaining order to appropriately remedy. *Evergreen America Corp.*, 348 NLRB 178, 180 (2006), enfd. 531 F.3d 321 (4th Cir 2008)
5   (granting of wage increase a hallmark violation).

Hallmark violations can justify a finding, without extensive explanation, that they will have a lasting negative and coercive effect on the workforce and remain in the memory of employees for a long time. Id; see also *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 40
10   822 (4th Cir. 1990).  The incursion of the Respondent's owner to personally disseminate his coercive message against the Union through interrogation, surveillance; threats and accusations against employees was likely left a lasting impact as to the importance of voting against representation.  See *Michael's Printing, Inc.*, 337 NLRB 860, 861 (2002) (employees are unlikely to forget employer's antiunion stance when direct highest level of management directly
15   involves them in the commission of unfair labor practices).  Finally, the Union's razor-thin majority obtained, the additional 15 workers who had signed union cards but their names were not on the Excelsior list and the credible testimony provided by Simbana of the decline of workers participating in union events strongly suggests that the Respondent's unfair labor practices had their intended effect that a traditional remedial order to re-run the election would
20   be fruitless and that the Respondent's unlawful conduct will likely continue..

Under the circumstances, the General Counsel has met all the factors in a *Gissel* Category II analysis and a *Gissel* bargaining order is warranted as the Respondent's extensive and pervasive antiunion campaign resulted in ultimately, the Union's withdrawal of its representative
25   petition.

CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section
30   2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. The Respondent violated Section 8(a)(1) of the Act by
35

(a) Engaging in surveillance of employees who were talking with the Union thereby giving an impression among the employees that their union activities were under surveillance;

(b) Informing the employees of the futility with the Union as their bargaining
40   presentative;  Promising employees increased benefits and improved terms and conditions of employment in response to union activity.

(c) Threatened to discharge employees because of their support for the Union;

45   (d) Threatened to file a lawsuit against employees for their support for the Union;

78

JD(NY)-05-23

(e) Threatened the immigration status of the employees because of their support for the Union;

(f) Interrogated employees about their Union sympathies, membership and activities;

5

(g) Accused an employee of being a Union supporter and thereby created an impression among its employees that their union activities were under surveillance;

(h) Engaged in surveillance of the employee's protected concerted activities by instructing the employee to cast his official NLRB mail ballot in the presence of the Respondent;

10

(i) Implicitly promising an employee a wage increase if the Union lost the election;

(j) Threatened employees with a reduction in pay because of their union activities;

15

(k) Informed employees that Respondent knew who had signed Union authorization cards and thereby creating an impression among employees that their union activities were under surveillance by the Respondent;

(l) Instructed an employee to photograph his official NLRB mail ballot thereby engaged in surveillance of the employees' protected concerted union activities; and,

20

(m) Coercively interfered with an employee's official NLRB mail ballot election and engaged in surveillance of employees' protected concerted union activities.

25

4. Respondent violated Section 8(a)(3) and (1) of the Act, by engaging in the following conduct

(a) Reduced employees' work hours;

30

(b) Discharged Jose Patricio Pereira and Francisco Martinez

5. The Respondent's unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

35

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

40

The Respondent, having discriminatorily discharged employees Jose Patricio Pereira and Francisco Martinez, must offer them reinstatement and make them whole for any loss of earnings and other benefits. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest at the rate prescribed in *New Horizons,* 283 NLRB 1173

45

79

JD(NY)-05-23

(1987), compounded daily as prescribed in *Kentucky River Medical Center,* 356 NLRB No. 8 (2010).

5     The Respondent shall also make whole employees Nelson Danilo Molina, Jose Patricio Pereira, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all unit employees affected by the unlawful reduction of their hours of work, on and after April 1, 2021, and continuing, in the manner prescribed in *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), plus interest as set forth in 5 *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra, for

10    the consequential harm they incurred as a result of Respondent's unlawful conduct.

     Further, the Respondent shall also be ordered to compensate Jose Patricio Pereira and Francisco Martinez, for their unlawful discharge, and Nelson Danilo Molina, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Jose Patricio Pereira, Nelson

15    Benitez, and all unit employees affected by their reduced work hours for the adverse tax consequences, if any, of receiving a lump-sum backpay award and to file with the Regional Director for Region 22, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s). *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016).  In addition, the Respondent is

20    ordered to file with the Regional Director for Region 22 a copy of their corresponding W-2 form(s) reflecting the back-pay awards. *Cascades Containerboard Packaging—Niagara*, 370 NLRB No. 76 (2021).

     Further, in accordance with the Board's decision in *Thryv, Inc.*, 372 NLRB No. 22

25    (2022), the Respondent shall compensate the aforementioned discriminatees for any direct or foreseeable pecuniary harms incurred as a result of the unlawful adverse actions against them, including reasonable search-for-work and interim employment expenses, if any, regardless of whether these expenses exceed interim earnings. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New*

30    *Horizons,* supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

     The Order includes a bargaining order for the Respondent, requires it to bargain in good faith with the Union. Because of the Respondent's egregious and widespread misconduct demonstrating a general disregard for the employees' fundamental rights, I also find it necessary

35    to issue a broad Order requiring the Respondent to cease and desist from infringing in any other manner on rights guaranteed employees by Section 7 of the Act. *Hickmott Foods*, 242 NLRB 1357 (1979).

     Finally, because of the Respondent's numerous unfair labor practices, it shall be required

40    to take affirmative steps, including physically post the Notice to Employees and Explanation of Rights at all of its facilities and jobsites and require the Notice to be posted in English and Spanish; distribute the Notice in English and Spanish to employees by U.S. mail; hold a meeting(s) during working hours, scheduled to ensure the widest possible attendance of employees, at which the Notice will be read to employees in English and Spanish by Nelson

45    Martin Espinoza in the presence of a Board agent; alternatively, a Board agent will read the Notice to Employees and Explanation of Rights in English and Spanish during working hours in

the presence of Respondent's supervisors and agents as identified in paragraph 6 of the amended complaint; in either case, representatives of the Union must be permitted to attend all such readings; distribute the Notice to Employees and Explanation of Rights to all current and new supervisors and managers, and train employees, including supervisors and managers, both
5    current and new, on employees' rights under the Act and/or its compliance with the Board's Orders, by permitting a Board Agent to conduct said training; and grant reasonable access to the Union in nonwork areas during the employees' nonwork time.

10    On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[45]

ORDER

The Respondent, IBN Construction Corporation, its officers, agents, successors, and assigns,
15    shall

1. Cease and desist from

(a) Promising employees increased benefits and improved terms and conditions
20    of employment if they refrained from supporting the Union;

(b) Engaging in surveillance and/or creating the impression of surveillance of employees' union activities by the owner, supervisors and agents;

25    (c) Interrogating employees regarding their protected concerted and/or union activity;

(d) Threatening or implicitly threatening employees' immigration status;

(e) Reducing employees' work hours, work assignments, and other terms and conditions
30    of employment in retaliation for their Union support and to discourage support for the Union;

(f) Threatening employees with discharge for engaging in protected concerted activity;

(g) Threatening employees with lawsuits and other retaliating conduct to discourage
35    employee union support;

(h) Discharging employees because they engaged in union activities or because they support the union;

40    (i) Refusing to recognize and bargain with New Jersey Building Laborers District Council (the Union) as the exclusive collective-bargaining representative of the employees in the following appropriate unit:

---

[45] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

All full-time and regular part-time laborers employed by Respondent from its 49 Herman Street, Newark, New Jersey facility, excluding all office clerical employees, managers, guards, and supervisors as defined in the Act and all other employees. On or about May 1, 2021, a majority of the Unit designated the Union as their exclusive collective-bargaining representative.

(j) In any like or other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive representative of the employees in the above appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

1) commence bargaining with the Union as the collective-bargaining representative of the employees in the above appropriate unit, upon request, within 15 days of this Order;
2) bargain, upon request, for a minimum of 15 hours a week until an agreement or lawful impasse is reached or until the parties agree to a respite in bargaining; and,
3) prepare written bargaining process reports every 15 days and submit them to the Regional Director of Region 22 and serve them on the Union and provide the Union with an opportunity to reply.

(b) On request, restore all work hours that were reduced and rescind any terms and conditions of employment which the Respondent unlawfully implemented or unlawfully eliminated on or after April 1, 2021, but nothing in this Order is to be construed as requiring the Respondent to rescind any unilateral changes that benefited the unit employees without a request from the Union.

(c) Reinstate Jose Patricio Pereira and Francisco Martinez to their positions, or if that job no longer exists, to a substantially equivalent position, without prejudice to their seniority or any other rights and privileges previously enjoyed, and make them whole for any loss of wages and benefits they may have suffered as a result of their unlawful termination and, in the event a discharged discriminatee is unable to return to work, instate a qualified applicant of the Union's choice.

(d) Make whole employees Jose Patricio Pereira and Francisco Martinez, including but not limited to, by reimbursement for consequential harm they incurred as a result of Respondent's unlawful conduct.

(e) Make whole employees Nelson Danilo Molina, Jose Patricio Pereira, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all unit employees affected by the unlawful reduction in work hours, on and after April 1, 2021.

(f) Reimburse the discriminatees for reasonable consequential damages incurred by them as a result of the Respondent's unlawful conduct.

(g) Remove from all files any reference to the discharge of Jose Patricio Pereira and Francisco Martinez and notify them in writing that this has been done and that it will not be relied on for any future purpose.

(h) Compensate Jose Patricio Pereira, Francisco Martinez Nelson, Danilo Molina, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 22, within 21 days of the date the amount
5    of backpay is fixed, either by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a report allocating the backpay award to the appropriate calendar year(s) and a copy of the backpay recipient's corresponding W-2 form reflecting the backpay award.

(i) Preserve and, within 14 days of a request, or such additional time as the Regional
10   Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(j) Provide ongoing training of employees, including supervisors and managers, both
15   current and new, on employees' rights under the Act and compliance with the Board's Orders and by permitting a Board Agent to conduct said training.

(k) Physically post the Notice to Employees at all of Respondent's facilities and jobsites and distribute the Notice to Employees and the Board's Orders to current and new supervisors and manager. Copies of the notice, on forms provided by the Regional Director for Region 22,
20   after being signed by the Respondent's authorized representative, shall be posted by the Respondent immediately upon receipt and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, text messages, and/or other electronic means, if the
25   Respondent communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed a facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees
30   employed by the Respondent since April 1, 2021.

(l) Publish the Notice to Employees and Explanation of Rights in English and Spanish in two local publications of broad circulation and local appeal, chosen by the Regional Director, with publication to occur twice per week for a period to be determined by the Regional Director;

(m) Grant a Board Agent access to Respondent's facilities and to produce records so that
35   the Board Agent can determine whether Respondent has complied with posting, distribution, and mailing requirements.

(n) At a meeting or meetings scheduled to ensure the widest possible attendance, have Nelson Martin Espinoza read the Notice to Employees and an Explanation of Rights to employees employed by Respondent on work time in the presence of a Board agent, a
40   representative of the Union, or alternatively, have a Board agent read the Notice to Employees and an Explanation of Rights to employees employed by Respondent at Respondent's facilities and jobsites on work time in the presence of Nelson Martin Espinoza, and a representative of the Union.

(o) Provide the Union with notice of, and equal time and access to Respondent's
45   worksites in New Jersey, to respond to any Respondent meetings with employees about union

JD(NY)-05-23

representation and to grant reasonable access to the Union in nonwork areas during the
employees' nonwork time.

  (p) Within 21 days after service by the Region, file with the Regional Director for Region
22, a sworn certification of a responsible official on a form provided by the Region attesting to
5  the steps that the Respondent has taken to comply.

  (q) give the Union notice of, and equal time and access to Respondent's facility to
respond to any address made by Respondent to employees regarding the issue of union
representation;

  (r) reimburse the Union for expenses it incurred in organizing Respondent's employees;
10  and,

  (s) cease and desist from interfering with, restraining, or coercing employees in the
exercise of their rights under Section 7 of the Act in any manner.


  IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges
15  violations of the Act not specifically found.


Dated, Washington, D.C.  April 3, 2023

20


                                     *Kenneth W. Chu*
                                     Kenneth W. Chu
                                     Administrative Law Judge

25

**APPENDIX**
NOTICE TO EMPLOYEES
Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.
**WE WILL NOT** reduce your work hours, and other terms and conditions of employment in response to union activity.
**WE WILL NOT** promise you increased benefits and improved terms and conditions of employment in response to union activity.
**WE WILL NOT** engage in surveillance of you participating in union activity.
**WE WILL NOT** station the owner, foremen, supervisors, and agents in order to more closely supervise, monitor, or create the impression that your union activities are under surveillance.
**WE WILL NOT** interrogate you about your union sympathies, membership and activities.
**WE WILL NOT** interrogate you about your protected concerted activities.
**WE WILL NOT** threaten you and report your immigration status in retaliation for your support for the Union.
**WE WILL NOT** interfere with the Union as your exclusive collective-bargaining representative.
**WE WILL NOT** threaten you with discipline or reprisal for engaging in protected concerted activity.
**WE WILL NOT** fire you for your protected concerted activities.
**WE WILL NOT** threaten you with reprisal for engaging in union activity.
**WE WILL NOT** fire employees in response to union activity.
**WE WILL NOT** communicate to you of the futility of joining the Union or as your bargaining representative.
**WE WILL NOT** threaten to sue or reprise against you because of your union activity.
**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**WE WILL**, within 14 days from the date of the Board's Order, offer Jose Patricio and Francisco Martinez full reinstatement to their former jobs or, if their jobs no longer exist, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed. In the event that any of these employees are unable to return to work, **WE WILL** instate a qualified applicant of the Union's choice.

**WE WILL** make Jose Patricio and Francisco Martinez whole for any loss of earnings and benefits resulting from their unlawful discharges, less any interim earnings, plus interest.

**WE WILL** also make Jose Patricio and Francisco Martinez whole for reasonable search-for-work and interim employment expenses, plus interest.

**WE WILL** reimburse Jose Patricio and Francisco Martinez for any consequential harm they incurred as a result of their unlawful discharges.

**WE WILL**, within 14 days from the date of the Board's order, remove from our files any reference to the unlawful discharges of Jose Patricio and Francisco Martinez.

**WE WILL**, within 3 days thereafter, notify them in writing that this has been done and that the unlawful discharges will not be used against them in any way.

**WE WILL** make Nelson Danilo Molina, Jose Patricio Pereira, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all unit employees whole for any loss of earnings and benefits resulting from us reducing their work hours, less any interim earnings, plus interest.

**WE WILL** make whole Jose Patricio Pereira, Francisco Martinez, Nelson Danilo Molina, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all affected unit employees for any consequential harm they incurred as a result of the unlawful reduction of their work hours.

**WE WILL** compensate Nelson Danilo Molina, Jose Patricio Pereira, Francisco Martinez, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all affected unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and

**WE WILL** file with the Regional Director of Region 22, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar years.

**WE WILL** file with the Regional Director for Region 22, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, copies of corresponding W-2 forms reflecting the backpay award for  Jose Patricio Pereira, Francisco Martinez, Nelson Danilo Molina, Melvin Garcia, Bolivar Ivan Rivera, Harrison Lopes, Juan Alvares Camacho, Nelson Benitez, and all affected unit employees.

**WE WILL** provide ongoing training of employees, including supervisors and managers, both current and new, on employees' rights under the Act and compliance with the Board's Orders, and

**WE WILL** permit a Board Agent to conduct the training.

**WE WILL**, before implementing any changes in wages, hours, or other terms and conditions of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following bargaining units:

> All full-time and regular part-time laborers employed by Respondent from its 49 Herman Street, Newark, New Jersey facility, excluding all office clerical employees, managers, guards, and supervisors as defined in the Act and all other employees. On or about May 1, 2021, a majority of the Unit designated the Union as their exclusive collective-bargaining representative.

JD(NY)-05-23

## IBN CONSTRUCTION CORPORATION
(Employer)


Dated _____ By_____
(Representative) (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act.  It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions.  To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website: www.nlrb.gov.

National Labor Relations Board Region 22
20 Washington Place, 5th Floor
Newark, New Jersey 07102
Hours of Operation: 8:30 a.m. to 5 p.m.
973-645-2100

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/22-CA-277455 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, 212-264-0300.

Joanna Pagones Ross
Counsel for the Petitioner
National Labor Relations Board, Region 22
20 Washington Place, 5th Floor
Newark, New Jersey  07102
Telephone:  (862) 229-7037


**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

SUZANNE SULLIVAN,                          :
Regional Director of Region 22             :
of the National Labor Relations Board      :
For and on behalf of the                   :
National Labor Relations Board,            :
                                           :
        Petitioner,                     :
                                           :
        v.                              :      Civil No. 2:22-cv-05668
                                           :
IBN CONSTRUCTION CORP.,                    :
                                           :
                                           :
                                           :
        Respondent                     :
_____   :

## <u>CERTIFICATION OF SERVICE</u>

I certify that a copy of the Petitioner's Motion to Extend Order Granting Temporary Injunction After Issuance of the Administrative Law Judge's Decision was served on Respondent today, April 18, 2023, by electronic mail.

I further certify that Respondent, on March 30, 2023, consented to accept service by electronic mail. The foregoing Motion was served on Respondent as follows:

John R. Vreeland, Esq.
Jackson Lewis P.C.
200 Connell Drive, Suite 2000
Berkeley Heights, NJ 07922
John.Vreeland@jacksonlewis.com

/s/ Joanna Pagones Ross
Joanna Pagones Ross
Counsel for Petitioner